UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

MBIA INSURANCE CORPORATION,

                    Plaintiff,                  09 Civ. 3255

   -against-                             OPINION

PATRIARCH PARTNERS VIII, LLC, a
Delaware limited liability company,
and LD INVESTMENTS, LLC, a
Delaware limited liability company,

                    Defendants.

----------------------------------------X

A P P E A R A N C E S:

           Attorneys for Plaintiff

           BINGHAM MCCUTCHEN LLP
           399 Park Avenue
           New York, NY  10022-4689
           By:  Jeffrey Q. Smith, Esq.
                 Susan F. DiCicco, Esq.
                 Kevin J. Biron, Esq.

           Attorneys for Defendants

           BRUNE & RICHARD LLP
           One Battery Park Plaza
           New York, NY  10004
           By:  Charles A. Michael, Esq.
                 David Elbaum, Esq.
                 Hillary Richard, Esq.



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
2|6|12

**Sweet, D.J.**


The defendants Patriarch Partners VIII, LLC ("Patriarch") and LD Investments, LLC ("LDI") (collectively, the "Defendants") have moved pursuant to Fed. R. Civ. P. 56 for summary judgment dismissing the complaint of MBIA Insurance Corporation ("MBIA" or the "Plaintiff").  MBIA has also moved pursuant Fed. R. Civ. P. 56 for partial summary judgment dismissing the Defendants' affirmative defenses of unclean hands and equitable estoppel.  In addition, both parties have moved in limine to exclude certain testimony and exhibits submitted by the opposing party.


Upon the facts and conclusions set forth below, the Defendants' motion for summary judgment dismissing the complaint is granted in part and denied in part, and Plaintiff's motion for partial summary judgment to dismiss the Defendants' affirmative defenses of unclean hands and equitable estoppel is granted.  The parties' motions to exclude evidence are denied.


These parties are sophisticated, well-advised entities engaged in complicated financial transactions.  MBIA had issued financial guaranty insurance on collateralized debt obligations

1

("CDOs") and had turned to Patriarch and its Chief Executive Officer Lynn Tilton ("Tilton") for assistance in remediating seven CDOs where losses estimated to be between $91 and $287 million were anticipated.  The parties' dispute turns on the interpretation of the complicated agreements reached between them.

**Prior Proceedings**

MBIA filed its complaint on April 3, 2009 alleging breach of contract, anticipatory repudiation, breach of the implied duty of good faith and promissory estoppel, along with a request for the Court to issue a declaratory judgment concerning both the enforceability of an agreement between the two parties and the scope of Patriarch's obligations under that agreement.

Discovery proceeded and the instant summary judgment motions were marked fully submitted on July 6, 2011.  The parties' motions in limine were marked fully submitted on July 21, 2011.

**The Facts**

2

The facts, as set forth in the Defendants' 56.1 Statement, the Plaintiffs' Local Rule 56.1 Response, the Plaintiff's Local Rule 56.1 Response,[1] and supporting affidavits and exhibits, are undisputed except as noted below.

MBIA is a corporation headquartered in Armonk, New York that is in the business of providing financial guaranty insurance on debt obligations. At all relevant times, MBIA provided, among other things, financial guaranty insurance to structured finance transactions, such as collateralized debt obligation transactions or "CDOs."

Patriarch is a limited liability company organized under the laws of the State of Delaware. Tilton founded Patriarch and still leads the company today, and the firm has developed an expertise in investing in distressed assets. According to its website, Patriarch concentrates on direct investments in distressed businesses, managing funds with over

---

[1]     MBIA, in opposition to the Defendants motion for summary judgment, has submitted in its Plaintiff's Rule 56.1 Response an additional 68 paragraphs of "disputed facts" which it contends are necessary to the resolution of the Defendants' motion. These additional paragraphs in essence state MBIA's view of the complicated transactions as described below.  Any of these "disputed facts" that have been included in this factual summary identify the "Plaintiff's Statement of Disputed Facts" as their source.

$7 billion of equity and secured loan assets.  Patriarch's sole member is Zohar Holdings LLC, whose sole members are Tilton and a trust for Tilton's daughter for which Tilton is the sole trustee.  Patriarch is an affiliate of Patriarch Partners, LLC, a global investment firm formed and managed by Tilton. Patriarch Partners manages funds that make direct investments in distressed businesses.  Patriarch and its affiliates specialize in the management of distressed assets and, among other things, Patriarch is engaged in the business of managing CDO transactions.  As a collateral manager, Patriarch selects a portfolio of underlying assets for a CDO and manages those assets over the life of the CDO.

LDI is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina.  Tilton, a Florida resident, is the sole member of LDI.  LDI is a holding company for certain Patriarch Partners affiliates and their subsidiaries.

Although the features of CDOs vary, in simplest terms, a CDO is a transaction in which a special purpose vehicle (generally referred to as the "issuer") (i) issues notes and/or

4

equity securities to investors and (ii) uses the proceeds of the issuance to acquire a portfolio of assets.  During the life of the transaction, returns on the issuer's asset portfolio are periodically distributed to satisfy the issuer's payment obligations, including those on the issuer's notes or equity securities.

MBIA provides insurance to CDO issuers for the benefit of the noteholders.  In exchange for premiums, MBIA agrees to pay interest or principal on the outside investors' notes in the event the CDO's cash flows are insufficient.

MBIA was motivated to pursue a relationship with Patriarch because it recognized that it faced a large exposure on insurance policies covering seven troubled CDOs.  By early 2003, it appeared likely that the asset portfolios of these seven troubled CDOs would generate insufficient funds to satisfy the payment obligations on the MBIA-insured notes, which would eventually result in MBIA being required to make payments under the applicable insurance policies.  In an effort to avoid that result, MBIA began discussing with Patriarch a plan to remediate the troubled CDO transactions.  The seven CDOs ultimately involved in the remediation transaction between Patriarch and

5

MBIA were:  (i) Z-1; (ii) Captiva; (iii) Ceres; (iv) Aeries; (v) Amara-1; (vi) Amara-2; and (vii) Oasis (collectively, the "Identified CDOs").  According to Mark Zucker ("Zucker"), global head of structured finance at MBIA, these CDOs were the "seven ugly step sisters" in MBIA's insured portfolio.  MBIA disputes that all seven of the Identified CDOs were troubled.  Both MBIA and Patriarch projected no losses on Aeries and Oasis, and MBIA projected losses on Amara-1, Amara-2 and Ceres to be zero under certain scenarios.  Over time, five of the Identified CDOs were able to pay off the MBIA-insured notes in full without any insurance payment by MBIA.

As of April 14, 2003, MBIA estimated its total losses on the Identified CDOs to be between $91 and $198 million, while Patriarch estimated the losses at $287 million.  MBIA had established loss reserves of $11 million.  MBIA's projected range of loss estimates was based on a variety of assumptions. MBIA maintains that at all relevant times, MBIA expected to remediate any potential losses on the Identified CDOs and had taken this remediation into account when establishing its loss reserves.

6

According to Patriarch, MBIA was aware that the losses could greatly exceed reserves and that reserve levels were insufficient to cover the potential magnitude of the loss.  MBIA disputes this contention and states that losses ultimately incurred could be greater or lesser than loss reserves and denies that loss reserves established in prior periods were insufficient.

MBIA and Patriarch worked together to develop solutions that could help remediate the Identified CDOs without requiring MBIA to increase its loss reserves.  MBIA maintains that it sought solutions to avoid losses in the transactions that would require it to pay claims on its insurance policies and that specific loss reserves on a transaction are separate from MBIA's general unallocated loss reserves.  According to MBIA, any increase in a specific case loss reserve is accompanied by a corresponding decrease in MBIA's unallocated loss reserves.

The discussions over many months led to a series of agreements dated November 13, 2003.  According to the Defendants, the first line of defense to MBIA's reserve problem was for MBIA to designate Patriarch as the new collateral

7

manager for the Identified CDOs in exchange for fees.  Patriarch
offered strategies for turning around the CDOs in an effort to
reduce their losses.  According to MBIA, the designation of
Patriarch as the new collateral manager for the seven CDOs
occurred pursuant to several distinct agreements, none of which
were dated November 13, 2003.  The Plaintiff acknowledges that
MBIA and Patriarch discussed appointing affiliates of Patriarch
as the new collateral managers of the Identified CDOs.

Patriarch also created a new CDO, called Zohar CDO
2003-1, Limited, or "Zohar I."  According to the Defendants, a
second, more speculative, line of defense to MBIA's reserve
problem involved junior notes issued by Zohar I termed the Class
B Notes.  Patriarch states that it agreed to contribute a
portion of the Class B Notes to the Identified CDOs to the
extent it would, in Patriarch's sole judgment, substantially
reduce or eliminate the potential losses.  MBIA disputes the
Defendants' characterization of their obligation to contribute
the Class B Notes as a secondary form of remediation.  According
to MBIA, the Class B Notes were to be the primary form of
remediation for the Identified CDOs because, once in the asset
portfolio of an Identified CDO, the payment on or sale proceeds
from the Class B Notes would be used to make payments on the

MBIA-insured notes or reimburse MBIA for payments made under the relevant insurance policies.

Like most CDOs, Zohar I is governed by an indenture (the "Indenture").  The parties to the Indenture are (i) Zohar CDO 2003-1, Limited, (ii) Zohar CDO 2003-1, Corp., (iii) Zohar CDO 2003-1, LLC, (iv) MBIA, (v) Natixis (f/k/a CDC Financial Products, Inc.), and (vi) U.S. Bank National Association.  An investment bank, now called Natixis, was retained to assist in structuring and arranging the Zohar I transaction.  Zohar I issued three classes of securities at a November 13, 2003 closing:

- $532 million in Class A Notes (divided into various subclasses), maturing in 2015;
- $150 million in Class B Notes, maturing in 2018; and
- $20 million in preference shares.

Zohar I was also authorized to issue a Class C Note in certain circumstances.  According to MBIA, the Indenture for the Zohar I transaction provided that if investment grade ratings were obtained on less than all of the Class B Notes, the Class B

9

Notes would be reissued in that amount and new Class C Notes would be issued for the then-unratable amount.

The Class A Notes were issued to outside investors for cash and paid interest quarterly. After expenses were paid, Patriarch anticipated it would have approximately $450 million of capital to invest. MBIA issued an insurance policy that guaranteed payment of interest and principal on certain of the Class A Notes. The Class A Notes were given "initial ratings" by Moody's and Standard & Poor's ("S&P") at the closing, and the Indenture required that those rating be "confirmed" within 30 days of the "Ramp Up End Date" in August 2004.

The Class B Notes were issued to an affiliate of Patriarch, called Octaluna, LLC, for no cash. Patriarch agreed, subject to a number of conditions precedent, to cause up to 80% of Octaluna's interest in the Zohar I Class B Notes (i.e., $120 million) to be contributed to the Identified CDOs. The Class B Notes were zero-coupon notes, and therefore, they paid no interest. Patriarch was the beneficial owner of the Class B Notes. Under the Indenture, the Class B Notes were fully subordinated to the Class A Notes, with no right to any payments until after the Class A Notes are repaid in full and other

10

claims and expenses are also satisfied.  The Class B Notes
represented the potential back-end gain from Zohar, and they
were defined as equity, rather than debt, for federal income tax
purposes, but the Indenture provided that the parties could, in
the future, amend the Indenture to re-characterize the Class B
Note as debt.  The Class B Notes were not rated by either
Moody's or S&P.  According to the Defendants, at closing, the
Class B Notes had no value and no worth so they could not rated.
MBIA asserts the value or worth of the B Notes is not the basis
upon which the Class B notes were not rated.

In addition to the Class A and B Notes, Zohar I also
issued preference shares to Octaluna.  The preference shares
were issued for cash.  Assuming the Indenture tests were
satisfied, the preference shares received a series of payments
totaling up to $30 million that, according to Patriarch, were
senior to the Class B Notes.  In addition, the preference shares
had a residual equity interest in the CDO.  According to MBIA,
the Zohar I Indenture provided that the preference shares would
receive an initial dividend from the transaction, if certain
Indenture tests were satisfied, ahead of distributions on both
the Class A and B Notes, but the preference shares were not

11

entitled to any residual interest in the transaction ahead of the Class A or B Notes.

On November 13, 2003, the parties also entered into an agreement called the "Master Agreement."  The Master Agreement was drafted primarily by counsel for the parties, with Weil Gotshal & Manges representing MBIA and Richards Spears Kibbe & Orbe representing Patriarch.  An issue is presented as to whether the Master Agreement was, as the Defendants describe, a "side agreement," or, as MBIA describes, "the principal embodiment of the remediation transaction contemplated by the parties."

According to Patriarch, pursuant to the Master Agreement, Patriarch's affiliates were designated as the collateral managers of the Identified CDOs.  According to MBIA, between May and September 2003, MBIA caused affiliates of Patriarch to be appointed as the replacement collateral managers in Z-1, Captiva, Ceres, and Aeries, and in connection with each appointment, the Patriarch affiliates entered into a collateral management agreement with the respective CDO issuer to which MBIA was not a party.  According to MBIA, in December 2003, pursuant to Section 3.01 of the Master Agreement, MBIA caused

12

Patriarch's affiliates to be appointed as the replacement collateral managers in the Amara-1, Amara-2 and Oasis CDOs.

Patriarch was paid for its services by a combination of fees from the transactions themselves and MBIA's assignment of its insurance premiums on the seven Identified CDOs to Patriarch. MBIA later agreed to pay the fees directly, instead of assigning its premiums. MBIA notes assignment of its insurance premiums was pursuant to a separate premium assignment agreement until such time as Patriarch waived its rights to these premiums in an agreement between the parties dated May 21, 2004 (the "May 2004 Agreement").

According to the Defendants, the Master Agreement delegated to Patriarch's sole judgment the determination of whether and when enough value had been created for the Class B Notes to substantially reduce or eliminate any losses in the Identified CDOs, and MBIA understood that this involved delegating to Patriarch broad discretion. MBIA disputes this interpretation of the Master Agreement and notes that Zucker testified that Patriarch had discretion "within parameters" under the Master Agreement and that he "could have" described Patriarch's discretion as broad but did not recall the extent of

13

it.  MBIA contends that the extent of Patriarch's discretion
under the Master Agreement is a question of law for the Court.

The Master Agreement included several conditions
related to Patriarch's contribution obligation, including that
the Class B Notes (1) be rated at least Baa3 by Moody's and BBB-
by Standard & Poor's as contemplated by Section 7.13(b) of the
Indenture, (the "Rating Condition") and (2) constitute debt for
United States federal income tax purposes as evidenced by an
opinion of a nationally-recognized tax counsel (the "Debt-For-
Tax Condition").  Ratings of "BBB-" by Standard & Poor's and
"Baa3" by Moody's (or higher) are considered investment grade.
If either of these conditions were not satisfied, Patriarch had
no obligation to transfer the Class B Notes.  MBIA notes that
the Master Agreement terms included that MBIA and Patriarch
agreed "to cooperate and use commercially reasonable efforts to
procure as soon as reasonably practicable" the satisfaction of
the Rating and Debt-For-Tax Conditions.  The parties dispute
whether the conditions are conditions precedent or necessary, as
MBIA disputes the Defendants' contention that Patriarch had no
obligation to transfer the Class B Notes if the conditions were
not satisfied because Patriarch materially contributed to the
non-satisfaction of those conditions.

14

The Rating Condition was tied directly to the underlying business rationale for the transaction, namely, to help remediate the Identified CDOs. At the closing, MBIA recognized that the Class B Notes had no value and that it would take a certain period of time to actually have value in the Class B Notes. Until Zohar I had built a sufficient collateral base and created sufficient expected cash flows to give the Class B Notes value, the Class B Notes could not help to reduce the potential losses in the Identified CDOs. The parties adopted the Rating Condition as verification that value had been created and that there was a reasonable expectation of payment on the Class B Notes, after the Class A Notes had been repaid first. According to MBIA, once the Class B Notes were rated investment grade and contributed to the Identified CDOs, they could help reduce the potential losses in those CDOs. MBIA contends that the parties adopted the Rating Condition in order to facilitate the receipt of a debt-for-tax opinion on the Class B Notes so that the Class B Notes could be contributed to the Identified CDOs.

According to Patriarch, the Identified CDOs could not hold the Class B Notes as an equity security. MBIA acknowledges

15

that, when the parties entered into the Master Agreement, the
parties believed, based on circumstances at the time, that it
would be practicable to place only securities which constituted
debt for tax purposes into the asset portfolios of the
Identified CDOs.  According to MBIA, the notes issued in Z-I and
Captiva have matured, and the assets of those entities have been
liquidated.  MBIA contends that, by their terms, the governing
documents for Z-1 and Captiva may now be amended so that each
CDO issuer establishes a "tax subsidiary" to accept and hold a
portion of the unrated Class B Notes as equity.  According to
MBIA, each tax subsidiary would receive any payments or
distributions made on the Class B Notes, pay any taxes
associated with such payments or distributions and distribute
the net proceeds to the Z-1 and Captiva issuers, as applicable,
which would then distribute such net proceeds to MBIA.

        Patriarch states that it had discretion both to
determine whether obtaining a rating on the Class B Notes would
be practicable and to set the specific timing regarding the
steps taken to seek a rating.  According to MBIA, the discretion
of Patriarch is an issue for the Court.  MBIA contends that,
under the Master Agreement, Patriarch was obligated to "use
commercially reasonable efforts" to seek a rating on the Class B

16

Notes "as soon as reasonably practicable." Patriarch highlights a statement made by MBIA's Rule 30(b)(6) corporate designee, Michael Murtagh ("Murtagh"), in which Murtagh states "only Patriarch with [Natixis, the investment bank] could really determine the best time to rate" the Class B Notes. MBIA contends that Murtagh's statement was not in reference to any discretion under the Master Agreement, but rather to the fact that Patriarch and Natixis were in the best position to assess the ratability of the Class B Notes because of their relationships with the rating agencies and their roles as Zohar 2003-1's collateral manager and arranger, respectively.

According to the Defendants, MBIA intentionally provided flexibility and discretion to Patriarch in the Master Agreement because the Class B Notes were an equity tranche of the Zohar I CDO. MBIA did not want to be deemed the owner of the Class B Notes because, if it were, it would be required under accounting rules to consolidate Zohar I onto its balance sheet and take an accounting charge for Zohar I's liabilities. In other words, MBIA wanted to not have any control over the Class B Notes. Ultimately, MBIA's auditors concurred that MBIA was sufficiently removed to avoid consolidation. According to MBIA, Patriarch's understanding of the Master Agreement is based

17

on FIN 46, the GAAP statement the Defendants suggest affected
MBIA's perspective on the language in the Master Agreement.
MBIA contends that the only evidence the Defendants have
concerning FIN 46 is the testimony of Zucker, who indicated that
he "was not certain if [he] remember[ed]" FIN 46 or its
implications.  MBIA disputes Patriarch's statement concerning
the auditor's opinion and also contends that the legal
implications of MBIA's potential control of the Class B Notes
are questions of law, not facts.

The parties agree that Patriarch was given discretion
to allocate any value created in the Class B Notes among the
Identified CDOs.  If the transferred Class B Notes exceeded what
was necessary to remediate the senior notes insured by MBIA in
any one of the seven Identified CDOs, that extra value would
inure to the benefit of the junior, uninsured note holders.

According to the Defendants, while Patriarch was
granted discretion with respect to the control of the Class B
Notes, MBIA agreed to bear the risk that the conditions would
not be satisfied.  Patriarch notes that the Master Agreement
included an express limitation of liability clause stating that

18

Patriarch would not be liable to MBIA if those conditions were not satisfied, highlighting the following language:

> Notwithstanding anything else contained herein, if . . . (2) such transfers cannot be made because the conditions of this Section 3.04 have not been satisfied, then neither Patriarch VIII nor any of its affiliates shall be liable to MBIA or any other Person because of any such non-Contribution . . . and/or Patriarch VIII's direction not to cause a Contribution to be made to any particular Identified CDO.

MBIA disputes this contention and notes that MBIA agreed to bear the risk that the rating agencies might refuse to rate the Class B Notes, not that the conditions in the Master Agreement would not be satisfied because Patriarch never sought the ratings.

The parties agree that the limitation of liability provision was specifically negotiated by the parties. The language in the second clause was added in a draft circulated by MBIA's counsel, in both clean and black-lined versions, on November 8, 2003, five days before the closing. MBIA notes that the draft circulated by MBIA's counsel was based on discussions between counsel for both parties.

19

The Master Agreement further provides that Patriarch is entitled to retain its interest in the Class B Notes "because the conditions precedent in this Section 3.04 have not been satisfied."  The Master Agreement is governed by New York law. If Patriarch had contributed the Class B Notes under the Master Agreement, they would have been transferred to one or more of the seven Identified CDOs, not to MBIA directly.  MBIA notes that, under the Master Agreement, Patriarch would cause Octaluna to contribute the Class B Notes to one or more of the Identified CDOs for MBIA's benefit.

Patriarch initially planned to invest the funds raised by Zohar I in distressed middle-market corporate loans that could be purchased at a steep discount in the secondary market. After covering expenses, Patriarch anticipated that Zohar I would have approximately $450 million to invest.  Patriarch hoped to use that cash to purchase loans with a face value of $750 million – i.e., at an average of around 60 cents on the dollar.  If Patriarch successfully selected underpriced securities that could be worked out to pay at par, the increase in value would inure to the benefit of Zohar I, including the Class B Notes.  Patriarch's initial strategy was embodied in the Indenture, which required Zohar I to purchase loans at a

20

weighted average price of between 25 and 70 percent of par.  At closing, Zohar I held less than $50 million in collateral assets, and the Indenture called for Zohar to make "commercially reasonable" efforts to "ramp up" by purchasing assets with a total face value of $750 million by August 2004, the defined "Ramp Up End Date."

According to the Defendants, Patriarch's initial strategy was also reflected in the parties' analysis of the Class B Notes.  In a "sources and uses" chart prepared in April 2003, the parties projected that if assets with a face value of $750 million could be acquired for only $450 million, then there could be sufficient value generated over the life of the transaction to pay the $150 million Class B Notes.  If this plan were successfully implemented, the Indenture required Patriarch to submit the Class B Notes for a rating within 30 days of the Ramp Up End Date in August 2004.  MBIA disputes this contention, stating that Patriarch, and not MBIA, prepared the "sources and uses" chart and that under Section 7.13(b)(1) of the Indenture, the Issuer was required to seek a rating on the Class B Notes within 30 days of the Ramp Up End Date, regardless of whether Patriarch's initial strategy was successfully implemented.

21

The Defendants contend that MBIA wanted the Class B Notes to have a face value of $150 million so that its 80% share would approximate its expected but unreserved losses. However, this face amount served as a mere "place holder" because the parties did not actually know at the closing how much value could be created. According to MBIA, Zucker testified that the Zohar I structure was created so that the potential gain on the Class B Notes would "plug the hole primarily" on the Identified CDOs based on Patriarch's projections. The Plaintiff states that MBIA had no "expected but unreserved" losses, and at all relevant times, MBIA expected to remediate any potential losses on the Identified CDOs, and it has taken this remediation into account when establishing its case loss reserves. According to MBIA, the $150 million face amount was a "place holder" because the parties did not know at closing how much of the Class B Notes could be rated investment grade.

If the full $150 million could not achieve an investment grade rating, the face amount would be reduced to a lesser amount that could achieve the rating. As described above, a new unrated note, the Class C Note, would then be issued in an amount such that the total face value of Class B and Class C Notes would be $150 million. MBIA notes that under

22

the Master Agreement, in the event a new, unrated Class C Note
is issued, Patriarch is obligated to contribute, subject to
certain conditions, up to $120 million of that Class C Note to
remediate losses on the Identified CDOs.

Zohar I was not able to ramp up using the originally
projected investment strategy. During the ramp-up period, the
market for distressed debt disintegrated because credit spreads
tightened, forcing Patriarch to change its strategy from
selecting and purchasing distressed senior secured loans to
sourcing, underwriting and servicing loans directly to
borrowers. Under the new strategy, rather than buy loans at a
steep discount, Patriarch would originate loans at or close to
100 cents on the dollar and negotiate for equity stakes in the
companies' borrowing from Zohar I. MBIA disputes that Patriarch
abandoned its original strategy entirely, noting that Tilton
testified that Patriarch still purchased loans at a discount
price for the Zohar collateral pool even after the new strategy
had been implemented.

The new strategy of originating loans involved a much
longer and more difficult process than buying loans on the
secondary market. According to the Defendants, Zucker testified

23

that the "[a]ccumulation of collateral would be difficult and
the building of value would be difficult under the new strategy,
and it would be more difficult" to obtain an investment grade
rating on the Class B Notes.  Patriarch contends that, as
evidenced by Zucker's testimony, MBIA's management was aware of
these concerns.  According to MBIA, Zucker testified that the
new strategy could "possibly" have an impact on obtaining an
investment grade rating on the Class B Notes.  Further, Zucker
stated that his discussions with MBIA senior management were
"not about the rating of the [Class B] note" and that Tilton
represented to MBIA that the new strategy would enhance her
ability to accumulate collateral and inure to the benefit of the
Class B Notes.  Both parties agree that MBIA approved the new
strategy as proposed by Patriarch and reflected in the
amendments to the Zohar 2003-1 Indenture.

        While the new strategy included the potential for
additional value from the equity interests, this would not help
achieve an investment grade rating for the Class B Notes.  The
credit rating agencies do not include equity interests in their
rating analysis.  The credit rating agencies were also more
comfortable rating pools of secondary loans, rather than
originated loans.  According to Patriarch, achieving an

investment grade rating for the Class B Notes depended on the original strategy of purchasing loans at steep discount.  MBIA disputes this contention, stating that achieving an investment grade rating for the Class B Notes did not depend on the original strategy of purchasing loans at steep discount, as demonstrated by the fact that the Class B Notes could have achieved an investment grade rating under the new strategy of originating loans.  MBIA contends that the Defendants' suggestion that, upon the change in Patriarch's strategy, the Class B Notes were no longer ratable is consistent with Tilton's representations to MBIA at the time.

The change in strategy had an immediate impact on the transaction.  The Ramp Up End Date was pushed back from August 29 to October 29, 2004.  At the end of October 2004, Zohar I had acquired, or entered into commitments to acquire, collateral assets with a face value of only $532 million, more than $200 million lower than the initial projected value of $750 million the parties had used in analyzing the Class B Notes.  MBIA notes that only Patriarch had initially used a projected face value of $750 million in previously analyzing the Class B Notes.  The new strategy also required extensive amendments to the Indenture to

reflect the lower collateral balance and the new investment criteria that would govern the transaction.

In light of those changes, it was difficult to obtain rating agency confirmation of the initial rating assigned to the Class A Notes.  In particular, S&P engaged in an extensive debate with Natixis and Patriarch and demanded numerous changes to the Indenture and the rating model submitted to the agency. MBIA notes that, in CDO transactions, the parties generally work closely with the rating agencies and often receive comments on the transaction documents from the rating agencies.  MBIA did not conduct any additional analysis to measure how the revised strategy would affect the cash flows to the Class B Notes.  MBIA approved and executed the Second Supplemental Indenture and Third Supplemental Indenture, both dated as of October 29, 2004.

The Class B Notes did not obtain an investment grade rating at the Ramp Up End Date.  As a result, the parties adopted the Third Supplemental Indenture, which changed the deadline for rating the Class B Notes from the fixed time of 30 days after the Ramp Up End Date to an uncertain and floating time of 30 days after the collateral balance "exceeds $750,000,000."  MBIA contends that the Third Supplemental

26

Indenture requires the Issuer to seek a rating on the Class B
Notes once the collateral balance reaches $750,000,000 or on
"such earlier date as [Patriarch] may determine."  According to
the Defendants, the $750 million figure represented the amount
of collateral the parties believed would be required to achieve
an investment grade rating on the Class B Notes.  MBIA disputes
this contention, instead stating that the $750 million figure
represented a safe upper bound at which the parties, based on
prior modeling, knew that the full $150 million of the Class B
Notes could definitely be rated investment grade and did not
represent the amount of collateral the parties believed was
"required" before any portion of the Class B notes could be
rated investment grade.  MBIA contends that Tilton understood
the collateral balance did not need to reach $750 million before
a rating could be obtained on the Class B Notes.

According to Patriarch, Section 3.04 of the Master
Agreement specifically incorporated the terms of Section 7.13(b)
of the Indenture.  Patriarch's contribution obligation was
expressly conditioned on the Class B Notes achieving an
investment grade rating "as contemplated by Section 7.13(b) of
the Indenture."  MBIA disputes this conclusion and contends that
the parties did not intend to incorporate Section 7.13(b) of

27

Indenture into the Master Agreement.  The parties agree that the
term "Indenture" is defined to include all amendments and
supplements to the initial November 2003 Indenture.

The Third Supplemental Indenture provides that it
"sets forth the entire understanding of the parties relating to
the subject matter hereof and supersedes and cancels any prior
communications, understandings and agreements between the
parties."  MBIA notes that the Defendants are not parties to the
Third Supplemental Indenture.  According to the Defendants,
Patriarch was only required to seek a rating if, as set forth in
the Third Supplemental Indenture, the collateral balance reached
$750 million.  The Third Supplemental Indenture was modifying
the obligations of the parties under the Master Agreement and,
in effect, superseded the Master Agreement.  MBIA disputes these
conclusions.

Citing Murtagh's testimony, Patriarch contends that
the "trigger for seeking an investment grade rating [under the
Third Supplemental Indenture] was that the collateral balance
hit 750 million."  MBIA notes that another trigger for the
Issuer to seek a rating was any date selected by Patriarch.  The
Third Supplemental Indenture states that Patriarch "may

28

determine" to seek a rating before the trigger is reached, but that is merely discretionary.  The collateral balance never reached $750 million.

Under the new strategy of originating loans near par, the collateral did not increase materially from the $532 million at the Ramp Up End Date, a time the Defendants characterize as being when "all agreed" no rating was possible.  MBIA disputes that "all agreed" no rating was possible with the collateral at that level, contending that Natixis reached a different conclusion and that the new strategy was the reason the amount of collateral did not increase materially from $532 million. According to MBIA, the collateral did not increase materially because Patriarch failed to make reasonable efforts to acquire collateral for Zohar I and instead devoted its energy to acquiring collateral for Zohar II and Zohar III and that when collateral was eligible for Zohar I and the other Zohar deals, Tilton personally decided which deal would acquire the asset.

Patriarch was unable to build the collateral balance of Zohar I as originally projected.  MBIA received a monthly accounting of the assets in Zohar I and knew that Zohar I had not been able to fully invest its capital.  MBIA contends that

29

Patriarch did not build the collateral balance of Zohar I as expected because Patriarch failed to make reasonable efforts to acquire collateral for Zohar I and instead devoted its energy to acquiring collateral for Zohar II and Zohar III.  Since Zohar I's collateral balance remained relatively flat, Patriarch believed that insufficient value had been created and Zohar I was not, according to Tilton's testimony, "anywhere close to where the B notes could be rated."  Tilton testified that she had personal knowledge of the state of the collateral in Zohar I and how the rating agencies had evaluated the other similar CDOs that Patriarch managed.

MBIA disputes whether the belief of Tilton was reasonable or relevant in light of Natixis' analysis and conclusions that the Class B Notes were ratable.  According to the Defendants, Natixis never told Patriarch or MBIA that, in its view, Patriarch should seek a rating at any time.  MBIA disputes this assertion and contends that Natixis employee Ken Wormser ("Wormser") informed Patriarch that Natixis believed a portion of the Class B Notes could get an investment grade rating.

30

According to Patriarch, by late 2005, MBIA sought to restructure Zohar I in a way that would give it the benefit of the Class B Notes without having to seek an investment grade rating.  MBIA disputes this contention and contends that by late 2004, Tilton had indicated to MBIA that she did not want to contribute the Class B Notes to the Identified CDOs at that time, and, in an attempt to negotiate in good faith with Patriarch so MBIA could obtain the benefit of the Class B Notes, MBIA participated in discussions regarding a restructuring of Zohar I.  MBIA states that, at all times, MBIA expected Patriarch to comply with the terms of the Master Agreement.

MBIA's "Statement of Disputed Facts" contends that the relationship between MBIA and the Defendants soured in early 2006 when MBIA, hesitant about the prospect of taking on additional exposure to the Defendants, declined to insure the Zohar III transaction.  According to MBIA, in view of Defendants' ongoing delay in seeking the rating on the Class B Notes, MBIA's senior management wanted Tilton to commit to a plan for contributing the Class B Notes.  According to the Defendants, there were significant issues between the parties arising out of MBIA's failure to insure the senior notes of Zohar III.  Patriarch states that there was no delay because the

31

Class B Notes could not be rated, Natixis never told either party that Patriarch should seek a rating and MBIA did not tell Patriarch that it believed the notes could be rated as investment grade.

The Plaintiff's "Statement of Disputed Facts" describes how, in February 2006, Tilton sent an email to Natixis describing her view about MBIA's hesitancy in insuring Zohar III.  In that same email Tilton wrote:  "As for the B Note, I have no interest in having it rated right now."  According to the Defendants, Tilton conveyed that Patriarch would abide by the Master Agreement but would not engage in transactions outside the Master Agreement.  The Plaintiffs also describe a November 2007 email Tilton wrote to MBIA stating:

> However, if you are calling this meeting to request my generosity, you can come visit me in my offices. However, I would not come empty handed with a request. You know well how I feel about MBIA and the damage that you caused to Patriarch when you asked me to postpone the launching of and then later walked from your commitment to wrap Zohar III.  At the time I made it clear that if you did not wrap Zohar III as committed that I would not share the Patriarch B note with MBIA to save you from losses on Captiva and Z-1. You were clear that such message was delivered to Jay and Gary and that they would nonetheless stand by the decision not to take any more exposure to Patriarch. As far as I am concerned that ended what had been a long term mutual relationship and my desire to help

> NMBIA will [sic] sunk losses caused by other managers.
> Please do not come looking for gifts from Patriarch.

According to the Defendants, Patriarch never refused to perform under the Master Agreement.

According to MBIA, Natixis was sensitive to the relationship issues between MBIA and Patriarch that arose when MBIA declined to insure the Zohar III offering.  Natixis attempted to identify a resolution to the dispute about the Class B Notes that was acceptable to all of the involved parties, and it discussed various proposals with MBIA and Defendants.  According to the Defendants, the proposals were outside the Master Agreement and MBIA never advised the Defendants of any dispute or breach of the Master Agreement.

According to Patriarch, new proposals were developed because MBIA understood that it was not possible at that time to obtain an investment grade rating on the Class B Notes.  Citing Zucker's testimony, Patriarch states that the proposals were "beyond the terms of the Master Agreement" and Patriarch "had no obligation to enter into a new transaction."  MBIA disputes this understanding of events and contends that it discussed the various proposed alternative transaction structures because it

33

understood that Patriarch did not want to seek a rating at the time.

One proposal was to raise new capital from investors and increase the size of another Patriarch-managed CDO called Zohar II, through a transaction known as a "tap." This new cash could be used to purchase the Class B Notes, with some of the cash going to MBIA. Tilton rejected this and other proposals because she thought it was "unethical" to use cash from investors to pay off a contingent obligation that was not due until 2018, which had no rights to payment until all senior notes were paid in full, which could not be turned into cash through trading markets (since it had no coupon and no rating could be obtained), and which had at best a speculative and uncertain value. MBIA admits that Tilton testified to that effect but disputes that she ever told MBIA of her concerns.

Another proposal was to simply transfer the Class B Notes without obtaining an investment grade rating. This proposal raised potential tax issues and, in any event, was inconsistent with the terms of the Master Agreement. MBIA also considered at some point having the Class B Notes transferred

34

for MBIA's benefit to an entity or entities other than the seven Identified CDOs.

On March 2, 2006, Tilton told MBIA that she would "comply with the documents of Zohar I that require my commercially reasonable efforts" -- i.e., the Master Agreement -- but that she "choose[s] not to take their generous exchange offer of a tap that requires me to find a solution to their reserve problem and link their losses with the B Note." Nonetheless, Tilton "reinforced" to Natixis that the Class B Notes "are there for MBIA." According to the Defendants, Tilton repeatedly told MBIA that she believed the collateral balance was too low and the rating agencies would not issue an investment grade rating for the Class B Notes. MBIA disputes this contention and states that Tilton did not tell MBIA the Class B Notes could not be rated.

According to Patriarch, Tilton's belief was justified because the rating agency criteria had become more stringent over time. For instance, for purposes of Zohar I, investment grade ratings agencies considered in their analysis commitments to purchase assets that had not yet settled. But by the time another Patriarch managed CDO called Zohar II closed in January

35

2005, they were no longer willing to do so.  MBIA disputes this

contention and contends that when evaluating the ratability of

the Class B Notes at any time, the rating agencies would have

considered committed but unsettled assets, as permitted by the

Indenture.  According to Patriarch, Natixis told MBIA that it

should wait and see if Patriarch was able to build a larger

collateral base before seeking a rating.  Although MBIA

acknowledges testimony by Zucker that suggests Natixis to have

told MBIA to "hold off," MBIA contends that Zucker did not

specify when Natixis allegedly advised MBIA to wait.


In March 2007, MBIA approved the Fourth Supplemental

Indenture, which authorized Zohar I to pay deferred fees to

Natixis that had been conditioned on obtaining an investment

grade rating for the Class B Notes.  MBIA did not ask Natixis to

seek a rating at that time because, according to Murtagh, it did

not want to "dictat[e] what day they should have it done."

Instead, MBIA was "comfortable with Natixis in the fact that

they had said that they would continue to endeavor to get the

notes rated."  MBIA, pursuant to the May 2004 Agreement,

continued to pay Patriarch management fees relating to certain

of the Identified CDOs, including Z-I and Captiva, through mid-

2008.  MBIA continued to include the Class B Notes within its

reserve calculations, without informing either its loss reserve committee or outside auditors of any alleged breach of the Master Agreement.

MBIA continued to discuss potential restructuring options with Natixis through at least May 2007.  On or about May 9, 2007, MBIA and Natixis discussed the possibility of restructuring Zohar I, extracting a discounted value of the Class B Notes and participating in a refinancing of the deal. MBIA determined at that time that it was in its best interest to continue under the Master Agreement rather than engage in a restructuring.  MBIA believed then that more value would accrue to MBIA with the current arrangement and the passing of time. Similarly, in June 2007, MBIA's action plan was to continue to work with Patriarch in implementing a strategy to fully realize the value of the Zohar notes.  According to the Plaintiff, MBIA was not interested in pursuing Natixis' refinancing idea.

According to Patriarch, MBIA brought up the issue of the Class B Notes again in emails in November 2007 and November 2008 and, in both instances, Tilton responded that she was not interested in a restructuring transaction.  According to MBIA, in November 2007 and November 2008, MBIA requested a meeting

37

with Tilton to determine if she would contribute the Class B
Notes to Z-1 and Captiva in accordance with the Master
Agreement, and Tilton indicated she would not perform in
accordance with the Master Agreement.  According to MBIA,
Tilton's November 2007 email reflects evidence of Patriarch's
breach (its failure to use commercially reasonable efforts since
early 2006 based on Tilton's anger over Zohar III) and
repudiation (Patriarch's unequivocal indication it would not
perform going forward) and in November 2008, Tilton reiterated
her repudiation of the obligations in the Master Agreement.
Tilton testified that she was refusing only to engage in further
discussions of transactions outside the Master Agreement.

          According to Patriarch, Tilton did not state in those
emails that she would never seek a rating for the Class B Notes
or that she would never seek a debt-for-tax opinion.  MBIA
disputes this contention, instead stating that the emails speak
for themselves and that the context of Tilton's responses in
light of the rest of the factual record demonstrates that she
indicated she would not contribute the Class B Notes or
otherwise perform under the Master Agreement.  At the time of
those emails, the Class B Notes were not rated, and Patriarch
did not believe that an investment grade rating was possible.

Also, at the time of those emails, MBIA itself did not believe the Class B Notes could be rated investment grade and contributed to the Identified CDOs before they were scheduled to mature and MBIA's insurance payment would come due.  MBIA disputes whether this alleged belief was credible or reasonable and contends that Natixis had previously analyzed the ratability of the Class B Notes, determined that various portions were ratable, and informed Patriarch that it believed so.  MBIA contends that, although MBIA knew by October 2008 that it would be required to make a payment on the policy for Z-1 the following month, there is no evidence to suggest that MBIA, at any time prior to filing this suit against Defendants, believed an investment grade rating was not possible and that MBIA did not know whether the Class B Notes were ratable.

According to Patriarch, MBIA never informed its loss reserve committee that it believed there had been a breach of the Master Agreement until late 2008, a year after the November 2007 email exchange.  MBIA disputes this contention and contends that Murtagh did not mention Defendants' breach in the written summaries for the loss reserve committee books, but he remembered generally communicating to others that the Defendants had breached prior to that time and that in any event, MBIA

39

always expected to receive the value of the Class B Notes when establishing its loss reserves for Z-1 and Captiva, irrespective of whether the Defendants breached.

The evidentiary record includes certain internal emails within Natixis discussing the ratability of the Class B Notes. These emails were never sent to Patriarch. MBIA contends that Wormser at Natixis told Patriarch at various times the Class B Notes could be rated investment grade. Citing Wormser's testimony, Patriarch states that Natixis' analysis consisted of merely "guesstimate[s]." Patriarch notes that no witness for Natixis was able to testify regarding the assumptions used in this analysis, and one Managing Director, Lorraine Medvecky ("Medvecky"), conceded that at least one key assumption relating to the purchase price of collateral was based on a misreading of the Indenture. According to Patriarch, MBIA's own rating experts conceded that this assumption was incorrect and did not use it in their analysis. According to MBIA, although Wormser testified that Natixis' analysis of the ratability of the Class B Notes consisted of Natixis' "best guesstimate[s]," he clarified that these estimates were based on running models of the transaction and that Medvecky did not concede that any of the assumptions Natixis used in the modeling

40

of the Zohar I transaction were based on a misreading of the
Indenture.

According to the Defendants, Patriarch was able to
reopen five of the CDOs for reinvestment and, through
Patriarch's management efforts, those CDOs were closed without
any losses or insurance payments by MBIA.  MBIA contends that
neither Patriarch nor MBIA expected losses on two of the CDOs
from the beginning of the transaction and, as expected, MBIA did
not experience losses on them.  The two CDOs that were not
reopened for new investments were Z-1 and Captiva.

According to the Defendants, the senior insured notes
of Z-1 and C Aptiva matured in November 2008 and November 2009,
respectively, without sufficient collateral to pay their notes.
In accordance with its policies, MBIA paid the senior note
holders of Z-1 $59,559,526 and the senior noteholders of Captiva
$56,019,913.  MBIA disputes that it paid the senior note holders
of Z-1 or Captiva directly and that, pursuant to its insurance
policies, MBIA paid the Z-1 and Captiva issuers $59.26 million
and $57.04 million, respectively, at which time MBIA obtained a
subrogation claim to be paid back by those issuers if and when
the issuers have additional assets.

41

At the time of these insurance payments, no payments had been made on the Class B Notes, and none have been made since.  MBIA recognized that the Class B Notes would not provide any benefit prior to the maturity of these CDOs.  According to the Defendants, even if the Class B Notes had been transferred, MBIA's insurance payments would have been the same.  MBIA contends that it planned to obtain the benefit of the Class B Notes as soon as it could under the terms of each Identified CDO and that MBIA had the right to call for the liquidation of Captiva's asset portfolio and planned to exercise that right once the Class B Notes to Z-1 and Captiva had been contributed. Prior to the Class B Notes' maturities, MBIA would have assessed at the time how it may have monetized the notes to reduce or eliminate its losses and that even if MBIA needed to make an insurance payment, MBIA would have been able to recover that payment later due to its subrogation claim under the policy. According to Patriarch, MBIA never intended to terminate Captiva or Z-1 and seize their assets prior to the maturity of those CDOs.  MBIA disputes this contention and contends that it had the right to accelerate Captiva prior to maturity and direct the liquidation of the collateral pool and that MBIA planned to

42

exercise that right once the Class B Notes had been contributed to Captiva.

According to Patriarch, throughout the relevant period, MBIA continued to use the Class B Notes as a credit to keep the cash component of its reserves for Z-1 and Captiva low, even as these transactions degraded. Patriarch states that, as the transactions degraded, MBIA should have posted additional cash reserves, but instead used increasing amounts of the Class B Notes as a substitute for cash reserves. MBIA contends that there is no support for the claim that the Class B Notes were a credit or that MBIA should have posted additional cash reserves. MBIA notes that, under the Master Agreement, MBIA is entitled to the contribution of up to $120 million of the Class B Notes (and/or Class C Notes) for the remediation of Z-1 and Captiva and that when determining the proper case loss reserves for those transactions, MBIA took into account the benefit for which it had bargained under the Master Agreement. MBIA further contends that as MBIA's estimate of its losses in Z-1 and Captiva increased, MBIA believed that a greater amount of the Class B Notes (and/or Class C Notes) would be required to offset those losses.

43

According to the Defendants, if Patriarch had
unsuccessfully sought an investment grade rating during this
period, MBIA would have had to substantially increase the
reserves and acknowledge its exposure.  By not pressing
Patriarch to rate the Class B Notes, MBIA was able to reserve
less than $25 million on expected insurance payments of $115
million.  According to MBIA, if Patriarch had unsuccessfully
sought an investment grade rating on any portion of the Class B
Notes at any time, it was obligated under the Master Agreement
to contribute a corresponding amount of Class C Notes.  MBIA
disputes that it has not pressed Patriarch to rate the Class B
Notes and contends that at all relevant times, MBIA wanted and
expected the Class B Notes to be contributed to the Identified
CDOs and communicated that to the Defendants.

After making the insurance payments, MBIA booked an
offsetting "salvage" asset of approximately $100 million for the
Class B Notes.  Patriarch contends that this was done to allow
MBIA to continue to delay recognizing losses, presumably as long
as it can continue this litigation.  MBIA admits it has booked a
salvage asset of approximately $100 million, but states that it
did so because it is entitled to the benefit of the Class B
Notes (and/or Class C Notes) and has a subrogation claim with

44

the Z-1 and Captive issuers for repayment of funds paid by MBIA to the extent the issuers obtain such funds.

In September 2008, with the global credit crisis, Moody's placed the Class A Notes on "Credit Watch" for a possible downgrade.  In June 2009, Moody's downgraded the Class A Notes to below investment grade.  In April 2010, S&P likewise downgraded the Class A Notes to below investment grade.  The Class B Notes cannot be rated investment grade by Moody's and Standard & Poor's because the senior, Class A Notes are below investment grade.  MBIA disputes any implication and/or speculation that the Class B Notes can never be rated investment grade in the future.

As of November 8, 2010, over $500 million of the Class A Notes remain unpaid, with senior rights to the Class B Notes. MBIA contends that the transaction is performing well and the Class A Notes are not in default.  The Class B Notes have never been recharacterized as debt for tax purposes.

MBIA's complaint was filed on April 3, 2009, and Patriarch contends that it learned for the first time during the April 2010 deposition of Murtagh that MBIA is claiming the

Master Agreement was breached in November 2005, March 2006 and November 2007 and repudiated in November 2008. MBIA contends that no such pre-litigation notice of a breach is required under the Master Agreement and that MBIA did not become aware Defendants were in breach of the Master Agreement in 2005 until after commencing this litigation, when MBIA learned through discovery that the Class B Notes were ratable in 2005 but that Defendants took no efforts to get them rates.

According to Patriarch, in May 2007, MBIA considered filing litigation against Patriarch. To support this contention Patriarch notes that MBIA has asserted work product protection over documents created at that time. Patriarch notes that, even in 2007, MBIA did not inform Patriarch that it believed there had been a breach or that it had retained counsel to analyze potential claims. MBIA disputes this contention to the extent it suggests that MBIA believed Patriarch had already breached the Master Agreement in May 2007 and contends that MBIA determined the Master Agreement had been breached in November 2007, when, according to Murtagh's deposition testimony, Tilton sent an email saying she would not discuss the Class B Notes and would not perform under the Master Agreement.

46

Relying on Murtagh's testimony, Patriarch contends that, at all relevant times, MBIA "continued to treat the Master Agreement as in effect," "continued to perform its obligations under the Master Agreement," and "continued to seek performance from Patriarch under the Master Agreement." MBIA disputes this contention, instead stating that to the extent Murtagh testified that MBIA continued to treat the Master Agreement "as in effect" after Tilton's November 2007 email, he was referring to the fact that MBIA could enforce the Master Agreement in this action, not that MBIA had agreed to continue with the contract and waive its right to bring a breach of contract claim. MBIA notes that Murtagh testified that MBIA "continued to perform its obligations under the Master Agreement" because MBIA was always willing and able to perform its final obligation of consenting to indenture amendments to effectuate the ultimate contribution of the Class B Notes (and the Class C Notes, if applicable). MBIA also notes that Murtagh testified that MBIA "continued to seek performance from Patriarch under the Master Agreement" after the November 2007 email because MBIA sought to resolve its dispute with Patriarch over the Class B Notes, not because MBIA had decided to treat Patriarch's breach as if it had not occurred.

47

In support of its factual assertion that MBIA
continued to treat the Master Agreement as in effect, Patriarch
cites documents suggesting that, after a May 2007 meeting with
Natixis to discuss "restructuring Zohar I [and] extracting a
discounted value of the Class B Notes," MBIA determined that it
would be more advantageous to maintain "the current
arrangement." MBIA contends that MBIA ultimately rejected
Natixis' proposal and that it had no knowledge that Defendants
were in breach of their obligations in May 2007.

Patriarch, citing Murtagh's testimony, states that
MBIA believes the Master Agreement to remain in effect to this
day. MBIA disputes this contention and contends that Murtagh
testified that in establishing the value of the Class B Notes as
a salvage asset, MBIA considered the fact that Defendants are
obligated under the Master Agreement to contribute the Class B
Notes to Z-I and Captiva, that to the extent Murtagh testified
that MBIA continued to treat the Master Agreement "as in effect"
after Tilton's November 2007 email, he was referring to the fact
that MBIA could enforce the Master Agreement in this action, not
that MBIA had agreed to continue with the contract and not
assert breach.

Patriarch continued to perform management services for the Identified CDOs, including Captiva and Z-I, throughout the relevant period.  MBIA admits that, pursuant to Collateral Management Agreements between Patriarch affiliates and the Captiva and Z-I issuers, Patriarch affiliates continued to perform management services for Captiva and Z-I through the respective maturities of those deals.

**The Summary Judgment Standard**

Summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The courts do not try issues of fact on a motion for summary judgment, but, rather, determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

49

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." Rodriguez v. City of N.Y., 72 F.3d 1051, 1060-61 (2d Cir. 1995). Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted). In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations and quotation marks omitted); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, "the non-moving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of

50

events is not wholly fanciful." Morris v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999) (internal citation and quotation marks omitted).

When deciding a motion for summary judgment, a court must remain mindful of the fact that summary judgment is "an extreme remedy, cutting off the rights of the non-moving party to present a case to the jury." H & M Hennes & Mauritz LP v. Skanska USA Bldg., Inc., 617 F. Supp. 2d 152, 155 (E.D.N.Y. 2008).

**The Defendants' Motion For Summary Judgment To Dismiss The Complaint Is Granted In Part And Denied In Part**

Based on the Master Agreement and each party's recitation of the facts, MBIA has established a triable issue of fact which is not barred by the limitations of liabilities provisions or by the election of remedies doctrine. However, because New York law does not recognize a cause of action for breach of an implied covenant independent of a claim for breach of the underlying contract, MBIA's claim alleging breach of the implied covenant of good faith and fair dealing is dismissed.

**A.   A Triable Issue Of Fact Exists Under The Master Agreement**

51

Section 3.04 of the Master Agreement between MBIA,
Patriarch and LDI dated November 13, 2003 contains a provision
which MBIA contends has been violated by Patriarch.  The first
paragraph of the provision states:

Section 3.04.  Patriarch VIII, in connection with the
management services it or the Managers, as applicable,
are (or will be) providing to the Identified CDOs, as
applicable, intends to use the Transferable Notes (as
defined below) to the extent reasonably possible to
remediate one or more of the Identified CDOs.  In
connection therewith, Patriarch VIII shall use
commercially reasonable efforts (i) to cause Octaluna,
LLC to transfer to Patriarch VIII (or to one or more
of its affiliates), (ii) to contribute (or to cause
such Patriarch VIII affiliate to contribute) and (iii)
to cause the applicable Manager(s) of the Identified
CDOs to cause the relevant Identified CDO to accept,
from time to time prior to May 15, 2012, in each case,
a portion of the Class B Notes (each such contribution
of Class B Notes to an Identified CDO, a
"Contribution") in the manner described in this
Section 3.04, such that (in the sole judgment of
Patriarch VIII (and such applicable Manager)) any
shortfall or perceived shortfall in the assets
available to such Identified CDO to pay interest and
ultimate principal on the notes and/or other
securities issued by such Identified CDO would be
eliminated or substantially reduced (it being the
intent of Patriarch VIII and the applicable Manager to
use the Transferable Notes to the extent reasonably
possible to remediate each such Identified CDO).  The
foregoing Contribution obligation of Patriarch VIII
shall be subject to the following terms and the last
paragraph of this Section 3.04: (i) the aggregate
amount of Class B Notes (the "Transferable Notes") to
be so contributed by Patriarch VIII (and/or its
affiliates) to the Identified CDOs shall be no more
than 80% of the face amount of the Class B Notes

52

issued on the Closing Date (the "Cap Amount"); (ii)
the rating of such Transferable Notes is at least
"Baa3" by Moody's and "BBB-" by Standard & Poor's as
contemplated by Section 7.13(b) of the Zohar
Indenture; (iii) at the time of such Contribution, the
Class B Notes being contributed to such Identified CDO
shall be free and clear of all liens, claims and
encumbrances except those created by the Transaction
Documents (such non-excepted liens, claims and
encumbrances, "Liens") (it being understood that the
existence of any such Lien voluntarily created by
Patriarch VIII or any of its affiliates shall not
relieve Patriarch VIII of its Contribution obligations
hereunder); (iv) the Class B Notes being contributed
shall constitute debt for United States federal income
tax purposes, as evidenced by an opinion of nationally
recognized tax counsel; and (v) the satisfaction of
all applicable transfer, acquisition and/or
contribution restrictions (A) imposed by law and (B)
contained in (x) the Transaction Documents, the
constitutive documents of Octaluna, LLC and any other
governing documents with respect to the Class B Notes
and (y) the indenture and other applicable governing
documents (the "Identified CDO Agreements") of the
applicable Identified CDOs (as such Identified CDO
Agreements of each such Identified CDO may be amended,
modified or supplemented from time to time).  Each of
MBIA (solely in its capacity as Controlling Party
under the Zohar Indenture or similar capacity with
respect to the Identified CDOs) and Patriarch VIII
agrees to cooperate and use commercially reasonable
efforts to procure as soon as reasonably practicable
the satisfaction of the conditions specified in
clauses (ii), (iv) and (v)(B) of the preceding
sentence, including without limitation consenting to
and otherwise supporting supplemental indentures,
amendments, waivers or other modifications to the
Transaction Documents and/or the Identified CDO
Agreements with respect to each applicable Identified
CDO and taking such other action as may be necessary
to effectuate the intention of and/or facilitate the
performance of Patriarch VIII's obligation to make
Contributions hereunder.  It is the intent and
expectation of the parties that all expenses incurred
by the parties in connection with the performance of
their obligations set forth in the preceding sentence

shall be reimbursed by the Issuer, or the Identified
CDO, as applicable, in accordance with the Transaction
Documents and/or Identified CDO Agreements, as the
case may be (it being understood that neither
Patriarch VIII nor any of its Affiliates shall be
required to bear the expenses described in this
sentence).

According to MBIA, under the Master Agreement,
Patriarch was required to seek the Ratings on the Class B Notes
and contribute up to 80% of the rated Class B Notes to one or
more of the Identified CDOs, as necessary, to prevent shortfalls
on the MBIA-insured CDOs.  According to the Defendants, they
never had an enforceable obligation under the Master Agreement
to seek the Ratings or to contribute the Class B Notes.

A contract must be construed to effectuate the intent
of the parties.  E.g., Hunt Ltd. v. Lifschultz Fast Freight,
Inc., 889 F.2d 1274, 1277 (2d Cir. 1989) ("As a general matter,
the objective of contract interpretation is to give effect to
the expressed intentions of the parties.").  In interpreting a
contract, courts "should examine the entire contract and
consider the relation of the parties and the circumstances under
which it was executed.  Particular words should be considered,
not as if isolated from the context, but in the light of the
obligation as a whole and the intention of the parties as

54

manifested thereby." Kass v. Kass, 91 N.Y.2d 554, 566, 673

N.Y.S.2d 350 (1998) (quoting Atwater & Co. v. Panama R. R. Co.,

246 N.Y. 519, 524 (1927)).


Under the Master Agreement, Patriarch was required to

"use commercially reasonable efforts" to contribute the Class B

Notes to the Identified CDOs, as necessary, to remediate those

transactions.  As the beneficial owner of the Class B Notes and

the collateral manager of the Zohar I transaction, only

Patriarch had the authority to cause the Issuer to seek a rating

on the Class B Notes.  MBIA relies on the following language

from Section 3.04 of the Master Agreement:


> [Patriarch] agrees to cooperate and use commercially
> reasonable efforts to procure as soon as reasonably
> practicable the satisfaction of the conditions
> specified [including the Rating and Debt-For-Tax
> Conditions] . . ., including without limitation
> consenting to and otherwise supporting supplemental
> indentures, amendments, waivers or other modifications
> to [the relevant documents] and taking such other
> action as may be necessary to effectuate the intention
> of and/or facilitate the performance of Patriarch
> VIII's obligation to make Contributions hereunder.


The requirement that Patriarch use "commercially

reasonable efforts" in a timely manner provided an objective

standard of reasonableness rather than Patriarch's mere

subjective belief about what efforts Patriarch should take to obtain the Ratings.  See, e.g., Christie's Inc. v. SWCA, Inc., 867 N.Y.S.2d 650, 653-54 (Sup. Ct. 2008) (holding reasonableness standards in a contract "suggest[] that the parties intended a standard of objective reasonableness to apply") (citing Misano di Navigazione, SpA v. U.S., 968 F.2d 273, 275-76 (2d Cir. 1992)).  The Master Agreement also defines the nature of the efforts required, namely that Patriarch should "tak[e] such other action as may be necessary to effectuate the intention of and/or facilitate the performance of Patriarch VIII's obligation to" contribute the Class B Notes to the Identified CDOs.

        According to MBIA's view of the facts, the Defendants' refusal to perform under the Master Agreement was because of MBIA's decision not to insure Patriarch's Zohar III transaction and its desire to hold onto a valuable asset.  The Defendants contend that they had discretion to decide when it was practicable to seek the ratings.  However, the terms of the Master Agreement require Patriarch to use "commercially reasonable efforts" as soon as "reasonably practicable." Whether or not the Defendants not seeking a rating in a four year period satisfied the Defendants' contractual obligations is a contested factual issue.

The Defendants have asserted that Patriarch had no obligation to seek the ratings until the collateral balance reached $750 million.  In support of this contention, the Defendants rely on the Master Agreement, which establishes the contractual condition that "the rating of such Transferable Notes is at least 'Baa3' by Moody's and 'BBB-' by Standard & Poor's as contemplated by Section 7.13(b) of the Zohar Indenture."  The Defendants claim that this condition, and specifically the words "as contemplated by Section 7.13(b) of the Indenture," limits Patriarch's obligation to seek the ratings because the Third Supplemental Indenture changed Section 7.13(b) to state:

> Within thirty (30) days following the date that the Aggregate Principal Balance of the Collateral Debt Obligations exceeds $750,000,000 (or such earlier date as the Collateral Manager may determine), the Issuer (or the Collateral Manager on behalf of the Issuer) shall (with the assistance of the Arranger) request that each of Moody's and Standard and Poor's provide an initial rating of the Class B Notes of at least "Baa3" by Moody's and at least "BBB-" by Standard & Poor's (an "Acceptable Class B Rating"), within thirty (30) days after the date of such request (it being understood that such initial rating of the Class B Notes would address the ultimate payment in full of the principal of the Class B Notes); provided that such request to Standard & Poor's will result in a separate rating process that may or may not result in the issuance of a rating on the Class B Notes.

57

The Defendants contend that this language clearly limits Patriarch's obligation to seek a rating until the balance reached the $750 million.  MBIA, however, contends that the language in the Master Agreement that refers to Section 7.13(b) of the Indenture merely restates the Rating Condition and does not relate to Patriarch's obligation, set forth in the next sentence of the Master Agreement, to "use commercially reasonably efforts to procure as soon as reasonably practicable the satisfaction of" that Condition.

In addition, the Defendants claim that Section 7.13(b) of the indenture limits when Patriarch is required to request a rating on the Class B Notes because, under the indenture, the Issuer is the party that requests ratings on the Class B Notes, and Section 7.13(b) provides, among other things, that the Issuer shall seek the ratings on the Class B Notes when directed to do so by Patriarch.  Patriarch contends that "any words which express the idea that performance of a promise is dependent on some other event" will create a condition, and, because the requisite conditions were not met, Patriarch was under no obligation to seek the rating.  According to MBIA, neither the Master Agreement nor the Indenture express that Patriarch's obligation is dependent on a collateral balance of $750 million

because the Indenture did not limit, nor create a condition precedent to Patriarch's obligation under the Master Agreement to use commercially reasonable efforts as soon as reasonably practicable to obtain the ratings.

The Defendants also contend that the Third Supplemental Indenture overrides any conflicting provision of the Master Agreement. However, the Master Agreement provides that it cannot be amended absent a writing signed by all parties, and no evidence of any such amendment has been presented. Patriarch has cited Marsh v. Cabrini Medical Center, No. 08 Civ. 5405(RJS), 2009 WL 1726331, at *3 (S.D.N.Y. Apr. 6, 2009) for the proposition that, because the Third Supplemental Indenture was executed after the Master Agreement and contains a merger clause, it trumps the Master Agreement. However, the Court in Marsh held that "a subsequent contract not pertaining to precisely the same subject matter will not supersede an earlier contract unless the subsequent contract has definitive language indicating it revokes, cancels or supersedes that specific prior contract." 2009 WL 1726331, at *3. MBIA notes that the Third Supplemental Indenture sets forth, inter alia, when the Issuer is required to seek the ratings, whereas the

59

Master Agreement embodies the agreement between MBIA and the Defendants with regard to the remediation transaction.

"[T]he mere fact that a contract refers to another contract does not mean that it has 'incorporated' the other contract." Rosen v. Mega Bloks Inc., No. 06 Civ. 3474(LTS)(GWG), 2007 WL 1958968, at *10 (S.D.N.Y. July 6, 2007). A contract interpretation "that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible." LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005). Using this standard, it would seem that MBIA's interpretation of the Master Agreement is more appropriate, as Section 3.04's requirement that Patriarch seek the satisfaction of the conditions "as soon as reasonably practicable" would be rendered superfluous under the Defendants' interpretation that Patriarch had no obligation to seek the ratings unless the collateral balance exceeded $750 million. However, the Court need not definitively decide between the parties' competing interpretations, for so long as the Master Agreement is ambiguous on this issue, the Defendants are not be entitled to summary judgment. See LaSalle Bank, 424 F.3d at 205 ("[W]hen the meaning of the contract is ambiguous and the intent of the

parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment.").

Under the Master Agreement, a triable issue of fact exists as to the scope of Patriarch's obligations under the Master Agreement, specifically whether Patriarch was obligated to use a commercially reasonable effort as soon as practicable to obtain the ratings.

### B.   A Triable Issue Of Fact Exists With Respect To MBIA's Claim For Anticipatory Repudiation

Patriarch contends that it is entitled to summary judgment on MBIA's repudiation claim, a cause of action Patriarch describes as being based entirely on a November 2008 email, for three reasons.  First, the Defendants state that because the aggregate principal balance never reached $750 million, Patriarch had no obligation to seek a rating for the Class B Notes.  Second, the Defendants contend that MBIA's experts have not provided any evidence that the Rating or Debt-For-Tax Conditions could have been satisfied in November 2008. Finally, the Defendants state that MBIA's damages expert did not offer an opinion as to the fair market value of the Class B

61

Notes or MBIA's damages as of November 2008 or any date thereafter.

As noted above, there is a triable issue of fact concerning Patriarch's obligations under the Master Agreement, including whether having $750 million was a condition necessary to trigger Patriarch's performance.  With respect to the Defendants' other contentions, MBIA has based its anticipatory repudiation claim on both a November 2007 email and a November 2008 email.  As described above, in November 2007, MBIA emailed Tilton requesting a meeting regarding the Class B Notes, and Tilton responded: "At the time I made it clear that if you did not wrap Zohar III as committed that I would not share the Patriarch B note with MBIA to save you from losses on Captiva and Z-1."  As such, the evidence presented establishes a triable issue of fact concerning Patriarch's anticipatory repudiation of the Master Agreement, and the Defendants' summary judgment motion on this cause of action must be denied.

### C.   The Limitation Of Liability Does Not Preclude MBIA's Contract Claims

"Courts in New York generally enforce contractual waivers or limitations of liability."  See Baidu, Inc. v.

Register.com, Inc., 760 F. Supp. 2d 312, 317 (S.D.N.Y. 2010).

Courts in New York generally enforce contractual waivers or

limitations of liability.  See, e.g. Indus. Risk Insurers v.

Port Auth. Of N.Y. & N.J., 387 F. Supp. 2d 299, 307 (S.D.N.Y.

2005) ("[P]arties, especially those of equal bargaining power,

should be able to rely upon the general New York rule that

enforces contracts for the release of claims of liability.");

Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc., 84 N.Y.2d

430, 436, 618 N.Y.S.2d 882, 643 N.E.2d 504 (1994) ("A limitation

on liability provision in a contract represents the parties'

[a]greement on the allocation of the risk of economic loss in

the event that the contemplated transaction is not fully

executed, which the courts should honor.").  However,

"exculpatory clauses should be strictly construed against the

person seeking exemption from liability." HealthExtras, Inc. v.

SG Cowen Sec. Corp., No. 02 Civ. 9613(RO), 2004 WL 97699, at *2

(S.D.N.Y. Jan. 20, 2004).  "The common business practice of

limiting liability by restricting or barring recovery by means

of an exculpatory provision, although disfavored by the law and

closely scrutinized by the courts, is accorded judicial

recognition where it does not offend public policy." Banc of

Am. Sec. LLC v. Solow Bldg. Co., 47 A.D.3d 239, 244, 847

N.Y.S.2d 49 (1st Dep't 2007) (internal citations and quotation
marks omitted).

The limitation of liability provision in the Master
Agreement relied upon by Defendants states:

If Patriarch VIII has given or received notice of its
removal, resignation or termination as Collateral
Manager of the Issuer or one or more of the Managers
of an Identified CDO has been removed with the consent
of MBIA or resigned, then Patriarch VIII shall, at the
Controlling Party's option, either (i) satisfy its
Class B Note Contribution obligation described in this
Section 3.04 in respect of such Identified CDOs prior
to the effectiveness of such removal, resignation or
termination or (ii) transfer such Transferable Notes
to the replacement collateral manager of the Issuer
(which transfer obligation shall be subject to the
conditions set forth in clauses (iii), (v)(A) and
(v)(B)(x) of the third sentence of the preceding
paragraph).  Notwithstanding anything else contained
herein, if (i) Patriarch VIII shall have made
Contributions pursuant to the preceding paragraph
and/or transferred Transferable Notes pursuant to
clause (i) or (ii) of the preceding sentence, or (ii)
such transfers cannot be made because the conditions
of this Section 3.04 have not been satisfied, then
neither Patriarch VIII nor any of its affiliates shall
be liable to MBIA or any other Person because of any
such non-Contribution or any Contribution to any
Identified CDO, Patriarch VIII's decision to make a
Contribution in any particular amount(s) to any one or
more Identified CDOs and/or Patriarch VIII's direction
not to cause a Contribution to be made to any
particular Identified CDO.  For the avoidance of
doubt, the parties agree that Patriarch VIII is
entitled to retain the distributions on the Class B
Notes and/or Class C Notes directly or indirectly
received by it and to retain its interests, direct or
indirect, in the Class B Notes and/or Class C Notes

64

that it holds because the conditions precedent in this
Section 3.04 have not been satisfied.

The first sentence of the paragraph addressed what would happen
if Patriarch was removed, resigned, or terminated as collateral
manager of Zohar I, or one of the Patriarch affiliates managing
the Identified CDOs was removed or resigned.  It requires that
Patriarch, at MBIA's option, either (i) satisfy the Contribution
obligation in Section 3.04 before the effectiveness of the
removal, resignation or termination, or (ii) transfer the Class
B Notes to a replacement manager subject to certain of the
conditions in Section 3.04.  The second sentence states that
Patriarch has limited liability if (i) it satisfies one or both
of those two options (the Contribution obligation to the
Identified CDOs before removal and/or the transfer obligation to
a replacement collateral manager), or (ii) "such transfers
cannot be made because the conditions of this Section 3.04 have
not been satisfied."

The phrase "such transfers" refers to the immediately
preceding use of the word "transfer":  "transfer[ing]
Transferrable Notes pursuant to clause (i) or (ii) of the
preceding sentence."  Because "the preceding sentence" applies
only in the context of removal, resignation or termination, the

provision the Defendants highlight also applies only in that context. In this instance, there has been no removal, resignation or termination of Patriarch as collateral manager, and, accordingly, the clause upon which the Defendants rely is not applicable.

Additionally, it is impossible to enforce the limited liability provision because it is contingent upon either (i) Patriarch satisfying its contribution obligation to the Identified CDOs or transferring that obligation to a replacement collateral manager, or (ii) a situation where "such transfers cannot be made because the conditions of this Section 3.04 have not been satisfied." Patriarch did not contribute Class B Notes to the Identified CDOs, nor did it transfer this obligation to a replacement collateral manager. As such, in order to enforce the limited liability provision, it would need to be found that "the conditions of this Section 3.04 have not been satisfied." As described above, the precise conditions of Section 3.04 raise triable issues of material fact. Under these circumstances, the limitation of liability provision does not bar MBIA's action to enforce the Master Agreement.

> **D.   The Doctrine Of Election Of Remedies Does Not Bar MBIA's Contract Claims**

The Defendants contend that MBIA's contract claims are barred by the doctrine of election of remedies because MBIA elected not to seek the benefit of its bargain under the Master Agreement.  The doctrine "election of remedies" provides as follows:

> When a party materially breaches a contract, the non-breaching party must choose between two remedies—[it] can elect to terminate the contract and recover liquidated damages or [it] can continue the contract and recover damages solely for the breach.  A party can indicate that [it] has chosen to continue the contract by continuing to perform under the contract or by accepting the performance of the breaching party.  Once a party elects to continue the contract, [it] can never thereafter elect to terminate the contract based on that breach, although [it] retains the option of terminating the contract based on other, subsequent breaches.

ESPN, Inc. v. Office of Com'r of Baseball, 76 F. Supp. 2d 383, 387-88 (S.D.N.Y. 1999) (quoting Bigda v. Fischbach Corp., 898 F. Supp. 1004, 1011-12 (S.D.N.Y. 1995)).  If the non-breaching party does not terminate and continues to perform, then it cannot later use that breach as a basis to terminate the contract.  ESPN, 76 F. Supp. 2d at 388 ("Although a party can either treat the entire contract as broken and sue immediately for the breach or reject the proposed breach and continue to

67

treat the contract as valid, the party must make an election and cannot at the same time treat the contract as broken and subsisting. One course of action excludes the other."). The doctrine is based on the concept that a party may not "exercise two alternative or inconsistent rights or remedies." Apex Pool Equip. Corp. v. Lee, 419 F.2d 556, 562 (2d Cir. 1969).

The Defendants contend that MBIA cannot bring this action because it elected to continue under the Master Agreement rather than sue the Defendants for their breach. As part of this argument, Patriarch contends that MBIA waived the right to sue for breach because it did not provide notice of that breach to the Defendants before filing suit. However, this argument confuses the election doctrine with the waiver doctrine. See Bigda, 898 F. Supp. at 1013. When a contract contains a "no waiver" clause, such as the Master Agreement's Sections 4.02 and 4.04, a non-breaching party can continue his contract instead of terminating it based on breaches that previously occurred and yet not waive any of his rights under the contract. See id. According to MBIA, once it knew Defendants had breached the Master Agreement and would not perform as required, MBIA brought this suit seeking damages for Defendants' breaches. MBIA claims Patriarch failed to use commercially reasonable efforts to seek

68

the Ratings as soon as practicable, and MBIA asserts that it will show that the Class B Notes were ratable at various points in time from 2005 to 2007.

Additionally, Patriarch's election of remedies defense fails because it has not been adequately pled.  Under New York law, election of remedies is an affirmative defense.  <u>Lumber Mut. Cas. Ins. Co. of N.Y. v. Friedman</u>, 176 Misc. 703, 706, 28 N.Y.S.2d 506 (1941).  "The general rule in federal courts is that a failure to plead an affirmative defense results in a waiver."  <u>Travellers Int'l, A.G. v. Trans World Airlines</u>, 41 F.3d 1570, 1580 (2d Cir. 1994).  The Defendants acknowledge that they did not plead election of remedies in their answer, but contend that this defense should be permitted because this is the first "pragmatically possible time" to do so and applying the defense now would not unfairly prejudice MBIA.  The Complaint, which was filed in April 2009, alleges that Defendants "repeatedly" breached their obligations under the Master Agreement and cites a November 2008 email as an example. The Defendants knew MBIA was claiming multiple breaches by at least April 2010, nine months prior to filing this motion, but the Defendants never sought leave to amend their answer and instead raised the election of remedies defense for the first

69

time on summary judgment.  Fed. R. Civ. P. 8(c) requires a
defendant to "affirmatively state any avoidance or affirmative
defense," and affirmative defenses that are not raised in the
pleading stage should be dismissed.  In re Cross Media Mktg.
Corp., 367 B.R. 435, 446 (Bankr. S.D.N.Y. 2007) ("[U]nless
Defendants can assert that the affirmative defenses now being
alleged were not available at the pleading stage, Defendants
failure to plead these defenses should result in a waiver.").

      The election of remedies doctrine requires knowledge
of the alleged breach and an affirmative action that constitutes
an election to continue performance.  See Bigda, 898 F. Supp. at
1013 ("Of course, a non-breaching party cannot be found to have
elected to continue a contract in the face of a breach unless he
knew of the breach.").  MBIA asserts that it did not have
knowledge of Defendants' breach until November 2007, when MBIA
received Tilton's email and concluded that Patriarch had not
performed and did not intend to perform under the Master
Agreement.  Therefore, MBIA cannot have elected to continue
performance under the Master Agreement prior to November 2007,
yet MBIA's allegations concerning Patriarch's alleged breach of
the Master Agreement extend prior to that time.

Furthermore, an election of remedies requires an affirmative action of some kind. Hallinan v. Republic Bank & Trust Co., 519 F. Supp. 2d 340, 352 (S.D.N.Y. 2007). Here, MBIA never communicated expressly or by implication that MBIA would forego a breach and instead continue with the Master Agreement. "A party can indicate that [it] has chosen to continue the contract by continuing to perform under the contract or by accepting the performance of the breaching party," ESPN, 76 F. Supp. 2d at 387. However, according to MBIA, as of early 2004, MBIA had no remaining obligations, having fully performed under the Master Agreement by transferring the management of Amara-1, Amara-2 and Oasis to Defendants and entering into certain premium assignment agreements with the Defendants. MBIA's only remaining Task was consent to the ultimate contribution of the Class B Notes (and the Class C Notes, if applicable).

The Defendants claim that MBIA continued to pay Patriarch management fees relating to certain of the troubled CDO's through mid-2008. However, MBIA's obligation to pay those fees to Patriarch's affiliates was not set forth in the Master Agreement, but rather the May 2004 Agreement. After November 2007, MBIA did not take any action to perform under the Master Agreement. No election is required until the non-breaching

71

party is required to render some performance.  Bigda, 898 F.

Supp. at 1013 ("Election to take advantage of breach of

condition in a contract generally need not be exercised until

the time arrives when, by the terms of the contract, the party

entitled to elect must render some performance.  Then either

performing or failing to perform will indicate an election.").

        Also not indicative of any election to forego a breach

is MBIA's other conduct after first learning of Defendants'

breach in November 2007.  According to the Plaintiff, MBIA

attempted to discuss the breach with Tilton before filing suit

and requested a meeting with Tilton in October 2008.  MBIA's

attempt to resolve the dispute with the Defendants resulted in

Tilton's email in November 2008, which MBIA claims reiterates

the Defendants' repudiation.  Good faith attempts to realize

contractual benefits by negotiating with a counterparty, rather

than immediately filing suit, do not constitute an election of

remedies.  See Seven-Up Bottling Co. (Bangkok) v. PepsiCo., 686

F. Supp. 1015, 1023 (S.D.N.Y. 1988) ("[A] party's reluctance to

terminate a contract upon a breach and its attempts to encourge

the breaching party to adhere to its obligations under the

contract do not necessarily constitute a waiver of the innocent

72

party's rights in the future.") (citing S.D. Hicks & Son Co. v. J.T. Banker Chem. Co., 307 F.2d 750, 752 (2d Cir. 1962)).

Further, the doctrine of election of remedies typically only applies when the non-breaching party continued to receive benefits under the contract. See Hallinan, 519 F. Supp. 2d at 352 ("Typically, where courts find that a breach claim is barred by the doctrine of 'election of remedies,' the claimant has not only continued to perform under the contract, but received benefits under the contract. Here, [the plaintiff's] actions generally amount to inaction, rather than affirmative steps to continue to perform the contract.") (citing ARP Films, Inc. v. Marvel Entm't Grp., Inc., 952 F.2d 643, 649 (2d Cir. 1991)). According to MBIA, MBIA did not reap any benefits under the Master Agreement after learning of Defendants' breach because the sole benefit to be conveyed by Defendants was Patriarch's use of commercially reasonable efforts to satisfy the conditions and contribute the Class B Notes (and Class C Notes, if applicable), neither of which ever occurred. The Defendants argue that Patriarch's continued management of certain CDOs was a benefit conferred on MBIA under the Master Agreement. However, according to MBIA, the management of those CDOs is governed by agreements separate from the Master

73

Agreement that were entered into several months before the
Master Agreement.

The Defendants have not established that MBIA pursued
two opposing courses of action in the wake of Defendants'
breach.  Accordingly, the election of remedies doctrine does not
bar MBIA's claims.

> ### E.   The Motion To Dismiss MBIA's Claims For A Declaratory Judgment, Breach Of The Implied Covenant Of Good Faith And Fair Dealing And Promissory Estoppel Is Denied

In their motion for summary judgment, the Defendants
also seek dismissal of MBIA's request for a declaratory judgment
as well as MBIA's claims for breach of the implied covenant of
good faith and fair dealing and promissory estoppel.  Patriarch
contends that because summary judgment must be entered against
MBIA's substantive claims, the claim for declaratory judgment is
moot.  However, as noted above, triable issues of fact exist
with respect to Patriarch's contractual obligations.
Accordingly, MBIA's request for a declaratory judgment remains
valid.

With respect to MBIA's claim alleging breach of the implied covenant of good faith and fair dealing, this Court has previously noted that "New York law does not recognize a cause of action for breach of an implied covenant independent of a claim for breach of the underlying contract." See Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro, 961 F.2d 1052, 1056 (2d Cir. 1992) ("Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract."); see also Sea Carriers Corp. v. Empire Programs, Inc., 488 F. Supp. 2d 375, 380 (S.D.N.Y. 2007) (collecting cases). Here MBIA cannot maintain a separate claim for breach of the implied duty of good faith. Patriarch's motion for summary judgment to dismiss the claim of breach of the implied covenant of good faith and fair dealing is granted.

MBIA states that it included a claim for promissory estoppel in the event the Defendants disputed the validity of the Master Agreement. While Patriarch has acknowledged the existence of the Master Agreement, there is a triable issue of fact concerning the scope of the parties' obligations under that agreement. Because there is a dispute concerning Patriarch's obligation to use commercially reasonable efforts to seek the

75

ratings, it would be inappropriate to grant Patriarch's motion for summary judgment on MBIA's claim for promissory estoppel.

## The MBIA Motion For Summary Judgment Dismissing The Affirmative Defenses Of The Defendants Is Granted

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The Defendants bear the burden of proving their affirmative defenses of unclean hands and equitable estoppel.  In re Roundabout Theatre Co., Inc., 131 B.R. 14, 17 (S.D.N.Y. 1991) ("Since equitable estoppels is an affirmative defense, [the party asserting the defense] has the burden of establishing its elements."); Gidatex, S.r.L. v. Campaniello Imports, Ltd., 82 F. Supp. 2d 126, 130 (S.D.N.Y. 1999) ("The defendant who invokes the doctrine of unclean hands has the burden of proof.").

### A.    The Defendants' Affirmative Defense Of Unclean Hands Fails

76

In their answer, the Defendants alleged the doctrine of unclean hands as an affirmative defense.  Under New York law, the doctrine of unclean hands is "never used unless the plaintiff is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct." Nat. Distillers & Chem. Corp. v. Seyopp Corp., 17 N.Y.2d 12, 15-16, 267 N.Y.S.2d 193 (1966); see also Weiss v. Mayflower Doughnut Corp., 1 N.Y.2d 310, 316, 152 N.Y.S.2d 471 (1956); Cohn & Berk v. Rothman-Goodman Mgmt., 125 A.D.2d 435, 436, 509 N.Y.S.2d 367 (2d Dep't 1986).

Tilton, the Defendants' principal and Rule 30(b)(6) witness, was questioned in her deposition about the basis for the unclean hands affirmative defense:

> Q.   There's another purported defense stated in Defendants' Answer that says:  "MBIA's claims are barred in whole or in part by the doctrine of unclean hands?"  What is the factual basis for that purported defense?
>
> A.   To the best of my knowledge, this has to do with the fact that MBIA was trying to do many things with this B Note that were unethical.  Trying to get the B Note cashed out in front of the A note investors; to try to get – you know, to use Zohar-2 to increase the value; to take things out; that they weren't always following

        this Master Agreement, but otherwise trying to
        capitalize on this B Note, at the expense of others.

Q.     Let me break that down just for a moment.  Because
       when you said - - you added something there.  You said
       they were - - "they weren't always following this
       Master Agreement."  You don't have any argument, do
       you, that MBIA has failed to perform under the Master
       Agreement, do you?

A.     No.  My argument is that they asked us to perform
       outside of the Master Agreement in an unethical
       fashion to solve a problem that was supposed to be
       solved under the Master Agreement but could not due to
       the inability to rate the notes.

Tilton Tr. 434:6-435:13).  Additionally, Patriarch has alleged

that MBIA improperly used the Class B Notes to keep its reported

reserves low and hide its growing exposure on the Identified

CDOs.  MBIA allegedly accomplished this by never adjusting its

reserve analysis to reflect either the impact of the Third

Supplemental Indenture changing the timing of any rating

application or the fact that only $532 million had been raised

instead of the expected $750 million.  MBIA also failed to

inform its auditors of these developments, instead claiming that

there were no material changes and that the Class B Notes

continued to perform as expected.

      If the alleged misconduct is "unrelated to the claim

to which it is asserted as a defense, [it] does not constitute

unclean hands." Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC, 149
F.3d 85, 90 (2d Cir. 1998); see also Specialty Minerals, Inc. v.
Pluess-Staufer AG, 395 F. Supp. 2d 109, 112 (S.D.N.Y. 2005)
(unclean hands inapplicable unless conduct has "immediate and
necessary relation to the equity that [plaintiff] seeks in
respect of the matter in litigation."); Weiss, 1 N.Y.2d at 316
("The doctrine of unclean hands is only available when the
conduct relied on is directly related to the subject matter in
litigation and the party seeking to invoke the doctrine was
injured by such conduct."). Here, MBIA seeks enforcement of its
rights under the Master Agreement, but the misconduct Patriarch
has alleged stems from actions taken outside the bounds of that
contract. An unclean hands defense focused on MBIA's reserving
practices or statements to its auditors is not "directly
related" to whether Defendants breached the Master Agreement.
There is no evidence in the record of any facts reflecting
misconduct by MBIA with respect to the Master Agreement.

Additionally, the affirmative defense of unclean hands
fails as a matter of law where the defendant has no injury.
Security Pacific Mortgage & Real Estate Servs., Inc. v. Canadian
Land Co. of Am., 690 F. Supp. 1214, 1224 (S.D.N.Y. 1988)
("Without a claim of injury, the defense of unclean hands fails

79

as a matter of law."), aff'd 891 F.2d 447 (2d Cir. 1989); see

also Obabueki v. Int'l Bus. Machs. Corp., 145 F. Supp. 2d 371,

401 (S.D.N.Y. 2001) ("[U]nder New York law, to assert a defense

of unclean hands, a party must have been injured by the

allegedly inequitable conduct.") (citing Netherby Ltd. V. G.V.

Licensing, Inc., No. 92 Civ. 4239, 1993 WL 463679, at *6

(S.D.N.Y. Nov. 9, 1993).  Here, there is no evidence that MBIA's

reserving practices or comments made to its auditors injured

Patriarch.


    **B.**    **The Defendants' Affirmative Defense Of Equitable Estoppel Fails**


      The Defendants have also asserted an affirmative

defense of equitable estoppel.  As the Second Circuit has

explained:


> Equitable estoppel is grounded on notions of fair
> dealing and good conscience and is designed to aid the
> law in the administration of justice where injustice
> would otherwise result.  The doctrine of equitable
> estoppel is properly invoked where the enforcement of
> the rights of one party would work an injustice upon
> the other party due to the latter's justifiable
> reliance upon the former's words or conduct.


80

Babitt v. Vebeliunas (In re Vebeliunas), 332 F.3d 85, 93 (2d
Cir. 2003) (internal citations and quotation marks omitted).
Under New York law, equitable estoppel requires a showing of
"(1) An act constituting a concealment of facts or a false
misrepresentation; (2) An intention or expectation that such
acts will be relied upon; (3) Actual or constructive knowledge
of the true facts by the wrongdoer; (4) Reliance upon the
misrepresentations which causes the innocent party to change its
position to its substantial detriment." Kargo, Inc. v. Pegaso
PCS, S.A. de C.V., No. 05 Civ. 10528(CSH)(DFE), 2008 WL 4579758,
at *13 (S.D.N.Y. Oct. 14, 2008); see also Gen. Elec. Capital
Corp. v. Amadora, S.A., 37 F.3d 41, 45 (2d Cir. 1994) (quoting
Special Event Entm't v. Rockefeller Ctr., 458 F. Supp. 72, 76
(S.D.N.Y. 1978).

        The Defendants focus their equitable estoppel defense
on MBIA's approval of the Fourth Supplemental Indenture (the
"Fourth Amendment").  Pursuant to that amendment, the investment
bank Natixis was permitted to receive certain accrued arranger
fees that originally were only to be paid upon the rating of the
Class B Notes.  The Fourth Amendment also preserved a deferred
fee payable to Natixis upon the rating of the Class B Notes that
otherwise would have expired in November 2006.  The Defendants

contend that MBIA misled Patriarch at the time of the Fourth
Amendment, when MBIA was secretly contemplating litigation
against Patriarch for breach of the Master Agreement.  Patriarch
contends that, rather than inform Patriarch that it believed
there had been a breach or that it had hired counsel to
investigate claims, MBIA approved the Fourth Amendment that
reduced Natixis' incentive to assist in rating the Class B
Notes, leading Patriarch to believe that there had been no
breach and that it agreed the Class B Notes could not be rated
at that time.

        This theory does not establish an equitable estoppel
defense.  Defendants do not claim that MBIA made any statement
to them upon which MBIA intended Defendants to rely, instead
relying on MBIA's act of approving the Fourth Amendment.  But
that act does not constitute a concealment of facts necessary to
establish equitable estoppels, as MBIA's opinions at the time
about whether the Class B Notes were ratable and whether
Defendants' prior actions constituted a breach are opinions, not
facts.  See In re Zarro, 268 B.R. 715, 722 (Bankr. S.D.N.Y.
2001) ("The misrepresentation must be one of fact, and an
opinion or misrepresentation of law will not suffice.") (citing
Lignos v. United States, 439 F.2d 1365, 1368 (2d Cir. 1971)).

Even if the act of approving the Fourth Amendment can be considered an act constituting a concealment of facts or a false misrepresentation, there is no evidence in the record establishing that MBIA intended for Patriarch to rely on MBIA's alleged misrepresentation or concealment.  Additionally, the Defendants independently approved the Fourth Amendment before MBIA did, and thus they did not rely on MBIA's approval. Without establishing these necessary elements, Patriarch cannot bring its affirmative defense of equitable estoppel.

## The Motions Of The Parties To Preclude Evidence Are Denied

Both parties have moved to exclude evidence offered by the other on various grounds including hearsay and materiality. These motions are denied at this time without prejudice to their renewal at any subsequent submissions.  The present submissions will be considered and given the appropriate weight in light of the objections made.  Factual issues are presented by the experts' testimony, and their resolution is not appropriate in the context of the present motions.

## Conclusion

83

Based on the conclusions set forth above, the Defendants' motion for summary judgment dismissing the complaint is granted in part and denied in part, and the Plaintiff's motion for partial summary judgment to dismiss the Defendants' affirmative defense of unclean hands and equitable estoppel is granted.  The parties' motions to exclude evidence are denied.

It is so ordered.

New York, NY
February  6  , 2012

ROBERT W. SWEET
U.S.D.J.