UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

MBIA INSURANCE CORPORATION,

                         Plaintiff,              09 Civ. 3255

   -against-                             OPINION

PATRIARCH PARTNERS VIII, LLC, a
Delaware limited liability company,
and LD INVESTMENTS, LLC, a
Delaware limited liability company,

                     Defendants.

----------------------------------------X

A P P E A R A N C E S:

        Attorneys for Plaintiff

        BINGHAM MCCUTCHEN LLP
        399 Park Avenue
        New York, NY  10022-4689
        By:  Jeffrey Q. Smith, Esq.
            Susan F. DiCicco, Esq.
            Kevin J. Biron, Esq.

        Attorneys for Defendants

        BRUNE & RICHARD LLP
        One Battery Park Plaza
        New York, NY  10004
        By:  Charles A. Michael, Esq.
            David Elbaum, Esq.
            Hillary Richard, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/3/12

**Sweet, D.J.**

Plaintiff MBIA Insurance Corporation ("MBIA" or the "Plaintiff") and Defendants Patriarch Partners VIII, LLC and LD Investments, LLC (collectively, "Patriarch" or the "Defendants") have filed various motions in limine with respect to certain anticipated evidence in the upcoming trial of this action, which is tentatively scheduled to begin on October 15, 2012. Based upon the conclusions set forth below, (1) evidence relating to MBIA's internal loss reserves will be admitted, (2) the MBIA attorney-client privilege is waived with respect to testimony of MBIA witnesses as to MBIA's intent concerning provisions of the Master Agreement and the Indenture, (3) evidence relating to the collateral for Zohar II and Zohar III and the Patriarch pitch-books will be admitted, (4) the admissibility of the Natixis Documents as business records will be determined at the time they are offered, depending on the purpose for which particular documents are offered and the practice of Nataxis with respect to the offered documents, (5) discovery is reopened for the purpose of taking the depositions of Anthony McKiernan ("McKiernan"), Mitchell Sonkin ("Sonkin") and Ram Wertheim ("Wertheim"), (6) the expert testimony of David Miller

1

("Miller") will be admitted and (7) the expert testimony of Joseph Mason ("Mason") will be admitted.

## Prior Proceedings

In an opinion dated February 6, 2012 (the "February 6 Opinion"), Patriarch's motion for summary judgment and MBIA's motion for partial summary judgment were determined. See MBIA Ins. Corp. v. Patriarch Partners VIII, LLC, No. 09 Civ. 3255, 2012 WL 382921 (S.D.N.Y. Feb. 6, 2012). The February 6 Opinion set forth the prior proceedings in this action, and familiarity with those proceedings is assumed. The Joint Pretrial Order ("PTO") was submitted by the parties and signed by the Court on March 12, 2012. The instant motions were marked fully submitted on June 13, 2012.

## The Facts

Familiarity with the facts as set forth in the February 6 Opinion and the PTO is assumed. A brief recapitulation of the complicated transactions at issue constitutes a background for the conclusions set forth below.

2

Patriarch is an affiliate of Patriarch Partners, LLC, an investment firm founded and managed by Lynn Tilton ("Tilton"), its chief executive officer.  Patriarch and Patriarch Partners, LLC specialize in the management of distressed assets and manage funds that make investments in distressed businesses.  Patriarch and its affiliates serve as collateral managers for collateralized debt obligation transactions or "CDOs."

On November 13, 2003, Patriarch sponsored a new CDO, called Zohar CDO 2003-1, Limited, or "Zohar I."  Patriarch is the Collateral Manager of Zohar I under the Collateral Management Agreement among (i) the Issuer, (ii) Zohar CDO 2003-1, LLC, and (iii) Patriarch.  As Collateral Manager of Zohar I, Patriarch is responsible for selecting and managing Zohar I's collateral pool, meaning the assets underlying the security, in accordance with the transaction's governing documents, including the Indenture.  The Class B Notes were issued as part of the Zohar I transaction.

On November 13, 2003, MBIA, Patriarch and LDI also entered into the Master Agreement.  The Master Agreement sets

forth Patriarch's obligation, subject to a number of conditions, to cause the transfer of up to 80%, or $120 million, of the face amount of the Class B Notes to one or more of certain CDOs insured by MBIA (the "Identified CDOs").  Patriarch's contribution obligation was subject to several conditions, including, but not limited to, that the Class B Notes being transferred be rated "at least 'Baa3' by Moody's and 'BBB-' by Standard & Poor's as contemplated by Section 7.13(b) of the Indenture."  Ratings of "BBB-" or higher by S&P and "Baa3" or higher by Moody's are considered "investment grade" ratings.

The Master Agreement contained a provision that Patriarch, subject to, among other things, the condition that the Class B Notes be rated investment grade, "use commercially reasonable efforts" to contribute up to $120 million of the Class B Notes to the Identified CDOs as necessary to remediate expected shortfalls in those transactions.  The Master Agreement also contained a provision that Patriarch:

> use commercially reasonable efforts to procure as soon as reasonably practicable the satisfaction of the conditions specified [including the conditions that the Class B Notes be rated investment grade] . . ., including without limitation consenting to and otherwise supporting

4

supplemental indentures, amendments, waivers or other
modifications to [the relevant documents] and taking such
other action as may be necessary to effectuate the
intention of and/or facilitate the performance of Patriarch
VIII's obligation to make Contributions hereunder.

## The Applicable Standard

"The purpose of an in limine motion is to aid the
trial process by enabling the Court to rule in advance of trial
on the relevance of certain forecasted evidence, as to issues
that are definitely set for trial, without lengthy argument at,
or interruption of, the trial." Island Intellectual Prop. LLC
v. Deutsch Bank AG, No. 09 Civ. 2675(KBF), 2012 WL 526722, at *1
(S.D.N.Y. Feb. 14, 2012) (quoting Palmieri v. Defaria, 88 F.3d
136, 141 (2d Cir. 1996)). However, "[e]vidence should be
excluded on a motion in limine only when the evidence is clearly
inadmissible on all potential grounds." Commerce Funding Corp.
v. Comprehensive Habilitation Servs. Inc., No. 01 Civ.
3796(PKL), 2005 WL 1026515, at *3 (S.D.N.Y. May 2, 2005) (citing
Baxter Diagnostics, Inc. v. Novatek Med., Inc., No. 94 Civ.
5520, 1998 WL 665138, at *3 (S.D.N.Y. Sept. 25, 1998)).
Further, "[a] court considering a motion in limine may reserve
judgment until trial, so that the motion is placed in the
appropriate factual context." Id. (citing Nat'l Union Fire Ins.

5

Co. v. L.E. Myers Co. Grp., 937 F. Supp. 276, 287 (S.D.N.Y.
1996).

## Evidence Relating to MBIA's Loss Reserves Is Admissible

MBIA has moved to preclude Patriarch from introducing
at trial any evidence regarding MBIA's internal loss reserves,
accounting practices and discussions with its outside auditors
as well as certain of Defendants' proposed trial exhibits, which
MBIA contends consist of inadmissible hearsay.  According to
MBIA, evidence concerning MBIA's reserving practices should be
excluded because it is irrelevant to the determination of this
action, and, even if it were relevant, evidence concerning
MBIA's loss reserves should be excluded because the probative
value of this evidence is outweighed by the danger of confusion
of issues and undue delay.  MBIA also contends that certain of
Patriarch's exhibits, including a report by a third-party hedge
fund, internal notes authored by MBIA's auditors and email
communications authored by non-MBIA declarants, are inadmissible
hearsay.  For the reasons set forth below, Patriarch is
permitted to introduce evidence of MBIA's loss reserves and
present the challenged exhibits.

**A. Evidence Concerning MBIA's Loss Reserves Is Relevant**

    **1. The Evidence Addresses Disputed Communications Between MBIA And Patriarch**

A disputed issue in this trial concerns communications between MBIA and Patriarch. MBIA has contended that from 2005 to 2008, "Patriarch repeatedly refused to discuss the B Notes or Patriarch's plans for obtaining a rating on all or some of the B Notes." Patriarch has disputed this claim.

MBIA has moved to exclude 33 documents that include reports to MBIA's loss reserve committee, excerpts from those reports and memos prepared by PriceWaterhouseCoopers ("PWC"), MBIA's auditors, concerning meetings of MBIA's loss reserve committee. Each quarter, MBIA's Insured Portfolio Management Division made a presentation to MBIA's loss reserve committee, which included a number of senior executives, regarding Z-1 and Captiva, the two CDOs that MBIA hoped would be remediated using the Class B Notes. The loss reserve committee memos are said to show that each quarter from 2005 until 2008 the committee was told that "there has been no material change since last quarter." Similarly, PWC's memos are said to show that MBIA's

7

employees repeatedly told them "there has been no material
change since" the prior quarter.

MBIA has contended that in the first quarter of 2006,
when MBIA refused to insure Zohar III, Tilton retaliated by
refusing to comply with the Master Agreement.  Patriarch
contends that the reasonable inference can be drawn that if
Tilton said she would not perform an agreement potentially worth
$120 million to MBIA, that information would have been reported
to management in the above-described quarterly meetings.  The
absence of such statements in MBIA's loss reserve committee and
PWC memos is said to be relevant to support Patriarch's position
that Tilton did not refuse to comply with the Master Agreement.
Because this evidence is probative to revealing the substance of
the disputed communications between MBIA and Patriarch, the
evidence is relevant and is admissible.

### 2. The Evidence Addresses The Scope Of The Parties' Obligations Under The Master Agreement

A central issue for trial is "the scope of Patriarch's
obligations under the Master Agreement."  See MBIA Ins. Corp.,
2012 WL 382921, at *23.  MBIA has claimed that Patriarch was
obligated to seek a rating on the Class B Notes as soon as a

8

"sizeable portion of the notes could be rated."  Patriarch has
disputed that claim.  The challenged loss reserve evidence at
issue in this motion in limine is claimed by Patriarch to be
relevant to a determination of the scope of Patriarch's
obligation to seek a partial rating of the Class B Notes.

MBIA has challenged 13 documents dated between July
15, 2002 and November 13, 2003, when the Master Agreement was
signed.  Those documents are relevant to the background of the
remediation transaction and to the parties' expectations under
the Master Agreement.  MBIA alleged in the Complaint that by
mid-2002, it recognized that it faced a risk of losses on
certain insured CDOs and approached Patriarch about a
remediation strategy to minimize the risk of loss.  The pre-
Master Agreement documents are relevant in that they concern
internal discussion within MBIA about the potential losses and
the amount of MBIA's reserves against those losses.

MBIA has also challenged 33 documents dated after the
Master Agreement was signed in November 2003 which allegedly
indicate that as the performance of Captiva and Z-1 continued to
decline, MBIA increased the amount of Class B Notes that it
assumed as a benefit in its loss reserve calculation.  According

9

to Patriarch, that amount increased over time to about $90
million.  Patriarch contends that if it sought a rating and
failed, or only a small portion of the Class B Notes were deemed
ratable, then MBIA would have been forced to increase its
reserves with additional cash to make up the shortfall.
Following a rating failure, it is contended that Patriarch would
not have been obligated to transfer the Class B Notes, and
MBIA's continued use of the Class B Notes as an offset in its
loss reserve calculations would have been invalid.  Patriarch
contends that it can be inferred that MBIA would not have
expected Patriarch to take actions that would have the effect of
imposing a reserve liability on MBIA.  Patriarch has submitted
that such an inference counters MBIA's contention that Patriarch
was obligated to seek a rating on an undefined "sizable portion"
of the Class B Notes, and Patriarch acted in a commercially
reasonable manner when it sought to build collateral value in
Zohar I rather than seek to obtain a rating.  Thus, a relevant
issue has been presented, and the evidence is admissible.


**B. The Probative Value Of The Evidence Is Not Outweighed By**
   **Potential Prejudice**


     MBIA contends that, even if certain evidence is
relevant, its probative value is outweighed by potential

10

prejudice.  The prejudice MBIA has identified is that
presentation of this evidence would "needlessly waste the
Court's, the parties' and the witnesses' time."  In support of
this argument, MBIA notes that "Defendants estimate trial will
require a full week longer than MBIA estimate."  As described
above, the evidence at issue is probative with respect to
several key issues.  Although presenting additional evidence
will extend the duration of the trial, it is the Court's
responsibility to ensure that no relevant evidence is
unjustifiably excluded.  Notwithstanding MBIA's contentions, the
relevance of the loss reserve evidence outweighs the potential
prejudice, and the evidence will be admitted.


**C. The Exhibits Challenged On Hearsay Grounds Will Be Admitted**


        MBIA contends that certain Patriarch exhibits,
including internal notes authored by MBIA's auditors, a report
by a third-party hedge fund and email communications authored by
non-MBIA declarants, are inadmissible hearsay.  With respect to
the internal notes authored by MBIA's auditors, MBIA has
challenged 11 documents prepared by PWC, MBIA's outside
auditors, as inadmissible under Rule 801(d)(2)(D).  However,
auditors have been held to be agents of a party for purposes of

11

Rule 801(d)(2)(D) and, therefore, statements by auditors are deemed non-hearsay statements of a party opponent.  See <u>Trs. of Four Joint Bds. Health & Welfare & Pension Funds v. Penn Plastics</u>, 864 F. Supp. 342, 352 n.14 (S.D.N.Y. 1994) (finding statement by auditor admissible non-hearsay under Rule 801(d)(2)(D)).  There is no dispute that PWC served as MBIA's auditor, that the challenged documents were prepared during the course of the relationship and that the documents relate to matters within the scope of PWC's agency.  See, e.g., <u>Marcic v. Reinauer Transp. Cos.</u>, 397 F.3d 120, 128-129 (2d Cir. 2005) (summarizing elements of Rule 801(d)(2)(D)).  Accordingly, the exhibits containing PWC's internal notes and memoranda are admissible.

MBIA has also challenged a report prepared by a hedge fund in December 2002 that criticized MBIA's business practices, by among other things, arguing that MBIA's reserves for CDO losses were insufficient and that MBIA faced greater loss exposure on its portfolio of insured CDOs than it had acknowledged in its public disclosures.  However, Patriarch has stated that it does not intend to offer that document for the truth of the matters asserted therein, but rather as background to the transactions with Patriarch.  Since the evidence is not

12

being offered for the truth of the matter asserted, no hearsay objection has been presented, and the exhibit is admissible.

Finally, MBIA has objected to three documents prepared by Patriarch and sent to employees of MBIA.  However, to the extent that MBIA contends that Tilton "recently fabricated" any testimony that could be corroborated by these three documents, these documents are prior consistent statements and admissible under Rule 801(d)(1)(B).  As such, these email communications authored by non-MBIA employees are admissible as exhibits at trial.

**MBIA's Attorney-Client Privilege Has Been Waived As To Certain Documents**

The February 6 Opinion concluded that a fact issue for trial concerned the scope of Patriarch's obligations under the Master Agreement and the relationship between the Master Agreement and Section 7.13(b) of the Zohar I Indenture, as amended.  In the PTO, MBIA has identified four witnesses whose testimony Patriarch anticipates will include extrinsic evidence on these issues.  The witnesses MBIA has identified include Robert Chiperfield ("Chiperfield"), lead transactional counsel who negotiated the relevant documents, Ram Wertheim

13

("Wertheim"), MBIA's General Counsel, and Michael Murtagh

("Murtagh") and Amy Mauer-Litos ("Mauer-Litos"), two fact

witnesses.  Patriarch contends that, in offering this evidence,

MBIA has placed its contracting intent and interpretation at

issue and waived the attorney-client privilege that may have

attached to documents bearing on those issues.  MBIA objects to

any waiver of privilege.  For the reasons described below, MBIA,

by placing at issue its contracting intent and interpretation of

the Master Agreement, has waived attorney-client privilege.

###     A. Because MBIA Has Placed Its Intent And Understanding Of The Master Agreement "At Issue," The Attorney-Client Privilege Has Been Waived

     "It has long been recognized that the attorney-client

privilege constitutes an obstacle to the truth-finding process,

the invocation of which should be cautiously observed to ensure

that its application is consistent with its purpose."  Priest v.

Hennessy, 51 N.Y.2d 62, 68, 431 N.Y.S.2d 511, 409 N.E.2d 983

(1980) (internal quotation marks and citations omitted).  The

purpose of the privilege is to permit a client to "confide fully

and freely in his attorney, secure in the knowledge that his

confidences will not later be exposed to public view to his

embarrassment or legal detriment."  Id.  Where a party uses this

14

shield as a sword to the legal detriment of his litigation

opponent, however, the purpose of the privilege is no longer

served, and the privilege is impliedly waived.  Chin v. Rogoff &

Co., P.C., No. 05 Civ. 8360(NRB), 2008 WL 2073934, at *5

(S.D.N.Y. May 8, 2008) ("New York courts have held that an 'at

issue' waiver occurs where a party affirmatively places the

subject matter of its own privileged communication at issue in

litigation, so that invasion of the privilege is required to

determine the validity of a claim or defense of the party

asserting the privilege, and application of the privilege would

deprive the adversary of vital information. . . . The 'at issue'

waiver doctrine reflects the principle that the attorney-client

privilege is a 'shield' and must not be used as a 'sword.'").


          Courts have recognized that under New York law "it is

well established that a party waives the attorney-client and

work product privileges whenever it puts an attorney's opinion

into issue, by calling the attorney as an expert witness or

otherwise."  Herrick Co., Inc. v. Vetta Sports, Inc., No. 94

Civ. 905(RPP), 1998 WL 637468, at *1 (S.D.N.Y. Sept. 17, 1998)

(citing United States v. Bilzerian, 926 F.2d 1285, 1292 (2d

Cir.), cert. denied, 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39

(1991)).  MBIA, in rejecting Patriarch's argument that MBIA has

                              15

placed counsel's opinion "at issue," has cited the case of
Deutsche Bank Trust Co. of Am. v. Tri-Links Investment Trust, 43
A.D.3d 56, 63, 837 N.Y.S.2d 15 (1st Dep't 2007) and contended in
its opposition brief that "'at issue' waiver occurs only when a
party 'has asserted a claim or defense that he intends to prove
by use of the privileged materials.'"

However, notwithstanding MBIA's contentions, the First
Department in Deutsche Bank held that "'[a]t issue' waiver of
privilege occurs where a party affirmatively places the subject
matter of its own privileged communication at issue in
litigation, so that invasion of the privilege is required to
determine the validity of a claim or defense of the party
asserting the privilege, and application of the privilege would
deprive the adversary of vital information." Deutsche Bank, 43
A.D.3d at 63. The First Department held only that the
privilege-holder had not waived its attorney-client privilege
merely by asserting a claim against its insurer for
indemnification, and the privilege-holder had not made any
factual assertions that placed its state of mind at issue or
otherwise implicated advice of counsel. Id. at 64-65.

16

The First Department's statement in <u>Deutsche Bank</u> that "at issue waiver occurs when the party has asserted a claim or defense that he intends to prove by use of the privileged materials," <u>id.</u> at 64 (quotations omitted), did not purport to identify the exclusive basis for "at issue" waiver under New York law.  As described above, the First Department's description of the "at issue" waiver was broader.  Subsequent decisions of New York courts have not construed the <u>Deutsche Bank</u> decision in the manner that MBIA has suggested.  See, e.g., <u>Leviton Mfg. Co. v. Greenberg Taurig LLP</u>, No. 09 Civ. 8083 (GBD)(THK), 2010 WL 4983183, at *3 (S.D.N.Y. Dec. 6, 2010) ("Courts have recognized that a party need not explicitly rely upon advice of counsel to implicate privileged communications. Instead, advice of counsel may be placed in issue where, for example, a party's state of mind, such as his good faith belief in the lawfulness of his conduct, is relied upon in support of a claim"); <u>Chin</u>, 2008 WL 2073934, at *5-6.  Accordingly, under New York law, there are no exclusive requirements for finding an implied waiver.

MBIA has also contended that after the Second Circuit's decision in <u>In re County of Erie</u>, 546 F.3d 222 (2d Cir. 2008), there can only be an implied waiver if a party

17

affirmatively relies on privileged communications in support of
a claim or defense.  But in Erie, the Second Circuit recognized
a separate and independent basis for finding an at issue waiver
which was not applicable in that case.  The Erie Court
reaffirmed the principle adopted in United States v. Bilzerian,
926 F.2d 1285 (2d Cir. 1991), that "an inquiry into state of
mind . . . typically calls forth the possibility of implied
waiver of the attorney client privilege."  Erie, 546 F.3d at
228-29.  In Bilzerian, the Second Circuit found the privilege
was waived even through the defendant did not rely on any
privileged communications.  Bilzerian, 926 F.2d at 1292-93; see
also Leviton Mfg. Co., 2010 WL 4983183, at *3 (quoted above).
The Erie Court went on to conclude that a finding of waiver is
justified "when a party uses an assertion of fact to influence
the decisionmaker while denying its adversary access to
privileged material potentially capable of rebutting the
assertion."  Erie, 546 F.3d at 229 (quoting John Doe Co. v.
United States, 350 F.3d 299, 306 (2d Cir. 2003)).


        After Erie, the Southern District has continued to
recognize the broader waiver principles endorsed by the Second
Circuit.  In Arista Records, LLC v. Lime Group, LLC, No 06 Civ.
5936(KMW), 2011 WL 1642434, at *2-3 (S.D.N.Y. Apr. 20, 2011),

18

the Honorable Kimba M. Wood rejected the argument, similar to
MBIA's here, that a party could present state of mind evidence
without waiving the attorney client privilege, so long as it
refrained from relying on the advice of counsel.  Judge Wood
observed that Erie "noted that the Bilzerian court was correct"
in concluding that such assertions waive the attorney client
privilege.  "Further," the Court continued, "a decision issued
after Erie makes clear that:

> a party need not explicitly rely on advice of counsel to
> implicate the privileged communications.  Instead, advice
> of counsel may be placed in issue where, for example, a
> party's state of mind, such as his good faith belief in the
> lawfulness of his conduct, is relied upon in support of a
> claim of defense . . . [Because the] legal advice that a
> party received may well demonstrate the falsity of its
> claim of good faith belief, waiver in these instances
> arises as a matter of fairness.

Id. at *3 (quoting Leviton Mfg., 2010 WL 4983183, at *3).  MBIA
has contented that Patriarch's motion is based on the superseded
test announced in Hearn v. Rhay, 68 F.R.D. 574 (E.D. Wash.
1975).  However, while the Erie Court narrowed the Hearn test,
the court did nothing to undermine the principles adopted in
Bilzerian and subsequently endorsed by courts in this district.

19

MBIA has demonstrated its intention to place the
opinion of counsel at issue.  In opposing Patriarch's summary
judgment motion, MBIA sought to introduce various affidavits
reflecting its witnesses' intent and interpretation of the
Master Agreement and Indenture.  In one of the affidavits MBIA
submitted with respect to the summary judgment motion, Mauer-
Litos made factual assertions about what "MBIA expected
Patriarch" to do pursuant to the Master Agreement, what she
"believed" about the relationship between Section 7.13(b) of the
Indenture and the Master Agreement, and what she "intended" when
she signed the Third Supplemental Indenture.  In another
affidavit, Murtagh offered similar factual assertions about his
intent and interpretation of the Master Agreement and Third
Supplemental Indenture.  Similar to Mauer-Litos and Murtagh,
Chiperfield has made factual assertions about his
"understanding" of the Master Agreement as well as what was
"intended" by the parties in the Agreement.  As such, MBIA has
placed the opinion of counsel at issue and impliedly waived the
attorney-client privilege.  Disclosure of the documents withheld
by MBIA as privileged will permit Patriarch a fair opportunity
to assess and challenge MBIA's factual assertions at trial.
See, e.g., Chin, 2008 WL 2073934, at *7 ("The [attorney-client]
privilege does not exist to allow clients to mask important

20

elements of their claims against third-parties."); see also Bank Brussels Lambert v. Credit Lyonnais (Suisse), Nos. 93 Civ. 6876 (KMW), 94 Civ. 1317 (KMW), 1995 WL 598971, at *6 (S.D.N.Y. Oct. 11, 1995) ("The [privileged] communications will enable the plaintiffs to verify or challenge [defendants] assertion that its liability, if any, was caused by faulty advice of counsel. To deny the plaintiffs this opportunity would result in a one-sided account and prejudice the plaintiffs' ability to litigate their claim.").

### B. As A Matter Of Fairness, Patriarch Is Entitled To Obtain Documents Capable Of Rebutting MBIA's Assertions Regarding The Master Agreement

MBIA has contended that fairness principles only apply where there has been a selective disclosure of privileged communications. Patriarch has contended that there was a selective disclosure in this instance. Irrespective of whether MBIA has selectively disclosed privileged information, Patriarch, as a matter of fairness, is entitled to obtain documents capable of rebutting MBIA's assertions regarding the Master Agreement.

21

"Underlying any determination that a privilege should be forfeited is the notion of unfairness" that results when a party attempts to use the attorney client privilege as both a sword and a shield.  Erie, 546 F.3d at 229; see also People v. Kozolski, 11 N.Y.3d 223, 246-47, 869 N.Y.S.2d 848, 898 N.E.2d 891 (2008) (extent to which privilege has been waived turns on considerations of fairness) (citing John Doe Co. v. United States, 350 F.3d 299, 302 (2d Cir. 2003)).  Our Circuit has held that a finding of waiver is justified "when a party uses an assertion of fact to influence the decisionmaker while denying its adversary access to privileged material potentially capable of rebutting the assertion."  Erie, 546 F.3d at 229 (quoting John Doe Co., 350 F.3d at 306).  Thus, "even if a party does not attempt to make use of a privileged communication he may waive the privilege if he asserts a factual claim the truth of which can only be assessed by examination of a privileged communication."  Bowne of N.Y. City, Inc. v. AmBase Corp., 150 F.R.D. 465, 488 (S.D.N.Y. 1993); see also One Beacon Ins. Co. v. Forman In'l, Ltd., No. 04 Civ. 2271, 2006 WL 3771010, at *10 (S.D.N.Y. Dec. 15, 2006) ("Fairness considerations may also come into play where the party asserting the privilege makes factual assertions, the truthfulness of which may be assessed only by an examination of the privileged communications or documents.")

22

(quoting Am. S.S. Owners Mut. Prot. & Indem. Assoc, Inc. v.
Alcoa S.S. Co., 232 F.R.D. 191, 199 (S.D.N.Y. 2005)); see also
Granite Partners v. Bear Stearns & Co., 184 F.R.D. 49, 55
(S.D.N.Y. 1999) ("A privilege may be impliedly waived where a
party makes assertion in the litigation or asserts a claim that
in fairness requires examination of protected communications.").

The Federal Court of Claims recently noted,

> [A] veritable Niagara of opinions have concluded that where
> a party affirmatively reserves the right to use parol
> evidence to bolster its interpretation of a contract, it
> may not, via the attorney-client privilege, withhold from
> discovery attorney-client communications that also form the
> extrinsic context for the agreement, particularly those
> that occurred in negotiating or interpreting the agreement.
> In such circumstances, a waiver of the privilege as to the
> latter communications is implied.

Stovall v. United States, 85 Fed. Cl. 810, 816 & n.7 (2009)
(collecting cases).

MBIA has stated that its witnesses will testify
concerning their "intent and interpretation of the contracts."
Accordingly, the waiver shall be enforced against all documents
that concern those subject matters. See, e.g., In re Seagate
Tech., 497 F.3d 1360, 1372 (Fed. Cir. 2007) ("The widely applied

23

standard for determining the scope of a waiver is that the waiver applies to all other communications relating to the same subject matter.  This broad scope is grounded in principles of fairness and serves to prevent a party from simultaneously using the privilege as both a sword and a shield[.]") (internal citations and quotation marks omitted); see also Stovall, 85 Fed. Cl. at 817 n.8.  Patriarch is entitled to obtain all documents that are potentially capable of rebutting MBIA's factual assertions with respect to the Master Agreement § 3.04 as contemplated by Section 7.13(b) of the Zohar Indenture and the Third Indenture Section 7.13(b) altering the deadline after the collateral balance exceeds $750 million.

### C. MBIA's Various Other Objections Are Without Merit

MBIA has presented various other objections to the notion that it has waived attorney-client privilege. First, MBIA has asserted that the burden of proof to show a waiver is on Patriarch. However, the courts in this district have held otherwise. See, e.g., Gruss v. Zwirn, 276 F.R.D. 115, 131 (S.D.N.Y. 2011) ("The party claiming either attorney-client privilege or work-product immunity also bears the burden of establishing that the

privilege has not been waived.") (citing Allied Irish Banks v.
Bank of Am., N.A., 240 F.R.D. 96, 103 (S.D.N.Y. 2007) ("[T]he
party claiming the privilege bears the burden of establishing
that it has not been waived."). Allocation of the burden to
MBIA is consistent with the long-standing rule that "the
attorney-client privilege constitutes an obstacle to the truth-
finding process" and should be "cautiously observed to ensure
that its application is consistent with its purpose." Priest,
51 N.Y.2d at 68 (internal quotation marks and citations
omitted).

MBIA has also contended that it did not waive its
attorney-client privilege because Defendants first placed intent
at issue. However, Patriarch has contended that the Master
Agreement was unambiguous as a matter of law. As described
above, MBIA's decision to proffer evidence of subjective intent
to rebut Patriarch's contentions put the opinion of counsel "at
issue" and waived the attorney-client privilege.

MBIA has also claimed that Patriarch's motion to
compel is untimely in view of the failure to raise the privilege
issue with respect to the summary judgment submissions.
However, it was not until MBIA submitted the three affidavits in

25

opposing summary judgment that MBIA waived the privilege.  The
privilege issue would have been rendered moot had the Court
granted Patriarch's motion.  After the February 6 Opinion and
the completion of the PTO, Patriarch timely raised the privilege
issue.

For the reasons expressed above, MBIA has waived the
attorney-client privilege with respect to any testimony of MBIA
witnesses as to its intent with respect to the provisions of the
Master Agreement and the Third Indenture submitted to counter
Patriarch's contentions.  If no such testimony will be
proffered, no waiver will be enforced.

**The Evidence Relating To The Collateral For Zohar II, Zohar III
And The Patriarch Pitch-Books Will Be Admitted**

Patriarch has moved in limine to exclude from trial
all evidence relating to: (i) certain collateral that Patriarch
could have acquired for Zohar I, but instead acquired for two
other CDO transactions — Zohar II and Zohar III — managed by
Patriarch's affiliates; and (ii) financial projections regarding
the future cash flows from the Zohar I collateral that were
contained in Patriarch's presentations (or "pitch-books") to

26

potential investors as "unfairly prejudicial" as the term is used in Fed. R. Evid. 403.

"Relevant evidence is admissible" unless the United States Constitution, a federal statute, the Federal Rules of Evidence or other rules prescribed by the United States Supreme Court provide otherwise.  Fed. R. Evid. 402.  To be relevant, (i) evidence must be probative of the proposition it is offered to prove and (ii) that proposition must be one that is of consequence to the determination of the action.  United States v. Kaplan, 490 F.3d 110, 121 (2d Cir. 2007) (citing United States v. Diaz, 878 F.2d 608, 614 (2d Cir. 1989)); see also Fed. R. Evid. 401.  Under Fed. R. Evid. 403, a court may exclude relevant evidence if its probative value is substantially outweighed by a danger of, inter alia, unfair prejudice.  Fed. R. Evid. 403.

MBIA has stated its intention to introduce evidence at trial showing that Patriarch believed the shortfalls in two of the Identified CDOs, Z-1 and Captiva, would exceed $120 million; that Patriarch's obligation to use "commercially reasonable efforts to procure as soon as reasonably practicable" investment grade ratings required that Patriarch, inter alia, (a) use

27

"commercially reasonable efforts" to cause Zohar I to acquire sufficient collateral such that the rating agencies would assign the ratings to the $120 million of Class B Notes necessary to remediate Z-1 and Captiva and (b) request the ratings from S&P and Moody's; that Patriarch breached the Master Agreement by not using "commercially reasonable efforts . . . as soon as reasonably practicable" to cause Zohar I to acquire the appropriate amount of collateral to obtain the ratings; and that if Patriarch had complied with the Master Agreement, Zohar I would have acquired additional collateral, which would have increased the amount of Class B Notes that would have received investment grade ratings and been transferred to Z-1 and Captiva.

MBIA will seek to prove that Patriarch failed to use "commercially reasonable efforts" to acquire the appropriate amount of collateral by evidence that up to $141 million of collateral acquired for Zohar II and Zohar III was eligible and could have been acquired for Zohar I; that Tilton controlled Patriarch and its affiliates and benefited from causing Patriarch's affiliates to place collateral into Zohar II and Zohar III; and that if Patriarch had caused Zohar I to acquire a portion of the eligible collateral acquired for Zohar II and

28

Zohar III, S&P and Moody's likely would have assigned investment grade ratings to a greater amount of the Class B Notes.

According to MBIA, evidence concerning the Zohar II and Zohar III collateral is directly relevant to Patriarch's defenses, as stated in the PTO, that they satisfied all their obligations under the Master Agreement, that the conditions precedent to Patriarch's contribution obligation "were not, and could not have been, satisfied," and that MBIA's claims are barred by the doctrines of impossibility and frustration. Patriarch has asserted that it could not obtain investment grade ratings on the Class B Notes based on the collateral that Patriarch actually acquired for Zohar I, and it was impossible for Patriarch to acquire additional collateral for Zohar I such that the ratings could be achieved.  To rebut those allegations, MBIA seeks to introduce the evidence Patriarch has moved to exclude.

According to Patriarch, MBIA gave Patriarch discretion to decide which CDO to place eligible collateral into and authorized asset transfers among the funds, and Patriarch owed fiduciary duties to each fund and was under no obligation to violate those duties by favoring Zohar I for the benefit of

29

MBIA.  According to Patriarch, it was Patriarch's common
practice to allocate collateral among funds in a manner that, at
its discretion, was fair to all funds.  In addition, MBIA
approved the Collateral Management Agreement of Zohar I, which
expressly waived any "potential and actual conflicts of
interest" that may exist as a result of Patriarch's role
managing different funds, and MBIA approved transfers of assets
from Zohar I to the other Patriarch-managed CDOs.  According to
Patriarch, the indentures of Zohar II and Zohar III required
Patriarch to use commercially reasonable efforts to build
sufficient collateral in those funds as well.


Relevant evidence is unfairly prejudicial under Fed.
R. Evid. 403 only if it "involves 'some adverse effect . . .
beyond tending to prove the fact or issue that justified its
admission into evidence.'" United States v. Gelzer, 50 F.3d
1133, 1139 (2d Cir. 1995) (quoting United States v. Figueroa,
618 F.2d 934, 943 (2d Cir. 1980)).  Evidence cannot be excluded
under Fed. R. Evid. 403 on the basis that, due to its relevance,
such evidence has a negative impact on a party's litigation
position.  See, e.g., George v. Celotex Corp., 914 F.2d 26, 31
(2d Cir. 1990) ("Because Rule 403 permits the exclusion of
probative evidence, it is an extraordinary remedy that must be

used sparingly. . . . Any prejudice to [defendant] was derived
from the [evidence's] probative force and thus it did not
unfairly prejudice [defendant]."); United States v. Muyet, 958
F. Supp. 136, 141 (S.D.N.Y. 1997) ("All evidence that tends to
incriminate a defendant is prejudicial, in the sense that it is
harmful to his case, but Rule 403 only precludes the admission
of evidence that is unfairly prejudicial.").  The admission of
evidence regarding the Zohar II and Zohar III collateral
presents a disputed issue with respect to allocation of
collateral by Patriarch.  Such evidence should not be excluded
under Fed. R. Evid. 403.  See, e.g., George, 914 F.2d at 31;
Shea v. Royal Enters., Inc., No. 09 Civ. 8709, 2011 WL 2436709,
at *9 (S.D.N.Y. June 16, 2011) ("Plaintiff's case may be harmed
by references to [the evidence at issue], but such harm is not
the 'unfair' prejudice that Federal Rule of Evidence 403 is
intended to protect against.").


          With respect to the pitch-books, Patriarch contends
that the pitch-books are irrelevant to valuing the Class B
Notes, as the pitch-books presented numbers based on various
assumptions, and the pitch-books themselves make clear that they
were not to be relied upon as a valuation or analysis of the
actual value of Zohar I's collateral.  For similar reasons,

31

Patriarch contends that the hypothetical equity illustrations in the pitch-books are irrelevant to whether the Class B Notes could be rated investment grade, as these pitch-books do not represent a reliable analysis or value estimation of the assets underlying Zohar I.  Furthermore, Patriarch notes that rating agencies do not consider the value of equity holdings in their rating determinations of CDO securities, so the potential future value of any equity held by Zohar I would have been ignored by the rating agencies in deciding whether the Class B Notes were ratable.

MBIA has asserted that during the time period Patriarch was obligated to use "commercial reasonable efforts" to obtain the ratings on the Class B Notes, Patriarch was marketing a new fund and distributed "pitch-books" to potential investors and business partners containing Patriarch's Zohar I projections.  MBIA seeks to present testimony from its economic expert concerning the value of the Class B Notes and the amount of damages suffered by MBIA as a result of Patriarch's failure to transfer a portion of those notes to the other CDOs insured by MBIA.  The expert's opinions are based, in part, on his projections of the future cash flows that will be generated by the Zohar I collateral.  According to MBIA, the projections in

32

the pitch-books represent contemporaneous evidence probative of
the reasonableness of certain assumptions underlying the MBIA
expert's analysis.  In addition, Patriarch's Zohar I projections
are projections of the Zohar I cash flows during the relevant
time period and, as such, are relevant to whether there was
sufficient value in the Zohar I fund to submit any of the Class
B Notes for a rating.  The weight given to the pitch-book
projections is a triable issue, but, applying the Fed. R. Evid.
403 standard detailed above reveals that the probative value of
the pitch-books outweighs any potential prejudice.  Accordingly,
the pitch-books, along with evidence concerning the collateral
for Zohar II and Zohar III, are admissible.


**Determination Of The Admissibility Of The Natixis Business
Records Is Premature**


          Patriarch has moved in limine to preclude MBIA from
introducing 83 documents produced by nonparty Natixis (the
"Natixis Documents") as business records.  Patriarch has not
challenged the authenticity or relevance of the Natixis
Documents, but has contended that the Natixis Documents are not
business records within the meaning of Fed. R. Evid. 803(6).


33

Natixis North America LLC was retained to assist in
structuring and arranging the Zohar I transaction.  As the
arranger of a CDO transaction generally, Natixis coordinated the
other parties, brought in investors and liaised with the rating
agencies, among other duties.  Natixis was compensated for its
services as the arranger of Zohar I.  Natixis had knowledge of
the rating requirements applicable to the Zohar I transaction,
and it was contemplated that Natixis would assist Patriarch in
obtaining the ratings on the Class B Notes by, among other
things, negotiating with the rating agencies and preparing the
computer models used by the agencies to evaluate the credit
quality of the Class B Notes.  According to MBIA, Natixis
periodically used computer models in 2004, 2005, and 2006 to
assess whether the rating agencies would assign the ratings to
all or a portion of the Class B Notes, and Kenneth Wormser
("Wormser"), the senior Natixis banker on the engagement,
informed Patriarch on various occasions that Natixis believed a
portion of the Class B Notes could get the ratings.

According to Fed. R. Evid. 803(6), "[a] record of an
act, event, condition, opinion, or diagnosis" is admissible if
"the record was kept in the course of a regularly conducted
activity of a business, organization, occupation, or calling,

34

whether or not for profit."  Fed. R. Evid. 803(6)(B); see also
United States v. Feliz, 467 F.3d 227, 234 (2d Cir. 2006); Major
League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290,
313-14 (2d Cir. 2008).  Our Circuit and this Court have
interpreted Rule 803(6) liberally, repeatedly emphasizing that
the rule "favors the admission of evidence rather than its
exclusion if it has any probative value at all."  See United
States v. Kaiser, 609 F.3d 556, 574 (2d Cir. 2010); Phoenix
Assocs. III v. Stone, 60 F.3d 95, 101 (2d Cir. 1995); S.E.C. v.
Credit Bancorp, Ltd., No. 99 Civ. 11395, 2000 WL 968010, at *9
(S.D.N.Y. Aug. 8, 2000).


       Patriarch has contended that the documents were not
made by Natixis as part of its "regular practice."  However,
courts in the Second Circuit and elsewhere routinely find
documents admissible as business records where a witness has
established they were regularly made and kept by the business,
even where the specific words "regular practice" were not used.
See, e.g., Phoenix Assoc. III, 60 F.3d at 101 (holding document
was improperly excluded because evidence that document was made
"in the course of a regularly conducted business activity" and
was not drafted in response to unusual or isolated events was
sufficient to qualify it as a business record); In re Blech Sec.

35

Litig., No. 94 Civ. 7696, 2003 WL 1610775, at *5 (S.D.N.Y. Mar.
26, 2003) (holding memorandum was admissible under Rule 803(6)
where it was prepared "within [compliance director's] regular
business activity" and there was no indication of a "motive to
lie").

Patriarch has contended that the Natixis Documents
were not created "as part of any systemic business activity,"
that the Natixis Documents are not business records because the
Natixis employees who created them – either Wormser, Ralph
Inglese ("Inglese") or Lorraine Medvecky ("Medvecky") – have not
been shown to be under a "business duty" to report the
information contained therein and that the Natixis Documents
cannot be admitted as business records because Medvecky, Wormser
and Inglese could not remember certain details about those
documents during their respective depositions.  In United States
v. Ford, 435 F.3d 204, 215 (2d Cir. 2006), the defendant
objected to the introduction of a calendar as a business record
because the calendar's creator could not remember when or why he
made certain entries.  The court found this detail to be
irrelevant, reasoning that "[i]f a custodian of a business
record need not have personal knowledge of the actual creation
of the document for it to be admissible, the absence of a

36

present recollection is no barrier to admission." Id. (internal
quotation marks and citations omitted); see also United States
v. Stewart, 433 F.3d 273, 316 (2d Cir. 2006) (the "reliability
and trustworthiness [of a business record] derive from the
circumstances under which it was created, rather than the
author's recollection").

Fed. R. Evid. 803(6) applies only to evidence that
falls within the definition of hearsay set forth in Fed. R.
Evid. 801, including that the evidence must be offered "to prove
the truth of the matter asserted" therein. Fed. R. Evid.
801(c)(2). MBIA has not yet offered the Natixis Documents for
any purpose, and, according to MBIA, MBIA will offer many of the
Natixis Documents at trial for reasons other than to prove the
truth of the matters asserted therein. Even if it is assumed,
as contended by Patriarch, that certain of the Natixis Documents
are hearsay, MBIA has included three Natixis employees –
Wormser, Medvecky and Adam True ("True") – on its witness list
to testify regarding the elements of Rule 803(6) which could
thereby establish that the Natixis Documents are admissible
business records. See Giannone v. Deutsche Bank Sec., Inc., No.
03 Civ. 9665(WHP), 2005 WL 3577134, at *4 (S.D.N.Y. Dec. 30,
2005) (holding it premature to rule on admissibility of document

37

under business record exception prior to trial because party had not yet had opportunity to establish elements of exception with trial testimony).

The purpose for which particular Natixis Documents will be offered has not yet been established, and evidence of compliance with the requirements of Fed. R. Evid. 803(6) has not yet been offered with respect to any particular documents offered for the truth of the matters contained therein.  It is therefore premature to exclude the Natixis Documents as failing to meet the requirements of the Rule.

**Discovery Is Reopened To Permit The Depositions Of McKiernan, Sonkin and Wertheim**

Patriarch has moved, pursuant to Fed. R. Civ. P. 26(a) and 37(c)(1), for an order directing MBIA to produce three recently-identified trial witnesses for deposition or strike them from MBIA's trial witness list.  On July 10, 2009, MBIA served its Rule 26(a) initial disclosures, and MBIA identified ten present and former employees of MBIA "who may have discoverable information that MBIA may use to support its claims and/or defenses in this case."  MBIA did not identify three individuals who were recently listed as potential trial

38

witnesses in the PTO: McKiernan, Sonkin and Wertheim.  Sonkin
and McKiernan are the head and deputy head of the Insured
Portfolio Management Division within MBIA, respectively, while
Wertheim is MBIA's General Counsel.  MBIA did not supplement its
initial disclosures at any time before the parties exchanged
witness lists for the PTO.

MBIA's counsel has stated that the decision to list
the three recently-identified witnesses in the PTO arose solely
from the possibility that Murtagh - MBIA's Rule 30(b)(6) witness
- might not be available to testify, and MBIA has acknowledged
that it would not have identified these three witnesses but for
its concern about the availability of Murtagh.  MBIA declined
Patriarch's request that these three witnesses be produced for
depositions in advance of trial.  According to MBIA, when MBIA
served its initial disclosures, it had no reason to believe
there was any material risk Murtagh might be unavailable to
testify at trial.  When MBIA determined that it might need to
call the new witnesses at trial, it disclosed that fact to
Patriarch on its proposed witness list.

MBIA contends that it has satisfied its obligations
under Rule 26.  See Fed. R. Civ. P. 26(a)(3)(A); see also Fed.

39

R. Civ. P. 26(e)(1)(A); Fed. R. Civ. P. 26 Advisory Cmte. Notes, 2000 Amendment, Subdivision (a)(1) ("As case preparation continues, a party must supplement its disclosures when it determines that it may use a witness or document that it did not previously intend to use.").  "Supplementations need not be made as each new item of information is learned but should be made at appropriate intervals during the discovery period, and with special promptness as the trial date approaches."  Fed. R. Civ. P. 26 Advisory Cmte. Notes, 1993 Amendment, Subdivision (e).

However, Patriarch should not be prejudiced by the changed circumstances.  This and other courts have adopted the taking of depositions as an appropriate mechanism to address late-disclosed witnesses.  See, e.g., Lesser v. Wildwood, No. 01 Civ. 4209, 2003 WL 22228757, at *3 (S.D.N.Y. Sept. 29, 2003) ("Defendants are, however, under an obligation to cure any prejudice suffered by the plaintiffs as a result of defendants' violation of their discovery obligations . . . [and] [d]iscovery will be reopened in order to provide plaintiffs an opportunity to depose [the undisclosed witnesses]."); McEnery v. City of N.Y., No. 03 Civ. 6307, 2007 WL 1574013, at *2-3 (S.D.N.Y. May 29, 2007) (concluding that plaintiff should be given opportunity to depose late-identified witnesses).

While the closure of discovery generally "weighs strongly against the possibility of a continuance" of the trial to reopen discovery, Rienzi & Sons, Inc. v. Puglisi, No. 08 Civ. 2450(DLI)(JMA), 2011 WL 1239867, at *4 (E.D.N.Y. Mar. 30, 2011), here the trial will not be held until October.  MBIA will produce McKiernan, Sonkin and Wertheim for deposition or strike these witnesses from the witness list.

**The Expert Testimony Of Miller And Mason Will Be Admitted**

Fed. R. Evid. 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; see also E.E.O.C. v. Bloomberg L.P., No. 07 Civ. 8383, 2010 WL 3466370, at *5-6 (S.D.N.Y. Aug. 31, 2010); accord Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 716 F. Supp. 2d 220, 223-24 (S.D.N.Y. 2010).

41

The Federal Rules of Evidence favor the admissibility
of expert testimony and are applied with a "liberal thrust."
Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 588, 113
S.Ct. 2786, 125 L.Ed2d 469 (1993); POM Wonderful LLC v. Organic
Juice USA, Inc., No. 09 Civ. 4916(CM), 2011 WL 70562, at *12
(S.D.N.Y. Jan. 3, 2011).  The Second Circuit's standard for
admissibility of expert testimony is "especially broad."  Clarke
v. LR Sys., 219 F. Supp. 2d 323, 332 (E.D.N.Y. 2002) (collecting
cases).  Where there is "sufficient indicia of reliability" to
allow admission of expert testimony, "vigorous cross
examination, presentation of contrary evidence, and careful
instruction on the burden of proof are the traditional and
appropriate means" to attack the evidence.  Rexall Sundown, Inc.
v. Perrigo Co., 651 F. Supp. 2d 9, 28 (E.D.N.Y. 2009) (citing
Daubert, 509 U.S. at 596).  Indeed, most objections to expert
testimony are related only to the weight of the evidence, not
its admissibility.  See Olin Corp. v. Certain Underwriters at
Lloyd's London, 468 F.3d 120, 133-134 (2d Cir. 2006).

    "The Rules' liberal approach to the admission of
expert testimony is particularly appropriate in a bench trial."
Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie, 508 F.

42

Supp. 2d 295, 312 (D. Vt. 2007); accord BIC Corp. v. Far E.
Source Corp., 23 Fed. Appx. 36, 39 (2d Cir. 2001).  While expert
testimony is likely to hold "unique weight" in the minds of a
jury, see Nimely v. City of N.Y., 414 F.3d 381, 397 (2d Cir.
2005), courts are accustomed to evaluating the strengths and
weaknesses of expert testimony.  Green Mountain Chrysler, 508 F.
Supp. 2d at 312.  Thus, "the Court can weigh the evidence
admitted without being unduly swayed by a witness's designation
as an expert."  Id.

       Patriarch has moved in limine to exclude the expert
testimony of Miller and Mason.  In the February 6 Opinion, it
was concluded that "factual issues are presented by the experts'
testimony, and their resolution is not appropriate in the
context of [summary judgment]."  MBIA Ins. Corp., 2012 WL
382921, at *32.  MBIA seeks to offer the expert report of Miller
on the issue of whether, at the relevant times, the notes at
issue would have been classified as debt for federal tax
purposes.  MBIA seeks to offer Mason to provide his expert
opinion with respect to the value of the Class B Notes as of
particular dates.

Patriarch has contended that "Mr. Miller's opinion is not based on 'sufficient facts and data'" and that Miller "did not consider the actual records of this case on the critical issues." A district court has considerable discretion both in deciding what factors to use in assessing reliability and in determining whether the expert testimony is, in fact, reliable. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 153, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); Zuchowicz v. United States, 140 F.3d 381, 386-87 (2d Cir. 1998). "The flexible Daubert inquiry gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002). The law is well-settled that only serious flaws in an expert's reasoning or methodology will warrant exclusion. See, e.g., Amorgianos, 303 F.3d at 267.

Patriarch has contended that Miller's reports and testimony as unreliable by reference to the decision in Amorgianos, 303 F.3d at 269. In Amorgianos, a set of several factors were established and articulated by the witness. 303 F.3d at 268-69. The expert in Amorgianos chose not to consider certain of the factors. Id. at 268 (upholding expert exclusion

44

because "[a]lthough data on the additional variables was available to [the expert], he inexplicably 'did not find it necessary' to include them in his calculation despite his stated opinion that a 'proper exposure assessment' would take them into consideration."). Here, MBIA has represented that Miller has set forth a set of recognized factors and undertook an assessment of each of them.

Patriarch has also contended that "Mr. Miller's testimony boils down to the circular and unremarkable proposition that, if one simply assumes that the Class B Note possesses the features that courts and IRS regulations deem indicative of debt, then it could be characterized as debt." Experts routinely employ assumptions as part of their analysis, and any contentions that the assumptions are unfounded go to the weight of the testimony, not its admissibility. BIC Corp., 23 Fed. Appx. at 38; Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996). Whether the assumptions Miller relies upon are supported by the record or the opinions of other expert witnesses does not necessarily render the testimony unreliable, but rather goes to weight and credibility of the expert's testimony. Given both that the applicable standards encourage admissibility as well as the fact that the pending trial will be

45

conducted without a jury, Miller's expert testimony will be admitted. Patriarch will have the opportunity to question Miller's methods and conclusions on cross-examination.

Patriarch has not challenged Mason's qualifications as an expert, but it has asserted that Mason used the wrong standard for valuation, that he did not properly apply a marketability discount, that he measured the wrong asset and that he erred in analyzing the value of the Class B Notes under the hypothetical scenario that Zohar I held certain additional assets. The challenges to Mason's testimony may well have validity but go to the weight of his testimony rather than to its admissibility. Patriarch may appropriately contend that Mason's assessments do not support his conclusion, but those contentions will be presented through cross examination and contrary evidence. See, e.g., Olin Corp., 468 F.3d at 133-34 (arguments challenging an expert's support for his opinions go to weight, rather than admissibility, of testimony).

The Patriarch motions in limine to exclude the expert testimony of Miller and Mason is denied, the issue raised going to weight rather than admissibility.

46

**Further Proceedings**

The disposition above of the pending motions may raise additional issues.  A pretrial conference will be held on September 18, 2012 at ten o'clock a.m. or at such other date and time convenient to counsel and the Court.  The trial of this action will commence on October 15, 2012 at ten o'clock a.m. or on such other date and time suitable for counsel and the Court. Counsel will meet and confer with respect to these and any other items and advise the Court in writing by September 14 of any open items to be resolved at the pretrial conference.

**Conclusion**

The pending motions are determined as set forth above. A pretrial conference will be held September 18 with the trial to commence on October 15.

It is so ordered.

New York, NY
June    , 2012


_____
ROBERT W. SWEET
U.S.D.J.

47