UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------

MBIA INSURANCE CORPORATION,

                               Plaintiff,                    09 Civ. 3255

   -against-                                    OPINION

PATRIARCH PARTNERS VIII, LLC, a
Delaware limited liability company,
and LD INVESTMENTS, LLC, a
Delaware limited liability company,

                              Defendants.

------------------------------------------X

A P P E A R A N C E S:

        <u>Attorneys for Plaintiff</u>

        BINGHAM MCCUTCHEN LLP
        399 Park Avenue
        New York, NY  10022-4689
        By:  Jeffrey Q. Smith, Esq.
             Susan F. DiCicco, Esq.
             Kevin J. Biron, Esq.

        <u>Attorneys for Defendants</u>

        BRUNE & RICHARD LLP
        One Battery Park Plaza
        New York, NY  10004
        By:  Charles A. Michael, Esq.
             David Elbaum, Esq.
             Hillary Richard, Esq.

USDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/10/13

## INDEX

|  |  |  | Page |
|---|---|---|---|
| Prior Proceedings................................... |  |  | 2 |
| The Parties........................................ |  |  | 3 |
| Findings of Fact................................... |  |  | 6 |
| I. | The Background of the Transaction......... |  | 6 |
| II. | The Agreements......... |  | 20 |
|  | 1. | The Master Agreement................. | 20 |
|  | 2. | The Indenture....................... | 25 |
| III. | The Performance of the Agreements by the Parties.............................. |  | 28 |
|  | 1. | The Closing........................ | 28 |
|  | 2. | The Change in Strategy for Collateral Acquisition.............. | 32 |
|  | 3. | The Supplemental Indentures and the Rating of the A Notes........... | 37 |
|  | 4. | The Third Supplemental Indenture and the Ratings Trigger for the B Notes............................ | 44 |
|  | 5. | Collateral Acquisition and the Rating Process for Zohar II and III...... | 48 |
|  | 6. | The Ratings for the Zohar Notes.. | 60 |
|  | 7. | Alternatives to Rating the B Notes..... | 63 |
|  | 8. | The Dispute between MBIA and Patriarch With Respect to Zohar III.......64 |  |
|  | 9. | MBIA Continued to Rely On the B Notes..................... | 67 |

i

10. The Natixis Fee Payment Without Procuring a
Rating on the B Notes......................71

11. Consideration of Alternatives
to the B Notes and Termination
of Discussion.......................  74

IV. The Required Rating of the B Notes Was
Not Achievable...........................  83

1. The Natixis Evidence Did Not
Establish Ratability................  84

2. Froebe's Testimony Established
that the B Notes Were Not Ratable.....  90

3. Froebe's Testimony Was Not
Impeached...........................  101

V. The Fulfillment of the Debt for Tax
Conditions Was Not Achievable............  116

VI. Witness Credibility.......................  124

Conclusion of Law...................................  125

I. Elements of the Breach of Contract Claim
and Burden of Proof...............................  125

II. The Agreements Required Patriarch to
Use Commercially Reasonable Efforts to
Have the B Notes Rated as soon as Reasonably
Practicable...............................  126

1. The Drafting History of the
Agreements................  130

2. The Conduct of the Parties.........  133

3. Patriarch's Position Is Not
Supported by the Third Indenture....  136

III. MBIA Did Not Establish that Patriarch
Failed to Use Commercially Reasonable
Efforts..................................  139

Page

IV.     The Conditions for Contributing the B Notes
        Were Not Established.......................   143

V.      Anticipatory Breach Has Not Been
        Established................................   147

Conclusion..........................................   151

**Sweet, D.J.**

This action was tried before the court over the course of fourteen days between October 15, 2012 and February 8, 2013. Upon all the prior proceedings, the findings of fact and conclusions set forth below, judgment will be entered in favor of the defendants Patriarch Partners VIII, LLC ("Patriarch") and LD Investments, LLC ("LDI") (collectively, "Patriarch" or the "Defendants") dismissing the causes of action of the plaintiff MBIA Insurance Corporation ("MBIA" or the "Plaintiff") for declaratory judgment, breach of contract and anticipatory breach of contract.

These parties are sophisticated, well-advised entities that engaged in 2003 in a complicated financial transaction involving the amelioration of certain troubled collateralized debt obligations ("CDOs") whose notes MBIA had previously agreed to insure. This action was commenced in 2009 after the parties disagreed as to the terms and effect of the agreements between them. Pre-eminent and able counsel have presented the issues and facts underlying this dispute with clarity and skill. Regrettably for MBIA, the evidence presented has not supported the causes of action alleged in the complaint.

1

**Prior Proceedings**

MBIA filed its complaint on April 3, 2009 alleging breach of contract, anticipatory repudiation, breach of the implied duty of good faith and promissory estoppel, and a declaratory judgment with respect to the enforceability of the agreements between the two parties and the scope of Patriarch's obligations under those agreements.

Discovery proceeded, and in an opinion of February 6, 2012 (the "February Opinion"), summary judgment sought by Patriarch was denied on the basis of contract ambiguity, and certain defenses were dismissed on motion by MBIA. Reconsideration of the February 6 Opinion was denied on April 4, 2012. Evidence was presented from October 15, 2012 to November 13, 2012, and final argument and submissions were made on February 8, 2013.

2

**The Parties**

MBIA is a New York corporation headquartered in Armonk, New York. At the time of the events at issue, it was in the business of providing financial guaranty insurance on structured finance securities including senior notes issued as part of CDOs. In 2003 and 2004, it was a multi-billion dollar company and the largest monoline insurance company in the United States issuing insurance policies only on financial instruments such as CDO notes.  Tr. [Mauer-Litos] 119-20[1]; Amended Joint Pretrial Order ("PTO Stip.") ¶ 9.

In exchange for premiums, MBIA agreed to pay noteholders principal and interest if the CDO ultimately failed to generate enough cash to do so, PTO Stip. ¶ 9, which is what occurred in the transactions under consideration here.

Patriarch is a limited liability company organized under the laws of the State of Delaware.  PTO Stip. ¶ 2.  Lynn Tilton ("Tilton") is the CEO of Patriarch, PTO Stip. ¶ 4; Tr. [Tilton] 498:12-14, and founded the company in 2000 after 20 years in the finance industry, Tr. [Tilton] 493, 495, 505-508.

---

[1] Citation is to the witness and transcript page.

Tilton is well known in the financial industry and is reputed to have a personal net worth of over \$1 billion.[2] Patriarch's sole member is Zohar Holdings LLC, whose sole members are Tilton and a trust for Tilton's daughter for which Tilton is the sole trustee.  PTO Stip. ¶ 3.  Patriarch is an affiliate of Patriarch Partners, LLC, a global investment firm formed and managed by Tilton. PTO Stip. ¶ 4. Patriarch Partners manages funds that make direct investments in distressed businesses. PTO Stip. ¶ 5. Patriarch Partners operates its business using a series of affiliated special purpose entities, including Patriarch, that have no employees of their own. See Tr. [Tilton] 497:6-504:1. "The money flows up from those affiliates" to Tilton, who ultimately controls the entire structure.  Id.  At all relevant times, Tilton was responsible for making all the important decisions for Patriarch.  Id. at 497:6-13.

    Patriarch and its affiliates specialize in the management of distressed assets and, among other things, serve as collateral managers for CDOs.  PTO Stip. ¶ 5.  As a collateral manager, Patriarch selects a portfolio of underlying

---

[2] See, e.g., Rob Wallace, The Stylish Job Saver: Lynn Tilton Owns More Companies Than Any U.S. Woman, ABC News, October 29, 2011, http://abcnews.go.com/Business/lynn-tilton-owns-companies-us-woman-save-american/story?id=14829869#.UZnSqLWsiSo.

assets for a CDO and manages those assets over the life of the
CDO.  PTO Stip. ¶ 21.

Defendant LD Investments, LLC ("LDI") is a limited
liability company organized under the laws of the State of
Delaware, with its principal place of business in Charlotte,
North Carolina.  PTO Stip. ¶ 6.  Tilton, a Florida resident, is
the manager and sole member of LDI.  Tr. [Tilton] 498:13-14,
499:7-17, 500:13-14.  LDI is a holding company for certain
Patriarch Partners affiliates and their subsidiaries.  Tr.
[Tilton] 499:1-9.

Natixis (formerly known as CDC Financial Products,
Inc. and later CDC Ixis) is not a party to this action, but was
the investment banker for Patriarch in the transaction at issue.
It is a French corporate and investment bank.  Tr. [True]
202:17-22.  Natixis' Structured Credit Products Group (or
"SCPG") provided investment banking services for CLO
transactions, which included structuring, documenting, obtaining
ratings for, and selling securities to investors.  Id. at
203:22-204:5, 204:20-205:18.

**FINDINGS OF FACT**

## I.   The Background Of The Transaction

A CDO is a type of securitization transaction in which a special purpose vehicle (generally referred to as the "Issuer"): (i) issues secured notes and/or equity securities to investors, (ii) uses the proceeds of the issuance to acquire a portfolio of collateral (e.g., bonds or loans), (iii) pays the holders of the issued securities with the cash flows generated by the collateral and (iv) obtains insurance upon the performance of the notes in order to enhance marketability of its securities.  PTO Stip. ¶ 8.  If the proceeds generated by the collateral of a CDO are insufficient to pay amounts due on insured notes, the insurer is obligated to cover the shortfall and consequently bears the risk that the proceeds of a CDO will be insufficient to make required payments on the insured notes. See generally Tr. [McKiernan] 674:17-675:3, 675:17-676:20.

The MBIA CDO New Business group ("CNB") and the Insured Portfolio Management group ("IPM"), were the two main groups within MBIA that dealt with Patriarch, Tr. [Mauer-Litos] 95:5-14; Tr. [Tilton] 531:10-22, 528:23-529:12. The personnel in

6

the two groups were different, as were their functions. See Tr. [Mauer-Litos] 74:7-75:1.

CNB was responsible for identifying and securing opportunities for MBIA to issue new insurance policies on CDOs, see id., and was part of the Structured Finance group at MBIA. DX-291 [Zucker Tr.][3] 8:10-9:3, 9:20-10:9; Tr. [Mauer-Litos] 74:18-20.

IPM monitored transactions that MBIA had already agreed to insure, Tr. [Mauer-Litos] 77:16-78:11, and also was responsible for remediating transactions that are not performing well and had the potential to lead to a claim being filed under a policy issued by MBIA, id. at 77:19-78:25. The goal of IPM's remediation efforts was to avoid or reduce losses arising from MBIA's payment of an unreimbursed claim on an insured transaction. Tr. [Mauer-Litos] 79:1-7.

CNB first came in contact with Tilton and Patriarch Partners in 2001 in connection with a distressed debt CDO transaction known as Ark II, which was sponsored and managed by a Patriarch affiliate. Tr. [Tilton] 525, 528:20-529:12, PX-13 at

---

[3] Citation is to deposition transcript and page number.

6; see also Tr. [Mauer-Litos] 80, 95:5-9.  IPM first came in contact with Tilton and Patriarch shortly thereafter. PX-13. At that time, IPM was in the process of addressing certain legacy CDO transactions on MBIA's books.  Tr. [Mauer-Litos] 79:9-80:2.

MBIA had issued financial guaranty insurance policies covering the senior notes issued by seven CDOs, Z-1 CDO 1996 Ltd. (formerly known as Cigna CBO 1996-1 Ltd. ("Z-1"), Captiva CBO 1997-1 Ltd. ("Captiva"), Ceres II Finance Ltd. ("Ceres"), Aeries Finance II Ltd. ("Aeries"), Amara-1 Finance Ltd. ("Amara-1"), Amara-2 Finance Ltd. ("Amara-2") and Oasis Collateralized High Income Portfolios-I, Ltd. (together with Z-1, Captiva, Ceres, Aeries, Amara-1 and Amara-2, the "Identified CDOs").

By 2002, it appeared likely that the collateral in certain of the Identified CDOs would generate insufficient funds to satisfy the payment obligations on the MBIA-insured notes, which would eventually result in MBIA being required to make payments of principal and/or interest under the relevant insurance policies. PTO Stip. ¶ 11.

As a consequence, MBIA faced a substantial insurance exposure which created related accounting issues with respect to

8

certain other CDO transactions it had insured. Tr. [Tilton] 529-32; DX-291 [Zucker Tr.] 15, 25.

The Identified CDOs were expected to have a shortfall on their insured notes of between $91 and $198 million according to MBIA's estimates, or even up to $287 million according to Patriarch's estimates. PX-13 at 3.  MBIA began to explore plans to remediate the troubled CDO transactions. PTO Stip. ¶ 12. IPM rather than CNB was responsible for the remediation of the Identified CDOs, and at the time was not optimistic as to the likelihood of finding a way to achieve the desired remediation. See PX-13; Tr. [Mauer-Litos] 74:7-17, 107:16-18; PX-445 [Murtagh Tr.] 19:5-20:2.  Michael Murtagh ("Murtagh"), then director of IPM, id. at 7, noted to Amy Mauer-Litos ("Mauer-Litos"), a managing director in IPM, Tr. [Mauer-Litos] 73, that "[IPM] would be hard pressed to find a manager that would take these deals and do something with them anyway."  DX-20.

Mark Zucker ("Zucker"), then Global Head of Structured Finance at MBIA, raised concerns about the loss reserves for the Identified CDOs with several members of MBIA senior management, including MBIA CEO Jay Brown ("Brown") and MBIA COO Gary Dunton ("Dunton"). DX-291 [Zucker Tr.] 28, 54, 70-82, 298-99.

In July 2002, Mauer-Litos wrote to Murtagh that MBIA "can't recommend a new loss number" but if the existing number was "really pure bullshit," the issue would have to be escalated to Dick Weil ("Weil"), the Vice Chairman of MBIA, DX-4; Tr.[Mauer-Litos] 11.  In January 2003, Mauer-Litos stated in a memo regarding one of the worst performing of the Identified CDOs that Weil would "handle the lack of reserving."  DX-14.

MBIA's senior management was sent a memo in April 2003 indicating that the loss reserves were not large enough to cover the expected shortfalls in the Identified CDOs. See Tr. [Mauer-Litos] 132-34; DX-26 (estimating losses between $91 million and $287 million while setting only $10 million in loss reserves); DX-291 [Zucker Tr.] 24-25.

In July 2003, Murtagh wrote to Mauer-Litos, stating that "[i]n the best of simulations—the Loss Reserve would be approx. $22M" for one of the troubled CDOs. Mauer-Litos wrote back: "Not sure we should be e[sic] mailing the simulations around."  DX-39.

10

The reserves for the two worst of the troubled CDOs, referred to as Captiva and Z-1 (formerly Cigna), were of particular concern. Tr. [Mauer-Litos] 79; Tr. [Tilton] 530; DX-291 [Zucker Tr.] 70-72.  MBIA did not want to have to increase its loss reserves which motivated MBIA to enter into the transaction with Patriarch.  DX-291 [Zucker Tr.] 15, 24-25.

MBIA turned to Patriarch to remediate the Identified CDOs. Tr. [Tilton] 529; DX-291 [Zucker Tr.] 24-25.  In March 2003, Tilton marketed Patriarch to MBIA, describing her company as a "solution provider" possessing the necessary structure and experience to repair and restore the Identified CDOs.  PX-351. Tilton proposed a strategy consisting of multiple components: (i) MBIA would transfer management of the Identified CDOs to affiliates of Patriarch; (ii) Patriarch would create and manage a new CDO that would issue different classes of notes; (iii) MBIA would insure the senior notes in the new CDO; and (iv) Patriarch would contribute the junior notes from the new CDO (i.e., the Class B Notes) to the Identified CDOs as needed to enhance the collateral value of those transactions. PX-1; PX-13; see also PX-352. Unlike the prior Ark transactions, which had a static pool of collateral identified at the closing of each transaction, Patriarch proposed that it would actively manage

11

the collateral pool of the proposed CDO. Tr. [Tilton] 536:3-19.
Tilton informed MBIA that she expected the cash flows generated
for the junior notes to "be substantial." PX-1; see also DX-291
[Zucker Tr.] 149:18-23.

After discussing various options, in April 2003 the
parties agreed to a strategy with three basic components: (1)
MBIA would replace the managers of the Identified CDOs with
Patriarch affiliates; (2) MBIA would insure the senior notes of
a new Patriarch sponsored CDO, Zohar I; and (3) a portion of any
value created in the unfunded Zohar I junior notes (the B Notes)
would be used, under certain conditions, to remediate the
Identified CDOs.  PTO Stip. ¶ 14; PX-1; see also Tr. [Mauer-
Litos] 82-83, 90-92; Tr. [Tilton] 536-37; DX-291 [Zucker Tr.]
34; PX-445 [Murtagh Tr.] 518.

The parties originally considered having MBIA become
an investor in the new CDO and pay cash for the B Notes. This
would have made it more likely that the B Notes would pay out
but would also have opened MBIA to the risk of investment
losses. DX-10.

12

MBIA ultimately decided not to become an investor in
Zohar I, and by April 2003, the parties had agreed that the
transaction would "not require MBIA to contribute any new
capital." PX-13 at 2; Tr. [Tilton] 556; Tr. [McKiernan] 731; Tr.
[Froeba] 1456.

Patriarch anticipated that Zohar I would invest in
distressed corporate loans, which were sold on the secondary
market at a steep discount to their face value and could
ultimately pay interest and principal. Specifically, Patriarch
expected to have, after expenses, $450 million in cash to reach
the "ramp up" target of assets with $750 million in face value.
PX-13 at 4; Tr. [Mauer-Litos] 135-36; Tr. [Wormser] 460; DX-291
[Zucker Tr.] 33.

The plan intended that the assets would have to be
bought, on average, at about 60 cents on the dollar and that if
successfully implemented, enough value might be created not only
to pay off the A Notes, but also to provide cash to pay off the
unfunded B Notes. See id.

An internal MBIA memo stated that Zohar I would seek
to "benefit from the steep liquidity premium associated with

stressed/distressed loan assets" and recommended approving the transaction based on "the asset acquisition discount," DX-34 at 2-3). Another memo acknowledged that the success of Zohar I was "highly reliant" on this aspect of its strategy. DX-35 at 8; <u>see also</u> Tr. [Mauer-Litos] 83 (plan was for "loans that were purchased below par" to "repay par value"); PX-13 at 5 (stating the claims on Zohar 7 will be "mitigated by the creation of Par value" in Zohar I loans).

The parties agreed that no more than 80% of the B Notes would be used to remediate the Zohar 7 and Patriarch retained the right to the remainder so that Patriarch and MBIA would both have the potential to benefit from the B Notes to "ensure that Patriarch's and MBIA's interests are aligned." DX-35 at 9. Both MBIA and Patriarch would gain if Zohar I overall and the B Notes in particular flourished. <u>See</u> Tr. [Tilton] 1274-76.

"MBIA wanted the B note rated because they wanted to include it for their remediation strategy, and Patriarch wanted to get the B note rated because [it] owned 20 percent of the B note at a minimum, and as the need for remediation got lower and the value got higher, it would have been a great tool . . . to

14

use to give out to [Patriarch] employees as upside rather than just future residual value." Tr. [Tilton] 1275.

When Patriarch presented the structure for what came to be known as Zohar I to MBIA, it calculated an interest rate spread of 3.4%, which would generate excess interest of $12.25 million per year after fees, or $62.25 million projected over five years. Tr. [Mauer-Litos] 87:20-88:9. Patriarch projected that the new CDO would generate sufficient revenue to cover 1.65 times the amount of the $150 million of issued par value Class B Notes (referred to at the time as Class C Notes). Id. at 89:18-90:1, 90:8-22. Tilton expressed her belief that she would create value to the Class B Notes sufficient to cover any losses to the Identified CDOs. Id. at 90:23-91:8.

When negotiating the fees Patriarch would be paid for managing the Identified CDOs and the Zohar I CDO, Tilton stated to MBIA that "the Zohar transaction originated as a Patriarch solution to an IPM issue." PX-15; Tr. [Tilton] 549:16-24.

MBIA accepted Tilton's proposed remediation strategy. Tr. [Mauer-Litos] 90:2-4, 91:12-24. CNB and IPM both were involved in the negotiations with Patriarch. Id. at 95:5-11;

15

DX-291 [Zucker Tr.] 12:3-12. Tilton negotiated business points on behalf of Patriarch, and both parties retained sophisticated counsel to negotiate a series of agreements. PTO Stip. ¶ 34; Tr. [Tilton] 558:8-559:15, 560:14-17.

In May 2003, MBIA transferred management of four of the Identified CDOs to Patriarch. PTO Stip. ¶ 16; see also PX-205 (Z-1 Collateral Management Agreement between MBIA and Patriarch Partners); PX-208 (Captiva Portfolios Management Agreement between MBIA and Patriarch Partners).

Three agreements governed the transaction as a whole, as well as the parties' respective rights to the B Notes: the Indenture (PX-5), the Collateral Management Agreement (PX-177) and the Master Agreement (PX-3). Patriarch, MBIA and the investment bank assisting them, Natixis, negotiated the terms of these agreements over several months. See PX-20, PX-21, PX-22, DX-238, DX-239, DX-240.

An early draft of the Indenture from October 24, 2003 contained a Section 9.8, which stated: "On or within [Five] Business Days following the Ramp Up End Date, the Collateral Manager (on behalf of the Issuer) shall request each of Moody's

16

and Standard & Poor's to confirm in writing its initial rating of the Class B Notes within [30] days after the Ramp Up End Date." DX-238 at MBIA0330853.  This draft assumed that the B Notes would receive an initial rating at closing. See DX-46 ("On the Closing Date, $150,000,000 of B Notes will be issued with a rating of 'Baa3/BBB-'.").  The Ramp Up End Date was the last day of the "ramp up" period, the time during which Zohar I was expected to acquire the assets that would make up its collateral pool. See PX-5 at § 7.13(a).  The "initial rating" described in the draft is a rating based on the parameters set forth in the Indenture.  Tr. [Froeba] 1568.

The first draft of the Master Agreement, circulated on October 29, 2003 set as a condition precedent to contributing the B Notes to the Identified CDOs that its initial rating be "confirmed as required under Section 9.8 of the Indenture."  PX-20.

This version of the Master Agreement did not address when Patriarch was obligated to seek a rating other than the reference to Section 9.8 of the Indenture, which assumed the B Notes would have an initial rating at closing and set a specific

17

deadline for obtaining a rating confirmation of the B Notes. See
id.; DX-238 at MBIA0330853.

In the months prior to closing, Patriarch and Natixis
worked together on presentations to S&P and Moody's
(collectively, the "Rating Agencies") to obtain an initial
rating on the Class A Notes. See DX-42 and DX-43 (Zohar I rating
agency presentations).

In analyses discussed with the Rating Agencies shortly
before the transaction closed, the parties estimated that only
$100 million of the $150 million B Notes could be rated
investment grade, even if Zohar I reached $750 million in
assets. DX-42; DX-43; see also Tr. [Tilton] 586-87.

On October 31, 2003, a "cooperation clause" was
inserted into the Master Agreement which required Patriarch and
MBIA both "to cooperate and use all commercially reasonable
efforts to procure as soon as reasonably practicable the
satisfaction of the conditions" to Patriarch's obligation to
transfer the B Notes. PX-22 § 3.04.  The cooperation clause
listed a series of examples of the kinds of actions both
Patriarch and MBIA agreed to take "as soon as reasonably

18

practicable" to satisfy the conditions precedent to transferring the B Notes including "amendments, waivers or other modifications to the Transaction Documents." PX-22 § 3.04. In this version, the rating obligation in the Master Agreement stated that "the initial rating of the B Notes shall have been confirmed by each of Moody's and Standard & Poor's as contemplated by Section 9.8 of the Indenture." Id.

The Indenture required Patriarch to obtain an initial rating of the B Notes at closing, to be confirmed at the same time as the A Notes, 30 days after the end of the ramp up period. DX-239 §7.13. The rating process for both the Class A and B Notes in this version of the Indenture was a single defined term ("Rating Confirmation"). See id. When the cooperation clause was inserted, the parties anticipated that the B Notes would have already received its initial rating at the time the Master Agreement was executed, and that the sole action remaining would be for the rating to be confirmed by a date certain, on the exact same schedule as the A Notes. See DX-239 § 7.13(b); DX-46 (Item 5); Tr. [Wormser] 361-62; Tr. [Medvecky] 458; Tr. [Tilton] 586-87.

19

## II.   **The Agreements**

On November 13, 2003, MBIA, Patriarch and LDI entered into the Master Agreement[4] (PX-3), the Indenture (PX-5) and Collateral Management Agreement (PX-177).

### 1.   The Master Agreement

The Master Agreement, in § 3.04, provided that Patriarch "use commercially reasonable efforts" to contribute up to $120 million of the $150 million (i.e., 80%) face amount of the Class B Notes to the Identified CDOs as needed to satisfy their payment obligations on the MBIA insured notes. PX-3 § 3.04.

> (i) to cause Octaluna, LLC to transfer to
> Patriarch VIII (or to one or more of its
> affiliates), (ii) to contribute (or to cause such
> Patriarch VIII affiliate to contribute) and (iii)
> to cause the applicable Manager(s) [(including
> the Patriarch affiliates serving as managers of
> Z-1 and Captiva)] of the Identified CDOs to cause
> the relevant Identified CDO to accept, from time
> to time prior to May 15, 2012, in each case, a
> portion of the Class B Notes (each such
> contribution of Class B Notes to an Identified
> CDO, a "Contribution") in the manner described in

---

[4] The Master Agreement is governed by New York law.  PTO Stip. ¶ 31, 35.

this Section 3.04, such that (in the sole
judgment of Patriarch VIII (and such applicable
Manager)) any shortfall or perceived shortfall in
the assets available to such Identified CDO to
pay interest and ultimate principal on the notes
and/or other securities issued by such Identified
CDO would be eliminated or substantially reduced
(it being the intent of Patriarch VIII and the
applicable Manager to use [up to $120 million
face amount of the Class B Notes] to the extent
reasonably possible to remediate each such
Identified CDO).

PX-3 § 3.04.


    The Class B Notes were to be the primary form of
remediation for the Identified CDOs. See PX-445 [Murtagh Tr.]
99:7-100:14, 122:1-14 (primary remediation strategy for Z-1 and
Captiva was the Class B Notes); see also Tr. [Mauer-Litos]
90:23-91:24, 94:14-23. Once the Class B Notes were contributed
to an Identified CDO, the payment on or sale proceeds from the B
Notes would be used to make payments on the MBIA-insured notes
or to reimburse MBIA for payments made under the relevant
insurance policies. See PX-445 [Murtagh Tr.] 99:7-100:14, 122:1-
14 (primary remediation strategy for Z-1 and Captiva was the
Class B Notes), 514:23-515:11; Tr. [Mauer-Litos] 90:23-91:24,
94:14-23.

21

The Master Agreement provided that Patriarch's obligation to cause the contribution of the Class B Notes (the "Contribution Obligation") is subject to the condition that the rating of the Class B Notes must be "at least 'Baa3' by Moody's and 'BBB-' by Standard and Poor's as contemplated by Section 7.13(b) of the Indenture" (the "Rating Condition" and such ratings, the "Ratings"), id., that the Class B Notes "constitute debt for United States federal income tax purposes as evidenced by an opinion of nationally recognized tax counsel" (the "Debt-for-Tax Condition"), PTO Stip. ¶ 33; PX-3 § 3.04, that, at the time of Contribution, "the Class B Notes being contributed to such Identified CDO shall be free and clear of all liens, claims and encumbrances except those created by the Transaction Documents" (the "No Lien Condition"), PX-3 § 3.04, and that "the satisfaction of all applicable transfer, acquisition and/or contribution restrictions (A) imposed by Law [(the "Legal Transfer Condition")] and (B) contained in (x) the Transaction Documents, the constitutive documents of Octaluna, LLC and any other governing documents with respect to the Class B Notes and (y) the indenture and other applicable governing documents . . . of the applicable Identified CDOs [(the "Document Transfer Condition")] (collectively, the "Contribution Conditions"). PX-3 § 3.04.

Section 3.04 of the Master Agreement also provided as
follows:

> Each of MBIA (solely in its capacity as
> Controlling Party under the Zohar Indenture or
> similar capacity with respect to the Identified
> CDOs) and [Patriarch] <u>agrees to cooperate and use
> commercially reasonable efforts to procure as
> soon as reasonably practicable the satisfaction
> of the conditions specified</u> in clauses (ii), (iv)
> and (v)(B) of the preceding sentence, including
> without limitation consenting to and otherwise
> supporting supplemental indentures, amendments,
> waivers or other modifications to the Transaction
> Documents and/or the Identified CDO Agreements
> with respect to each applicable Identified CDO
> and taking such other action as may be necessary
> to effectuate the intention of and/or facilitate
> the performance of [Patriarch's] obligation to
> make Contributions hereunder. (Underlining added.

PX-3 § 3.04 (emphasis added).

It is the language underlined above that is at the
source of the parties' dispute.

Section 4.02 of the Master Agreement provided in
relevant part:

> The failure of any party at any time to require
> performance by another party of any provision of

23

this Agreement shall in no way affect that
party's right to enforce such provision, nor
shall the waiver by any party of any breach of
any provision of this Agreement be taken or held
to be a waiver of any further breach of the same
provision or any other provision.

PX-3 § 4.02.


Section 4.04 of the Master Agreement provided in

relevant part:


No delay or omission in insisting upon the strict
observance or performance of any provision of
this Agreement, or in exercising any right or
remedy, shall be construed as a waiver or
relinquishment of such provision, nor shall it
impair such right or remedy. Every right and
remedy may be exercised from time to time and as
often as deemed expedient.

PX-3 § 4.04.


Section 4.05 of the Master Agreement provided:


This Agreement constitutes the sole agreement
between the parties concerning the subject matter
hereof. Except as otherwise set forth herein, all
previous agreements between these parties
concerning the subject matter hereof, whether
oral or written, have been integrated into this
Agreement.


PX-3 § 4.05.

Section 4.07 of the Master Agreement provided in relevant part:

> No amendment or modification of this Agreement shall be effective unless such amendment or modification is in writing and is signed by all of the parties hereto.

PX-3 § 4.07.

2.   The Indenture

The Indenture governed the types of investments Zohar I could make, when and how the cash flows from those investments could be used to pay expenses or to pay interest and principal to noteholders, and the process by which the Class A and B Notes would be rated by the Rating Agencies. PX-5 §§ 12.1, 11, 7.13(a)-(b).

The Indenture also provided that the issuer and the holders of the B Notes agreed initially to treat them as equity, that with the consent of MBIA and Patriarch the Indenture could be amended to modify the tax treatment provision without the consent of the Noteholders to effectuate the conditions in the

25

Master Agreement, PX-5 § 8.1(i)(4); PX-3 § 3.04, and that the B Notes were not transferrable, PX-5 § 2.4(c), 91; PX-3 § 3.04.

Patriarch's obligation to transfer the B Notes was expressly conditioned on the B Notes (1) having obtained an investment grade rating from Moody's and Standard & Poor's "as contemplated by Section 7.13(b) of the Zohar Indenture," and (2) having been deemed debt for federal tax purposes, as confirmed by a debt-for-tax opinion from a nationally recognized tax lawyer.  PX-3 § 3.04; PTO Stip. ¶ 33.

Under the Indenture, during the nine-month ramp up period following closing, Patriarch was to use "commercially reasonable efforts" to cause Zohar I to purchase a portfolio of assets with a face value of $750 million, and, within 30 days after reaching that amount, seek to have the initial ratings of the A Notes "confirmed" by the Rating Agencies. PX-5 § 7.13(a)&(b).  After ramp up, Zohar I had a five-year "reinvestment period," during which proceeds from the investments that were not used for expenses (such as fees and periodic interest to noteholders) could be redeployed to new investments. PX-5 at 52-53.  Collateral acquired during the ramp up period and during the reinvestment period had to meet certain

26

eligibility criteria. Tr. [Tilton] 1264-65; PX-5 § 12.1(a).
Following the reinvestment period, any excess funds were to be
used to pay down on the A Notes. PX-5 §§ 11.1(a)(ii)(F)-(J),
11.2(a)(v)-(xi).  Holders of the A Notes were entitled to
interest every quarter, and to payment in full of their
principal by November 2015.  PX-5 § 2.2(b).


      The Collateral Management Agreement gave Patriarch
discretion to allocate collateral among Patriarch-managed CDOs,
and waived any conflicts arising from Patriarch or its
affiliates purchasing similar investments for other CDOs and
provided that Patriarch and its affiliates "may invest for their
own accounts or on behalf of other clients (including clients
with business objectives and structures and loans identical to
[Zohar I]) in securities, obligations, loans or other assets
that would be appropriate as investments for [Zohar I]."  PX-177
§ 6.2.


**III.  <u>The Performance of the Agreements By The Parties</u>**


      Pursuant to the Master Agreement, MBIA agreed to, (and
did) cause one or more affiliates of Patriarch to be appointed
as the replacement collateral managers for the remaining

Identified CDO issuers (Amara-1, Amara-2 and Oasis). PX-3 §§ 3.01-3.03.

In connection with such appointments, MBIA agreed to (and did) enter into separate agreements whereby it paid the Patriarch affiliates an amount based on the periodic premiums MBIA received under the relevant insurance policies. See id.; PX-445 [Murtagh Tr.] 335:4-25, 337:5-9.

MBIA performed all its obligations that came due under the Master Agreement. Tr. [Tilton] 562:19-563:3.

    1.   The Closing

At closing, the Class A Notes received an initial rating of AAA/AA by S&P and Aaa/Aa2 by Moody's, indicating a low risk of default. See PX-227; PX-259; PX-260 (initial rating letters from S&P and Moody's). The Rating Agencies provided the initial rating on the Class A Notes based on a model portfolio of then unidentified – and unpurchased – collateral that reflected the criteria set forth in the Indenture. See Tr. [Wormser] 288:18-289:1; PX-5 at § 12.1 (eligibility criteria).

28

After Zohar I closed and initial ratings were assigned
on the Class A Notes, a ramp up period began. See Tr. [Tilton]
578:19-579:2. "Ramping up" involved locating and purchasing
Zohar I's collateral pool.  Tr. [Wormser] 289:2-5, 295:8-16.

As noted above, the Indenture required Zohar I to use
"commercially reasonable efforts" to acquire the requisite
initial collateral pool during the "ramp up" period, which was
originally scheduled to end no later than August 2004 or at any
earlier date directed by Patriarch. PX-5 at §§ 1.1 ("Ramp Up End
Date"), 7.13(a).  The Indenture further required that the Issuer
request a confirmation of the initial ratings from the Rating
Agencies at the end of the ramp up period, to ensure that the
amount and nature of the collateral ultimately purchased
conformed to the parameters set out in the Indenture. See Tr.
[Wormser] 289:6-8; Tr. [Medvecky] 415:8-25.

At closing, Zohar I issued the B Notes in a face
amount of $150 million to an affiliate of Patriarch called
Octaluna. PX-5 § 2.2(b); PX-195; Tr. [Tilton] 520, 556.  The B
Notes paid no interest, did not mature until November 2018. PX-5
at 67 n.6; PX-445 [Murtagh Tr.] 268-69, and were issued for no
cash. Tr. [Tilton] 556. The B Notes were fully subordinated to

29

the A Notes, and had no right to payment until after the A Notes were repaid in full. PX-5 § 11.2(a)(viii); PX-445 [Murtagh Tr.] 268-69.

The Identified CDOs did not mature until future dates – in the case of the worst performing, Z-1 and Captiva, in 2008 and 2009, respectively – and there was no way to know in 2003 if or how the B Notes would be allocated among the Identified CDOs. See Tr. [Mason] 1139. Moreover, even if the contribution conditions were satisfied and the B Notes were transferred, they would be transferred to the Identified CDOs insured by MBIA, rather than to MBIA itself. Tr. [Mauer-Litos] 187; Tr. [McKiernan] 799.

At closing, Natixis' arranger fee was withheld until at least $50 million of the B Notes received an investment grade rating. PX-5 §§ 1.1 (definition of "Class B Rating Condition"), 10.6A(Z) (Deferred Class B Structuring Fees.; Medvecky 420:18-421:24. The purpose of withholding the arranger fee was to incentivize Natixis to provide the assistance necessary to obtain promptly the ratings on the B Notes. Tr. [Medvecky] 418:24-419:11; Tr. [Tilton] 566:3-10; PX-48 (Natixis internal e-mail noting that "[w]e are NOT entitled to any of these arranger

30

fees until we get at least $50mm of the BBB Notes rated. This criteria was meant to hold us to what we represented we [could] get rated."). Ken Wormser ("Wormser"), a senior banker at Natixis, testified that $50 million was chosen because it was the minimum amount to ensure Natixis did a proper job, noting that anything less than that "was sort of too easy and [we] wouldn't get paid for it." Tr. [Wormser] 307:4-10.

The parties understood it might not be possible to obtain ratings on the entire face amount of the B Notes when the ratings were initially sought. See, e.g., Tr. [Tilton] 1363:4-1364:10; PX-3 § 3.04; PX-5 § 7.13(b)(4); see also PX-444 [Tilton Tr.] 123:22-124:19; Tr. [Tilton] 597:4-598:23 (same); PX-445 [Murtagh Tr.] 287:16-288:7 (stating that MBIA believed that contribution of the B Notes would occur at the time of a perceived shortfall in Z-1 and Captiva and that the remainder would become the Class C Notes).

Accordingly, the Indenture provided that if the ratings were obtained on less than the full $150 million Class B Notes – referred to in the Indenture as a "Rating Failure" – the Class B Notes would be reissued in the ratable amount and new Class C Notes would be issued for the then-unrated amount. PX-5

31

§ 7.13(b)(4) (Indenture provision addressing creation of Class C Notes).

      2.  The Change in Strategy for Collateral Acquisition

After Zohar I closed, the market for distressed debt changed in a way that impaired Patriarch's ability to carry out the original strategy of buying distressed loans. See, e.g., Tr. [Mauer-Litos] 98-99. By February 2004, "the market for opportunity in buying discounted distressed loans had closed," because "[o]thers had found the opportunity and increased the price levels." Tr. [Tilton] 1286; see also id. 569-70, 1239, 1286-87. As Murtagh testified, "[t]he market was rallying [in 2004], and that's not good for a distressed buyer. And that generally is what was happening at that time frame. The price – bond prices were going up, and Patriarch's platform was at the time to buy distressed debt." PX-445 [Murtagh Tr.] 101.

That Zohar I was not able to buy suitable loan assets as had been contemplated threatened not only Patriarch's ability to build value for the B Notes, but also its ability to ramp up and obtain a rating confirmation of the A Notes. MBIA was aware that Patriarch was not going to be able to reach the $750

32

million ramp up target given the market change.  Tr. [Mauer-Litos] 158-59.

Failure to confirm A Notes' rating would constitute an Event of Default under the Indenture that could have resulted in an immediate liquidation of Zohar I, at which point MBIA would have been required to pay claims to the holders of the A Notes to the extent that the interest and principal could not be repaid from the cash flows from Zohar I.  PX-5 §§ 5.1(o), 5.2(a); Tr. [Mauer-Litos] 164-65; Tr. [Tilton] 1375-76.

To save the Zohar I deal from failing, Patriarch proposed a revised investment strategy.  Rather than buy loans on the secondary market at a steep discount, Zohar I would originate loans and lend money to companies at or close to 100 cents on the dollar and seek in return equity "kickers," such as warrants or stock. If the borrowers could improve their financial performance, the kickers would increase in value. Tr. [Mauer-Litos] 99; Tr. [Tilton] 571, 1238-40.

In April 2004, Mauer-Litos sent an email to Tilton regarding the proposed change in strategy that Tilton understood as questioning Patriarch's right to alter the initial

33

distressed-debt business model.  PX-26.  Tilton did not react
well to the email.  Id.; Tr. [Tilton] 572:10-573:2.  She
responded by insisting the strategy change was permitted under
the Zohar I Indenture, and reminding MBIA that it was facing a
$200 million loss in the Identified CDOs and assuring MBIA that
the strategy change was driven by her "deep desire" to help MBIA
with "80% of the upside."  PX-26.  Mauer-Litos understood
Tilton's reference to "80% of the upside" as meaning 80% of the
Zohar I Class B Notes.  Tr. [Mauer-Litos] 105:1-8.  Mauer-Litos
also understood Tilton to be saying that MBIA was dependent on
Patriarch because Patriarch was going to build value in the
Class B Notes.  Id. at 105:15-23.


        Tilton outlined the new strategy to MBIA executives at
a meeting held in May 2004 and explained that the new investment
strategy was a necessary reaction to market conditions and that
the building of collateral would require long-term work to turn
around distressed companies.  Tr. [Tilton] 1239-40; DX-291
[Zucker Tr.] 54-56.  While building value would be more time-
consuming and more laborious than the initial strategy, DX-291
[Zucker Tr.] 53-56, the options at that point in time were
either to change the strategy or terminate the transaction
altogether, and "the change in strategy was [MBIA's] best hope

                                34

to . . . close any potential hole" in (i.e., remediate) the distressed CDOs, id. at 50-51, 77.

As noted by Murtagh in an internal email dated September 30, 2004, the implementation of the revised investment strategy would mean "basically rewriting the whole deal," and it was understood that the changes would have significant implications with respect to the ratability of the B Notes.  DX-90.  The core of the old strategy (i.e., discount purchases of distressed debt) was a key driver of ratings, Tr. [Froeba] 1461, 1476; in stark contrast, the core of the new strategy (i.e., equity investments in the borrowers) was not given any credit whatsoever in the ratings process, see Tr. [Carelus] 1068; Tr. [Froeba] 1427-28; Tr. [Mason] 1112.

While MBIA conducted no formal analysis to measure how the revised strategy would affect the ratability of the B Notes. PX-445 [Murtagh Tr.] 108 & 466, Zucker discussed with MBIA's CEO and other members of MBIA's senior management that the B Notes were significantly less likely to be rated than had initially been the case.  DX-291 [Zucker Tr.] 54-56, 58-59, 78. Zucker also testified that he shared his doubts about the ratability of the B Notes with others at MBIA. Id. at 63-64.

35

Tilton told MBIA's Mauer-Litos that the shift in business model would positively impact Patriarch's ability to mitigate losses in the Identified CDOs by way of the B Notes, but did not tell Mauer-Litos the change in strategy could jeopardize getting the B Notes rated.  Tr. [Mauer-Litos] 101:9-19.

The new strategy could not have been implemented without MBIA's approval, and MBIA did ultimately approve. PX-424 at 1; DX-291 [Zucker Tr.] 53.  MBIA recognized that the B Notes would not pay off until well into the future (if at all), and that the new strategy would further delay any payments on the B Notes. In an email to Mauer-Litos and Murtagh from April 2004, Christopher Weeks ("Weeks") of MBIA wrote: "[T]he B note on Zohar is going to be very back-ended. . . . I think it is fair to conclude that any residual i.e. B piece won't be seen until close to 12 year's [sic] time i.e. 2014 or 2015."  DX-75. Murtagh understood that the B Notes would not begin paying out until several years after Z-1 and Captiva (two of the troubled CDOs) matured in 2008 and 2009. PX-445 [Murtagh Tr.] 172, and tied this delay directly to the change in Zohar I's investment strategy: "{t]he deal was amended, the ramp up was slower than

36

expected, so it pushed out the timing of the payout of the B notes." Id. at 301.

No witness contradicted the evidence that this new strategy: (1) was explained to MBIA as necessary to save Zohar I from failing; (2) was successful in preventing a ramp-up failure and resultant liquidation of Zohar I; and (3) made the accumulation of collateral for an the rating of the B Notes a lengthier and more arduous process.

3.  The Supplemental Indentures and the Rating of the A Notes.

Patriarch's drastic shift in investment strategy for Zohar I necessitated extensive Indenture amendments, accomplished by way of several supplemental indentures (the "Supplemental Indentures").

Tilton advised MBIA in August 2004 that "[t]he deal flourishes but the timing to complete these types of investments mandates that we need a little more time to complete the ramp up." PX-28.  Patriarch proposed in the First Supplemental

Indenture to extend the ramp up period by two months. Id.; see also Tr. [Tilton] 578:19-579:10.

The Rating Agencies confirmed that the First Supplemental Indenture did not adversely affect Zohar I's assigned ratings. PX-228 (S&P confirmation letters); PX-264 (Moody's confirmation letters).

Following discussions with Tilton, MBIA approved Patriarch's request and executed the First Supplemental Indenture on August 10, 2004. PX-7; PX-28; Tr. [Tilton] 581:22-582:5. The First Supplemental Indenture extended the Ramp-Up End Date until no later than October 29, 2004 and retained Patriarch's ability to specify an earlier date. PX 7; PX-5 § 1.1 (definition of "Ramp-Up End Date").

Thereafter, Natixis approached the Rating Agencies to procure a confirmation of the initial ratings on the Class A Notes. See Tr. [Medvecky] 461:6-462:6.

Patriarch and Natixis negotiated with the Rating Agencies to identify changes to the Indenture that would be sufficient to procure a confirmation of the initial rating on

38

the Class A Notes under the revised strategy. E.g., PX-31
(Natixis to S&P re: calculating Adjusted Collateral Balance);
PX-32 (Natixis to Patriarch re: collateral balance and recovery
of 25 buckets); PX-34-36 (further Patriarch and Natixis
communications with the Rating Agencies.; Tr. [Medvecky] 415:6-
416:8 (explanation of rating confirmation and Natixis' generally
involvement), 425:12-440:4 (description of negotiations related
to the rating confirmation), 426:18-427:19 (obtaining the
confirmation required changes to rating criteria set forth in
the transaction documents); see also PX-424 (MBIA summary of
amendments); PX-39 (MBIA spreadsheet comparing amendments
discussed in PX 424).  Tilton was "deeply involved" in these
negotiations.  Tr. [Tilton] 1240:9-24.


        In response to concerns raised by the Rating Agencies,
Patriarch identified collateral available in the market
sufficient to achieve a collateral balance of approximately $667
million.  Tr. [Medvecky] 432:19-433:15, 434:10-435:16 (including
October 14, 2004 email).  Patriarch and Natixis also proposed
that some collateral would be transferred out of Zohar I at its
initial purchase price, in order to permit Patriarch to acquire
different assets at a greater discount to par. PX-31 (Natixis e-
mail to S&P stating "[t]he assets that Patriarch will be

transferring to Zohar 2 will be mostly the par assets and the proceeds from the sales will be invested in discount assets which will allow the transaction to build up the overall amount of assets.")

In October 2004, Patriarch and Natixis proposed two amendments to the Indenture, referred to as the Second Supplemental Indenture and the Third Supplemental Indenture. PX-424 (MBIA internal summary of second and third amendments); PX-39 (MBIA internal spreadsheet related to PX 424); see also Tr. [Mauer-Litos] 108:7-19.

The Second Supplemental Indenture addressed credit issues identified by the Rating Agencies. See PX-8; Tr. [Mauer-Litos] 108:7-13; see also PX-31; PX-34; PX-35 (Natixis and Patriarch communications with S&P regarding credit issues and proposed amendments in connection with ratings confirmation).

Among the changes to the Zohar I Indenture called for in the Second Supplemental Indenture were a lowering of various collateral tests, including the "Diversity Test," the "Minimum Average Recovery Rate Test," the "Moody's Weighted Average Rating Factor Test," the "Standard & Poor's Average Recovery

40

Rate," the "Weighted Average Purchase Price Test," and the "Weighted Average Spread Test."  In addition, the Second Supplemental Indenture lowered the amount of collateral necessary to obtain a ratings confirmation as of the Ramp Up End Date from $750 million to $543 million. PX-8 § 2.

According to Tilton, the parties "basically had to rewrite the entire deal in terms of eligibility criteria." Tr. [Tilton] 1241:5-10. She explained that the collateral that was acquired reflected both higher interest rates and a higher credit quality than originally expected, but was purchased at a smaller discount to the par value of the loans.  Id. at 1241:2-10.  The new eligibility criteria reflected her expectation that the transaction could reach $650 million in total collateral level, as opposed to the $750 million expected under the original Indenture.  Id.

Tilton also testified as to her motivation to obtain a ratings confirmation on the Zohar I Class A Notes, see Tr. [Tilton] 1289:1-1291:3, and stated that securing the rating confirmation was important to her because it would allow Patriarch to collect its subordinated management fees and would trigger payments to the Preferences Shares that Patriarch owned

41

in part.  Tr. [Tilton] 1289:6-14.  The parties had to change the Indenture when the strategy changed because the Rating Agencies based their tests and models on the terms of the Indenture.  Tr. [Medvecky] 461.

To reflect that loans would be originated at par instead of a discount, the ramp up target collateral balance was reduced from $750 million to $543 million and the previous requirement that the loans be purchased at a weighted average price of 70 cents on the dollar was replaced with a provision imposing no purchase price restriction for the first $650 million of assets.  PX-5, at 63 ("Weighted Average Purchase Price Test"), § 7.13(a); PX-8 §§ 2(dd), (ii).

The Second Supplemental Indenture substantially changed the investment parameters for Zohar I to reflect both the new strategy and the demands the ratings agencies imposed to confirm the Class A Notes' ratings.  See PX-8.  As Tilton explained,

> [T]he nature of the assets had really
> changed from the discounted assets and
> getting to a [$]750 million . . . . collateral
> level . . . .  We were at much lower
> collateral levels, but we had higher
> interest rates, and our ratings were a

42

little higher because they were less
stressed, but we basically had to rewrite
the entire deal in terms of eligibility
criteria.

Tr. [Tilton] 1241.


The terms of the Second Supplemental Indenture were
heavily negotiated with the Rating Agencies.  Tr. [Tilton] 598,
Tr. [Medvecky] 462; see also DX-86, DX-94, DX-96, DX-98, DX-105,
DX-102, DX-103, DX-104, DX-109, DX-111.  This was a "very
difficult process." Tr. [Tilton] 1290; see also Tr. [Medvecky]
462; Tr. [Tilton] 586-87. For example, Patriarch tried to
persuade the Rating Agencies to include in their analysis of the
transaction "hypothetical assets" that would increase the
collateral balance, but they refused.  Tr. [Tilton] 1240-42.
Standard & Poor's made clear that it would not confirm the A
Notes' rating unless Patriarch would "specifically identify the
assets which are owned or committed for purchase."  DX-107.


In the end, the A Notes' ratings were confirmed, but
"barely."  Tr. [Tilton] 1243, 1272; PX-231, PX-266; PX-267.
Moreover, Standard & Poor's confirmed the ratings of the A Notes
on the assumption that the collateral balance would reach $650
million.  See DX-112; Tr. [Tilton] 598, 1242; DX-96 (lengthy

43

back-and-forth between Lorraine Medvecky, managing director of Natixis' structured credit products group, and Bob Chiriani of S&P regarding how Zohar I would get to $650 million collateral balance).

    4. The Third Supplemental Indenture and the Ratings Trigger for the A Notes

    The Third Supplemental Indenture specifically addressed the B Notes by including an explicit statement that the Rating Confirmation on the Class A Notes had been obtained, and removing the requirement that the Issuer seek a rating on the B Notes by a specific date. <u>See</u> PX-9 § 2(a). It provided:

> Within thirty (30) days following the date that the Aggregate Principal Balance of the Collateral Debt Obligations exceeds $750,000,000 (or such earlier date as [Patriarch] may determine), the Issuer (or [Patriarch] on behalf of the Issuer) shall (with the assistance of [Natixis]) request that each of Moody's and Standard and Poor's provide an initial rating of the Class B Notes of at least 'Baa3' by Moody's and at least 'BBB-' by Standard & Poor's (an 'Acceptable Class B Rating') . . . .

PX 9 § 2(a)(1).

44

Following discussions with Tilton, MBIA approved the amendments, as well as the transfer of assets out of Zohar I. See, e.g., PX-424 (MBIA internal memo analyzing proposed amendments); PX-39 (chart referenced in PX-424 assessing changes in language). The ability to acquire equity in the obligors was an important consideration in MBIA's approval of the new strategy, and was explicitly described in MBIA's internal memorandum analyzing the proposed amendment.  PX-424.  MBIA believed the transaction would continue to accrete value to the Class B Notes.  PX-445 [Murtagh Tr.] 467:7-19.

The Second and Third Supplemental Indentures were executed together on the last day of the extended ramp-up period, October 29, 2004. PX-8; PX-9.

Tilton testified that, during discussions with MBIA regarding the Third Supplemental Indenture, the parties initially considered moving the rating deadline forward to March 2005.  Tr. [Tilton] 1243-44; see also DX-85 (draft proposal for rating deadline of March 2005).  However, she was unwilling to agree to another deadline of a specific date and instead sought to have the rating be tied to a specific collateral balance. Tilton testified, "I had a long conversation with actually Mark

45

Zucker at MBIA, at which time I was no longer willing to live to another date certain that wouldn't work but an amount certain, and that was the $750 million of collateral."  Tr. [Tilton] 1243-44.  Zucker's testimony corroborates Tilton's recollection. DX-291 [Zucker Tr.] 245.

Although MBIA offered no contrary evidence on this issue, it has challenged Zucker's credibility based on his deposition-only testimony.  In MBIA's view, the cooperation clause of the Master Agreement remained effective even after the execution of the Third Supplemental Indenture, in view of the Third Supplemental Indenture's inclusion of the phrase "or such earlier date as Patriarch may determine."

Given that the collateral was then $200 million below the $750 million that had previously been expected, and that it had been a long and difficult effort even to get the rating on the A Notes confirmed, the parties recognized that the contemplated investment grade rating on the B Notes could not have been achieved by the Ramp Up End Date.  Tr. [Tilton] 1243; DX-291 [Zucker Tr.] 60-61.

46

In the end, despite the modifications wrought by the
Supplemental Indentures, the parties found themselves dealing
with the fact that Zohar I was still failing certain eligibility
criteria – most notably the diversity test – so Tilton sought
and obtained MBIA's approval to sell certain assets held in
Zohar I to Zohar II, a new CDO that a Patriarch affiliate was in
the process of forming.

As Tilton testified, the strategy was twofold:

> First of all, we tried to — we sold some of the
> assets from Zohar I into the Zohar II warehouse
> with MBIA's approval to try to take down some of
> the larger concentrations because as
> concentrations [o]f both issuer and industry go
> down, diversity gets better, which is good. And
> the other thing is we tried to buy new assets. So
> we were working in two directions, taking the
> concentrations down and adding additional assets
> to create diversity.

Id.  Those transfers could not have been made without
MBIA's approval, and MBIA did in fact approve.  DX-118; DX-
125.

Patriarch "sold some of the assets from Zohar I into
the Zohar II warehouse with MBIA's approval to try to take down
some of the larger concentrations because as concentrations [o]f

47

both issuer and industry go down, diversity gets better." Patriarch "tried to buy new assets. So [Patriarch was] working in two directions, taking the concentrations down and adding additional assets to create diversity." Id.; see also Tr. [Tilton] 1241-42, 1328; DX-118; DX-125; DX-191; Tr. [McKiernan] 758-60.

     5.   Collateral Acquisition and the Rating Process for Zohar II and III

On October 8, 2004, Standard & Poor's required Natixis to run its model "based on the fully ramped up ($650 million) portfolio," and informed Natixis that it was not able to confirm the ratings on the A Notes, and Natixis responded that it had "rerun the portfolio based on pro-forma $650 million" collateral balance.  DX-98 at 2.  Standard & Poor's, however, required that Zohar I "have the fully-ramped-up pool of assets specifically identified" in order to confirm the rating. S&P would not "provide the effective date rating confirmation on an assumed pro forma effective date pool."  DX-102 at 2.

Tilton viewed the requirement to fully ramp up to $650 million to have the rating confirmed "unduly burdensome."  Id. at 1.

However, Standard & Poor's refused to change its position that it would not confirm the A Notes based on a pro forma portfolio. DX-105 at 1.  Natixis asked Standard & Poor's not to require the parties to rewrite the deal based on the "low probably [sic] contingent risk [of] the portfolio not getting to $650mm."  DX-112.

Ultimately, Standard & Poor's "barely" confirmed the ratings of the A Note on the assumption that the collateral balance would reach $650 million.  See DX-112; Tr. [Tilton] 598, 1242; DX-96; see also Tr. [Tilton] 1243, 1272; PX-231, PX-266; PX-267.

Natixis expected to begin pursuing a rating on the B Notes after obtaining the rating confirmation on the A Notes. See PX-30 (Natixis email dated September 29, 2004 stating "It looks like we will be able to get it all rated.").

After the amendments in October 2004, MBIA understood
that the new target collateral level was $650 million and not
$750 million.  DX-279 ("As of the October [2004] trustee report
the deal is approximately 82% ramped with collateral at $530.6
million").

Natixis assessed the amendments and believed their
implementation would help the deal's performance and not affect
the ratability of the Class B Notes.  See, e.g., PX-30 (September
29, 2004 - "It looks like we will be able to get [all the Class
B Notes] rated . . . After the 1st amendment gets passed (within
next 2 weeks) - confirming the "AA" rating - then we will pursue
the 'BBB' rating."); PX-41 (Natixis checklist for Zohar I,
noting "Patriarch is taking advantage of attractive lending
opportunities in the primary middle market. As a result, the
Zohar I portfolio has a higher purchase price which has been
offset by significantly higher spread and improved credit
ratings on the underlying assets. The deal . . . continues with
the same underlying note ratings."); PX-44 (March 8, 2005
Natixis email stating full amount ratable with $614 million
collateral and $75 million ratable with current $590 million
collateral); Tr. [Wormser] 315:4-23.

50

Zohar I's purchasing power was constrained in that its largest seven borrowers could each represent between 5% and 9% of the portfolio, but after those "buckets" were filled, any investment could not exceed 3% of the portfolio, or approximately $18 million. There was generally not enough money available in these smaller 3% buckets to buy control of entire companies as was contemplated in the new strategy, so it was determined that Zohar I "would need more purchasing power." Tr. [Tilton] 1245. Even before the Zohar I amendments were finalized, Patriarch began work on a new CLO, Zohar II that could invest alongside Zohar I. PX-8 § 2(uu).

Patriarch represented to MBIA that the Zohar II transaction would benefit Zohar I by providing additional liquidity and purchasing opportunities for Zohar I. Tr. [Tilton] 615:7-18, 1246:1-7. MBIA, which was to insure Zohar II, was involved in these discussions from the outset and recognized that establishing Zohar II would be beneficial to Zohar I. Tr. [Tilton] 1246, 1287-88.

Patriarch discussed the impact Zohar II would have on Zohar I "in broad detail with [MBIA]," which agreed with the strategy and insured $1 billion of A Notes for Zohar II. Tr.

51

[Tilton] 1287-88. MBIA stated in an internal memorandum in November 2004: "Through Zohar II, Patriarch will obtain funds to expand and solidify its new business activities." DX-280 at 2. In a November 8, 2004 email, MBIA acknowledged that Zohar II "will allow [Patriarch] to continue to grow and further support their platform."  DX-278 at 2.

    Tilton later proposed the creation of a third CLO, Zohar III.  DX-291 [Zucker Tr.] 81.  In the third quarter of 2005, Zucker informed Tilton that he was personally in favor of MBIA insuring Zohar III, and Tilton expected MBIA to make such a commitment. DX-166; DX-291 [Zucker Tr.] 81:15-25.  In addition, an internal MBIA memo stated that Zohar III would "directly benefit[] the success of Zohar I & II as new originations will support both transactions." DX-154, at 1.  However, unlike Zohar I and Zohar II, MBIA did not agree to insure Zohar III.  PX-3; see also Tr. [Tilton] 631:3-15.

    MBIA consented to transfers of assets from Zohar I to Zohar II and III to help those funds launch. See DX-118; DX-125; DX-191; Tr. [McKiernan] 758-60.  No evidence was adduced that at the time of these events MBIA objected to the creation of Zohar

II or Zohar III on the grounds that they conflicted with Zohar I or Patriarch's obligations under the Master Agreement.

In January 2005, Zohar II closed and issued $1 billion in funded, senior notes — almost twice as much as Zohar I had issued. PX-209 § 2.2(a). MBIA insured those notes. Id. at 22 (defining "Credit Enhancer"), § 16.3; Tr. [Tilton] 614:21-615:2, 643, 1246; Tr. [McKiernan] 751.  Thus, MBIA assumed the risk that the proceeds generated by the asset portfolio selected by Patriarch would be sufficient to repay the $1 billion invested by the Zohar II Class A Note holders. See id.

With the additional purchasing and funding power from Zohar II (and later, from Zohar III), Patriarch made controlling investments that could not have been made by Zohar I alone. Tr. [Tilton] 1251-56. During the same time period that Patriarch and Natixis were extending the deadline for the Zohar I ramp up period and negotiating with the Rating Agencies for the confirmation of the ratings on the Class A Notes, Patriarch was in the market simultaneously looking for collateral for Zohar I and Zohar II. Tr. [Tilton] 614:21-615:18.

Patriarch's affiliate is the collateral manager of the Zohar II transaction.  Tr. [Wormser] 284:17-285:9.  As collateral manager, Patriarch earns substantial fees.  E.g., PX-410 at 9.  Like the arrangement with MBIA with respect to Zohar I, Patriarch's management fees for Zohar II are two percent of the collateral balance per year (one percent in a senior fee paid at a high priority in the waterfall and one percent in a subordinate fee paid at a lower priority in the waterfall). PX-209 §§ 1.1 (definitions of "Senior Collateral Management Fee" and "Subordinate Collateral Management Fee), 11.1, 11.2; Tr. [Tilton] 512:2-514:2.  As of July 2012, approximately $177 million had been paid to Patriarch for Zohar II management fees. PX-410 at 9. In the aggregate, Patriarch's affiliates earned over $17 million for managing the Identified CDOs.  Tr. [Tilton] 575:23-576:18.

Zohar II also issued $200 million of Class B Notes to an affiliate of Patriarch. PX-209 § 2.2; Tr. [Tilton] 520:22-22. However, unlike the Zohar I Class B Notes, Patriarch made no contractual obligation to share the Zohar II Class B Notes with any other entity.  Tr. [Tilton] 521:1-4.

By December 2004, Zohar I had used all but $644,000 of its available funding. PX-169-5 at 5 ("Resulting Funding Availability: 644,129.30"); see also Tr. [Tilton] 593, 1333.

"[T]here was almost complete overlap [of collateral] amongst all three deals [i.e., Zohar I, II & III]." Tr. [Tilton] 615-16.  For example, in 2005, the Zohar funds loaned $117 million to purchase one of the country's six major helicopter makers, MD Helicopters, and Zohar I's portion of the loan was $29 million, the maximum available under Zohar I's 5% concentration limit. Tr. [Tilton] 1253-54.  In 2008, the Zohar funds loaned $61 million to a technology company, CBA, and the portion from Zohar I, $18 million, was the maximum available under Zohar I's 3% concentration limit.  Tr. [Tilton] 1251-53.

Further, "in virtually every instance," Zohar I not only joined in these investments with Zohar II and III, but also generally did so to the maximum amount that its issuer and industry concentrations and funding capacity would allow. (See Id. at 1380; see also id. at 1251-54. "[I]n virtually every instance Zohar I got as much of the loan as it could take under the eligibility criteria." Id. at 1380.

Transactions undertaken in connection with the new strategy were more complicated and time consuming than the transactions that would have been made under the initial strategy of simply buying distressed loans at a discount. Patriarch had to undertake due diligence, negotiate complex legal documents, and, in the case of assets purchased out of bankruptcy, contend with the court-supervised auction process. Tr. [Tilton] 667-68, 1310-11. The process took, on average, six months for a transaction to be consummated, at which point Patriarch had to focus on accomplishing the turnaround so as to profit from the equity kicker. Tr. [Tilton] 515-16, 1344, 1384.

While Patriarch was attempting to find worthwhile opportunities for re-investment, Zohar I was recouping on its initial investments: $340 million worth of Patriarch's initial loans repaid a total of $460 million, and the cash had to be redeployed. Tr. [Tilton] 593-94, 1271. As additional cash came in from successful investments, Patriarch was "scrambling to put money to work." Id.

The Zohar I monthly trustee reports show that Patriarch made collateral commitments and acquisitions each

month during the reinvestment period. PX-169, PX-170, PX-171; Tr. [Tilton] 568-69. In March 2006, the collateral balance in Zohar I was $544 million, and grew higher in almost every month following. DX-273. The balance reached as high as $621 million, and never was lower than $540 million — a drop of less than 1% from the March 2006 balance. Id.

As a result of Patriarch's success in finding viable investment opportunities for the incoming cash, available funding remained low throughout most of 2005 – the number was at $8 million in January 2005 and only $15 million as late as August 2005.  Id. at 593; PX-430.  However, despite Patriarch's efforts to deploy Zohar I's funds and thereby grow the collateral, the collateral balance of Zohar I remained relatively flat over time, and well below the $750 million target. DX-273.

Because the collateral balance was not growing as large as had been hoped, Tilton realized that obtaining an investment grade rating on the B Notes would not be possible. Tr. [Tilton] 1272, 1281. Tilton "knew [an investment grade rating] could not be had" because the collateral balance did not increase significantly from what it had been when the A Notes'

57

rating had been confirmed, when the B Notes could not be rated. Id. at 1272. Tilton was "very knowledgeable of how models worked and how Rating Agencies developed their thoughts" and utilized her "business judgment" in determining that no rating was possible on the B Notes. Tr. [Wormser] 359-60; Tr. [Tilton] 1302-03.

In discussions with Zucker, Tilton stated that she would seek a rating "[w]hen the market allowed." DX-291 [Zucker Tr.] 248.  Zucker did not believe that the collateral balance would have supported an investment grade rating in 2006. Id. at 87.

Tilton was concerned about the risk of a premature rating application on the B Notes and its impact on the rating of the A Notes.  See Tr. [Tilton] 598, 1278. The rating on the A Notes had been confirmed on the assumption that the collateral balance would reach $650 million, something that ultimately did not happen.  Tr. [Froeba] 1459.  Accordingly, a premature rating would have risked a downgrade of the A Notes by calling attention to the fact that the collateral balance remained deficient.  Id. at 1278.

The Indenture provided that a downgrade of the A Notes would increase the amount of interest owed to investors and would in turn increase MBIA's insurance exposure, thereby reducing the cash available for investment in collateral. Tr. [Tilton] 1278; PX-5, at 11 ("Class A Applicable Margin").

Although MBIA has pointed to $25 and $90 million of funding that was uninvested at certain points between the fall of 2005 and the end of 2008, PX-428; PX-430; Tr. [Tilton] 1314-15), Patriarch's reinvestments efforts were by and large highly successful, as by the end of 2004, just a month after the ramp up period, Zohar I had used virtually all of its available funding. Tr. [Tilton] 1332; PX-169-5; see also Tr. at 593 (just $8 million in available funding in January 2005).  Moreover, in August 2005, the available funding was still only $15 million, or approximately 2.5% of Zohar I's collateral balance. PX-428, PX-430.

The available funding did increase in the following months. In the first years after the ramp up period, $340 million in loans paid off earlier than expected, generating $460 million in cash.  Tr. [Tilton] 593-94, 1271.  However, this was not indicative of a lack of effort on the part of Patriarch.

59

Rather, as loans paid down, reducing the collateral balance,
Zohar I had to re-deploy the cash just to maintain the
collateral balance at the same level.  See id.  By the end of
the reinvestment period Patriarch had deployed virtually all of
Zohar I's available funding. Tr. [Tilton] 1316-17; PX-430.


     MBIA's executives did not give any indication that
they believed there was a problem with Patriarch's efforts at
collateral acquisition at the time, and there is no
contemporaneous document in which MBIA suggests that Patriarch's
effort was lacking.  Indeed, in May 2007, more than a year after
Patriarch's now supposed abandonment of Zohar I, MBIA reported
being "encouraged" by the "value being generated in [the B
Notes]." Tr. [McKiernan] 706; DX-205.


     6.  The Ratings for the Zohar Notes


     On September 19, 2005, Natixis' analysis showed that
the full $150 million of the Zohar I Class B Notes likely could
receive the Ratings when the Zohar I collateral balance reached
$615 million, and that $75 million of the Class B Notes likely
could receive the Ratings based on the then-current $590 million
collateral balance.  PX-48.

The ratings standards had become stricter over time. Tr. [Tilton] 1247, 1281; see also Tr. [Wormser] 393; DX-291 [Zucker Tr.] 459-60; Tr. [Froeba] 1402-04 (all confirming stricter ratings standards).  In particular, the Rating Agencies were no longer giving credit for unsettled commitments, which comprised a substantial portion of the Zohar I portfolio. Tr. [Tilton] 1247-49, 1261, 1280-81, 1295; Tr. [Wormser] 396; DX-273.  The Rating Agencies changed their policy with regard to committed but unsettled assets at least in part because "having looked at Zohar I, there was the realization that because of the type of investments we made, there were risks to unsettled assets actually settling because it was subject to a lot of different things, not like trading loans and having trade confirmations." Tr. [Tilton] 1249.

Tilton was asked at trial why she did not seek a rating on the B Notes, and her answer — "Because I knew that it could not be had" — was supported by others. Tr. [Tilton] 1272; see also id. at 1275, 1281. As Wormser of Natixis testified, in connection with earlier Patriarch transactions, Tilton "became very knowledgeable of how models worked and how Rating Agencies developed their thoughts." Tr. [Wormser] 359-60.

Among the sticking points in the negotiations for rating the A Notes was Standard & Poor's demand that Zohar I reach a $650 million collateral balance. A few weeks before the Ramp Up End Date, Tilton emailed Standard & Poor's objecting to the "onus you place on us to ramp up to the full $650 million prior to receipt of the Ratings Confirmation." DX-105.  Standard & Poor's ultimately confirmed the rating of the A Note based on a $543 million collateral balance, but on the assumption that the collateral balance would reach $650 million.  See DX-112; Tr. [Tilton] 597-98, 1242; Tr. [Froeba] 1459. Tilton testified that she "knew that [Patriarch] could not even begin to go back" to the Rating Agencies for a rating on the B Notes "until we hit" $650 million. Tr. [Tilton] 598.  Going back to the Rating Agencies before reaching at least that level risked the ratings agencies reexamining, and downgrading, the A Notes.  Tr. [Froeba] 1460; Tr. [Tilton] 598, 1278.

62

7.   Alternatives to Rating the B Notes

By 2005, both Zucker and Tilton were "under extreme
pressure to get th[e B] notes rated," DX-291 [Zucker Tr.] at
249), since MBIA, Natixis and Patriarch all wanted the ratings
to be given.  However, the collateral had not yet seasoned to a
point that the B Notes could in fact be rated. Tr. [Tilton] 608-
09, 1275.

Because of the parties' dissatisfaction with the situation,
efforts were made to explore options that did not require a
rating on the B Notes.  Tilton informed Natixis that MBIA and
Tilton were discussing some arrangement "whereby Lynn would buy
the [Class B Notes] for cash from MBIA" instead of having the
Class B Notes contributed to Captiva and Z-1. Id. Tilton
testified that she offered to purchase MBIA's interest in the
Class B Notes for $10 to $15 million, but MBIA declined. Tilton
1270:1-18. Tilton asked Natixis to come up with other ideas that
would be advantageous to Patriarch and satisfy MBIA. PX-48.
Possibilities included contributing the B Notes to the
Identified CDOs without an investment grade rating Tr. [Wormser]
377; Tr. [Tilton] 1268), or using the B Notes to remediate other

63

troubled transactions insured by MBIA aside from the Identified CDOs, PX-445 [Murtagh Tr.] 132-33.

In November 2005, a proposal was made to establish Zohar III "with upside capability" and the potential to buy the B Notes. PX-54; Tr. [Tilton] 608-13. Tilton responded that she "would not drop the B note into the deals" PX-54) . . . . "I will not use new investor money to buy a B note that I believed had future speculative value into a new deal." Tr. [Tilton] 609-10.

8.  The Dispute Between MBIA and Patriarch With Respect to Zohar III

In late 2005, MBIA had verbally agreed to insure a new transaction, Zohar III, provided the deal would be delayed until early 2006. DX-166; DX-154; DX-291 [Zucker Tr.] 81-82; Tr. [Tilton] 630-31.  However, once 2006 arrived, MBIA shifted its position and stated that it would only agree to insure Zohar III if Patriarch did a "tap" on Zohar II. DX-166; Tr. [Tilton] 630-31, 635-36; DX-291 [Zucker Tr.] 312; PX-62. Under MBIA's "tap" proposal, Patriarch would raise new investor cash that would be used, in part, to pay MBIA cash for its indirect and contingent

interest in the B Notes. DX-166; Tr. [Wormser] 383-84; Tr.
[Tilton] 634-35, 1268.

Tilton testified that she felt it was "inappropriate
and unethical" to take cash from new investors to pay out MBIA's
speculative interest in the B Notes, and that she was not
willing to consider doing a "tap."  Tr. [Tilton] 608-09, 614-15;
see also PX-63 (Tilton "concerned about monetizing an option
that does not mature for 10 years at a certain price today").

Tilton was outraged that "MBIA want[ed] to cash out in
front of all other constituents" and sarcastically told MBIA in
March 2006 that she would "comply with the documents of Zohar
I," but that that she would "not take [MBIA's] *generous* offer of
a tap that requires [Patriarch] to find a solution to [MBIA's]
reserve problem."  DX-166 (emphasis added); PX-62.

In March 2006, Tilton informed several MBIA employees
that "if [MBIA] did not wrap Zohar III as committed that [she]
would not share the Patriarch B note with MBIA to save [it] from
losses on Captiva and Z-1." PX-103; PX-107; PX-114; Tr. [Tilton]

636:17-24. Tilton was "assured that Jay Brown [(MBIA's CEO)] understood the trade off." PX-114.

Nonetheless, Brown decided that MBIA would not insure Zohar III due to his lack of confidence in Tilton personally, as well as the size of MBIA's aggregate exposure to Patriarch. DX-291 [Zucker Tr.] 396:3-398:3 ("he didn't appreciate her ability to manage and did not have confidence in her decision-making"); PX-114. Accordingly, MBIA informed Tilton in mid-March 2006 of its final decision not to insure Zohar III. Tr. [Tilton] 631:3-15, 635:4-25, 636:17-25; see also PX 445 [Murtagh Tr.] 454:25-455:19; DX 291 [Zucker Tr.] 85:21-86:5, 396:3-398:3.

Zucker, who had recommended that MBIA agree to insure Zohar III, was disappointed that his views were not followed. See DX 291 [Zucker Tr.] 85:13-86:5, 396:3-398:3; Tr. [Tilton] 631:3-14. Tilton was furious. Tr. [Wormser] 335:22-336:15; Tr. [Tilton] 629:14-23. However, Tilton's anger was short-lived, Tr. [Wormser] 336, Tr. [Tilton] 629-30, and she continued to work to build the collateral of Zohar I. Tr. [Tilton] 1275-76.

After March 2006, there were no further written communications between MBIA and Patriarch regarding the B Notes until November 2007.

### 9.   MBIA Continued to Rely On the B Notes

In November 2005, MBIA informed Natixis that it wanted to move forward with the rating of the B Notes, see PX-53 (email from Wormser to Ralph Inglese, managing director of Natixis' structured product group, stating that "[MBIA] cornered him re [L]ynn [Tilton] and [said] that . . . [they, i.e. MBIA] want[,] if [possible,] to get z 1 ratings done"), and this message was communicated to Patriarch shortly thereafter, see PX-54 (email from Inglese to Tilton stating that "[MBIA] want[s] to get the Z1 B note rated as originally planned").  In addition, MBIA contacted Tilton on several occasions throughout 2006 and 2007 to communicate that MBIA believed that the B Notes could be rated, and discuss the practicalities of moving forward with the rating process.  See PX-445 [Murtagh Tr.] 85:4-86:3, 93:17-94:8, 134:12-136:23.  Tilton's negative responses to these attempts to discuss the B Notes, e.g., id. at 136:14-18 ("You're never getting the B notes, they are not your B notes, they are my notes, get your lawyers and get your documents together and sue

67

me or whatever."), prompted MBIA, which at the time had a "substantial amount of exposure" to Tilton-controlled entities, to make a strategic decision to avoid further antagonization by remaining silent on the issue of the B Notes during the early part of 2007. See Tr. [McKiernan] 707:23-708:18 ("[W]e had a substantial amount of exposure to Patriarch, so . . . we were not anxious to get into protracted litigation. The idea is to try to always keep the lines of communication open until they're closed."). Despite these statements from Tilton, MBIA never formally demanded that Patriarch obtain a rating on the B Notes.

Nonetheless, MBIA always maintained that that Patriarch still had contractual obligations under the Master Agreement, PX-445 [Murtagh Tr.] 73:13-74:2, 409:2-411:13, 413:7-20, 449:20-24; PX-81, and that Tilton was still "willing to contribute the B notes for MBIA's benefit" pursuant to the terms of the Master Agreement. See PX-445 [Murtagh Tr.] 175. Indeed, according to Wormser, Tilton herself "reinforced the fact that the B notes are there for MBIA," but only under the terms of the Master Agreement. Id. at 175:5-20; Tr. [Wormser] 357-58.

In an email dated March 21, 2007, MBIA's Anthony McKiernan ("McKiernan"), who had succeeded Murtagh as director

of IPM and in that capacity engaged in a review of MBIA's
relationship with Patriarch wrote, "As of today, there is still
the belief Lynn will put in the collateral promised."  PX-81;
see also Tr. [McKiernan] 687:20-21.  McKiernan's statement was
based upon information he had been given by Zucker, who at the
time "had more of an understanding what the actual situation
was."  Tr. [McKiernan] 688-89; see also PX-445 [Murtagh Tr.]
441-442 (Murtagh stating that in 2007, "Mr. Zucker was the only
one who kn[ew] for sure where Ms. Tilton st[ood]").


       After writing the March 21, 2007 email, McKiernan
asked for and received the transaction documents to review.  Id.
at 728-30.  Nothing in those materials indicated to McKiernan
that there was a conflict with Patriarch, that Patriarch's
obligation to seek a rating had come due, or that that Patriarch
had breached the Master Agreement.  Id. at 730-31.


       The monthly reports to the MBIA loss reserve committee
stated that the B Note would continue to accrue value "[a]s the
deal seasons," and would be contributed when rated, and did not
suggest that Patriarch's duty to seek a rating had come due. DX-
168, at MBIA0466558 (second quarter 2006); DX-174, at
MBIA0032267 (third quarter 2006).  In regular "monitoring

69

reports" for Zohar I, MBIA stated that a rating would be sought when the collateral reached $750 million: "Process for getting the B Note rated – Within thirty (30) days following the date that the Aggregate Principal of the Collateral Debt Obligations exceeds $750,000,000 (or such earlier date as the Collateral Manager may determine)." (DX-147 at MBIA0014826; see also DX-181, DX-254, DX-255, DX-256, DX-257, DX-258, DX-259, DX-260, DX-261, DX-262, DX-263, DX-264, DX-265 (monitoring reports ranging from June 30, 2005 to February 20, 2009). This was an "accurate summary of the process for getting the B note rated." Tr. [McKiernan] 754-55. Neither the reports to the loss reserve committee nor the monitoring reports stated that Patriarch had refused to seek a rating for the B Note. Tr. [McKiernan] 756.

MBIA had planned to amend Z-1 and Captiva to allow Patriarch to reinvest proceeds, but its failure to obtain the necessary investor consent constrained Patriarch's ability to stem the deepening losses. DX-212 at MBIA0537287, MBIA0537289 (describing failed consent efforts); Tr. [Mauer-Litos] 135; Tr. [Tilton] 545-46; DX-291 [Zucker Tr.] 70-72. As the losses mounted, MBIA assumed on its books that it would realize a larger and larger amount from the B Note as an offset. Tr. [Mauer-Litos] 153; PX-445 [Murtagh Tr.] 128. For example, in

70

the second quarter of 2005, MBIA projected it would need $72 million of its potential $120 million share of the B Note to remediate Captiva and Z-1, but, in 2006, MBIA was calculating that the B Note would supply the full $120 million.  Compare DX-142, at 2 (30% contribution for each) with DX-172, at MBIA0043306-07 (50% contribution for each).  If there were to have been a premature and failed rating effort, MBIA would have had to increase its loss reserves and report that to its shareholders. PX-445 [Murtagh Tr.] 226.  As of May 2007, MBIA was "encouraged" by the "value being generated in [the B Note]" and MBIA thought that Zohar I was performing well.  Tr. [McKiernan] 706 & 709-13; DX-205.

          10.  The Natixis Fee Payment Without Procuring a Rating on the B Notes

          In late 2006, Natixis requested that MBIA and Patriarch agree to an amendment permitting Natixis to be paid the portion of its deferred fees associated with the Class A Notes without procuring the Ratings on the Class B Notes. See DX-175. This payment constituted a tacit recognition by both parties that the B Notes was not ratable.

71

An internal Natixis document states:

The agreement was that, once the portfolio
had accumulated to some critical mass,
[Natixis] would assist in getting a portion
of the Class B Notes rated. Since that time,
Patriarch Partners has decided that they do
not want to incur the expense nor invest the
time needed to get [the Class B Notes]
rated.

PX-95.  Natixis' communications with the Rating Agencies further

confirm Natixis' understanding:

[Natixis' deferred fees] were initially tied
to getting a portion of the Class B Notes
rated because [Patriarch] wanted to
incentivize [Natixis] in assisting them in
getting the Class B Notes rated . . . BUT
[Patriarch] has now decided that they do NOT
want to incur the expense/time in getting
the Class B Notes rated and, therefore, have
agreed to NOT make the payment of [Natixis'
deferred fees] conditional upon this
event").

PX-97.  Natixis also informed MBIA of its understanding:

Under the Indenture as initially in effect,
in order to encourage [Natixis] to cooperate
with Patriarch in obtaining a rating on some
or all of the Class B Notes, [Natixis]
agreed that the Arranger Fees (which accrued
from the Closing Date) were not payable
until that rating was obtained. However,

72

> when Patriarch determined not to pursue a
> rating of the Class B Notes, the rationale
> for the deferral of the Arrangement Fees
> disappeared, and the parties proceeded in
> good faith to amend the Indenture to permit
> the accrued and accruing Arranger Fees to be
> paid.

PX-112.

However, Natixis did not send these documents to Patriarch, and Tilton was not the source of the statements articulated therein.  Tr. [Medvecky] 482, Tr. [Tilton] 653-55.  According to Tilton, she would not have made such statements about Patriarch not wanting to incur the expense or spend the time necessary to have the B Notes rated, because any expense associated with the rating process would have been borne by Zohar I, rather than Patriarch, and the time expended toward such efforts would have been Natixis' time in working with the Rating Agencies.  Tr. [Tilton] 655; see also Tr. [Wormser] 388-89.

MBIA and Patriarch agreed to pay Natixis a portion of its deferred fee, which was confirmed in the Fourth Supplemental Indenture in March 2007, because MBIA believed Natixis would still possess a sufficient incentive to assist in obtaining the Ratings on the Class B Notes if Patriarch performed under the

73

Master Agreement. PX-445 [Murtagh Tr.] 41:7-42:2, 89:25-90:10, 91:7-92:5. While the Fourth Supplemental Indenture permitted Natixis to be paid the portion of its deferred fees associated with the Class A Notes, it still retained in a reserve account additional fees to which Natixis would be entitled when a rating was obtained on the Class B Notes. See PX 10.

11. Consideration of Alternatives to the B Notes and Termination of Discussion

By April 2007, MBIA had engaged legal counsel to assist MBIA in connection with the Master Agreement. See, e.g., DX-197; DX-212 at MBIA0537292-94; Tr. [McKiernan] 799:24-800:1, but, MBIA remained interested in continuing the remediation with Patriarch. DX 197 ("it behooves both parties to settle this remediation amicably").

In early 2007, MBIA's senior management requested that Zucker meet with Tilton to try to resolve the dispute concerning future remediation. Tr. [McKiernan] 696:15-698:2. Zucker provided assurances he would obtain the Class B Notes. Id. However, Zucker subsequently reported back that Tilton yelled at him for an hour during dinner in a restaurant. Id. Even so,

74

Zucker still assured MBIA senior management that Tilton would
"come around on it." Id.; see also PX-81 (McKiernan reporting
"As of today, there is still the belief Lynn will put in the
collateral promised."); Tr. [McKiernan] 696:7-14.

In May 2007, MBIA and Natixis discussed whether there
was potential for "a settlement type outcome" based on the value
of the Class B Notes. Tr. [McKiernan] 705:16-707:5; see also
DX-188 (Internal Natixis email dated April 2, 2007 stating "What
she [(Tilton)] forgets is she signed a contract and that what
MBIA paid . . . Then asked for more and MBIA gave more . . .
Sometimes one wins and sometimes lose in contracts . . . Fact
that market came back she wants some of those ups but not how
she set contract up.").

In spring 2007, MBIA again considered means of getting
cash for the B Notes. Natixis presented several proposals to
assist in the remediation, Tr. [McKiernan] 705:16-707:5,
including the creation of a new vehicle, to be called "Zohar 4"
which would involve a refinancing or unwinding of Zohar I, with
the potential of paying cash to MBIA. DX-187, DX-196; DX-243;
DX-244. Natixis estimated that Zohar I's net equity — that is,
simply its assets minus its liabilities — was then approximately

$70 million. DX-243; DX-244; DX-245; DX-246. It was proposed that Zohar I be rolled into the new Zohar 4 and that MBIA split the $70 million with Patriarch.  Id.; PX-92.

Natixis made its proposal to MBIA at a meeting in early May 2007. PX-98 at 2; DX-237; Tr. [McKiernan] 705-07, 760-62; PX-98 at 2.  MBIA decided against it.  PX-98 at 2.  MBIA was "encouraged" by the performance of Zohar I and wanted to wait to see how much value Patriarch could create in the B Notes. Tr. [McKiernan] 706.  MBIA's internal summary of the meeting stated, MBIA concluded that "more value will accrue [to] MBIA with the current arrangement and the passing of time." PX-98 at 2; see also DX-198, DX-205; Tr. [McKiernan] 762, 763-64, 769-70; PX-445 [Murtagh Tr.] 479.  MBIA reported the May 2007 meeting to its own board in a presentation specifically intended to bring its members up to speed on the status of the Zohar I remediation strategy.  See DX-198; DX-205. MBIA also included a summary of the meeting in its quarterly loss reserve reports for Z-1 and Captiva.  See DX-212; DX-217.

MBIA also reported the May 2007 meeting in its loss reserve report for the second quarter of 2007 because it was

evidence that the remediation plan was moving in a positive direction. Tr. [McKiernan] 762.

In July 2007, Mitch Sonkin ("Sonkin"), the then-head of IPM, requested a detailed explanation of the Zohar remediation strategy and the B Notes to present to the MBIA board. See DX-198, DX-205; Tr. [McKiernan] 762, 763-64, 769-70; [Mauer-Litos] 157; PX-445 [Murtagh Tr.] 479. That board presentation stated that the remediation agreement would require action by 2012. Tr. [McKiernan] 769-70; PX-445 [Murtagh Tr.] at 463-64. MBIA's board was not told that Tilton had said she would not seek a rating on the B Notes. PX-445 [Murtagh Tr.] at 479.

The issue of the loss reserves for Z-1 and Captiva was presented to the highest levels of MBIA's management. DX-4 (stating that MBIA "can't recommend a new loss number" but if necessary the issue would be escalated to MBIA's Vice Chairman); DX-14 (Vice Chairman would "handle the lack of reserving"); Tr. [Mauer-Litos] 79, 121, 128-29, 132; DX-291 [Zucker Tr.] 70-82, 298-99 (reserves concerns discussed with CEO and other senior managers).

77

In summer of 2007, the housing bubble burst and caused capital markets, including the market for structured products, to freeze. Tr. [McKiernan] 770-71. The Rating Agencies downgraded thousands of structured finance transactions, and the market for CDOs shut down. Tr. [McKiernan] 771-72. MBIA stopped issuing insurance on structured products altogether. Tr. [McKiernan] 772. For the last part of 2007, CDO issuance was delayed due to a lack of liquidity in the market. Id. at 773.

In the fall of 2007, MBIA again approached Patriarch with a request to be paid cash for its contingent interest in the B Notes. Tr. [Tilton] 640.  In the afternoon of November 6, 2007, MBIA emailed Ms. Tilton to schedule a meeting to discuss the matter in person. PX-103.  Tilton's response, sent to MBIA on November 7, 2007 at 4:39 A.M. (the "November 2007 Email") was as follows:

> I will call you upon my return. However, if you are calling this meeting to request my generosity, you can come visit me in my offices. However, I would not come empty handed with a request. You know well how I feel about MBIA and the damage that you caused to Patriarch when you asked me to postpone the launching of and then later walked from your commitment to wrap Zohar III. At the time [(i.e., March 2006)] I made it clear that if you did not wrap Zohar III as committed that I would not share the

78

> Patriarch B note with MBIA to save you from
> losses on Captiva and Z-1. You were clear
> that such message was delivered to Jay and
> Gary and that they would nonetheless stand
> by the decision not to take any more
> exposure to Patriarch.  As far as I am
> concerned that ended what had been a long
> term mutual relationship and my desire to
> help MBIA will [sic] sunk losses caused by
> other managers. Please do not come looking
> for gifts from Patriarch. I have already
> given more of me and my team than is
> deserved. You know I am loyal to you and to
> David. However, MBIA caused Patriarch much
> pain when they walked from that commitment
> and that will not soon be forgotten. It is
> not befitting to come looking for free gifts
> from a lady and a firm that you rejected and
> treated so badly.

Id.

In a later email that was part of the same thread, Tilton reiterated that "the B Notes does not belong in any way to any party but Patriarch." PX 107.

According to Tilton, the "free gift" to which she referred in the November 2007 Email was the possibility of Patriarch contributing the B Notes (or a cash equivalent) to the Troubled CDOs for the benefit of MBIA even though the conditions set forth in the Master Agreement for such a contribution had not been satisfied. Tr. [Tilton] 640.

79

After receiving Tilton's email, MBIA internally concluded that Tilton was "clearly open to a meeting" and decided to invite her to lunch. DX-208.

Murtagh confirmed that MBIA always tried to provide accurate and complete information to the loss reserve committee in the loss reserve reports. PX-445 [Murtagh Tr.] 15-16. McKiernan testified that he saw the November 2007 Email, yet he did not include a reference to it in the loss reserve reports. See Tr. [McKiernan] 744. [McKiernan] 743-49; DX-291 [Zucker Tr.] 88-90. In each quarter after Tilton's email, MBIA reported that there had been "no material change" to the remediation strategy for Z-1 and Captiva, and the full remediation was expected to come from the future value of the B Notes. See DX-212; DX-217; Tr. [McKiernan] 739-41, 744-45, 748.

Moreover, when MBIA filed suit in April 2009, it did not assert that Tilton's November 2007 email was a repudiation, nor did MBIA's corporate representative, Murtagh, consider the November 2007 Email to have been repudiation when he testified at his deposition in 2010. PX-445 [Murtagh Tr.] 67, 70.

In September 2008, Moody's put the Zohar I A Notes on watch for a possible downgrade. DX-235; Tr. [Tilton] 1458; Tr. [McKiernan] 718.

In an email dated November 1, 2008, MBIA again reached out to Tilton regarding the B Notes. PX-113, PX-114; Tr. [McKiernan] 714:4-22; see also PX-445, 347:20-350:16. MBIA was looking for Patriarch to offset the first insurance payment, which was coming due later that month. PX-114 at 2 (referring to "pending Z1 maturity"); PX-197 at MBIA0531611 (Z-1 insurance policy).

Tilton responded that MBIA's inquiries had nothing to do with what was required under the Master Agreement and everything to do with MBIA's efforts to get cash. See PX-114. Tilton stated that she would comply with the Master Agreement, and, as the email stated, continue operating "in the ordinary course" — nothing more and nothing less. Id. She told MBIA: "The B Notes belongs to Patriarch. It has always belonged to Patriarch." PX 114. Copying counsel, Tilton invited MBIA to restate in writing its proposals to cash out ahead of other stakeholders. Id.

81

When the notes of the troubled CDOs insured by MBIA matured in 2008, Z-1 had insufficient assets to satisfy its payment obligations and MBIA was required to make a payment of $59.56 million under its insurance policy. PX-445 [Murtagh Tr.] 312:5-17; see Tr. [McKiernan] 704:14-25; PX-444 [Tilton Tr.] 408:19-24, 409:6-8.  Pursuant to the relevant insurance policy, MBIA became subrogated to the rights of the holders of the insured notes to receive future payments from Z-1.  PX-198 § 5.5 (Z-1 Insurance and Reimbursement Agreement "Subrogation" section).

In May 2006, MBIA had paid approximately $370,000 on account of its Captiva insurance policy due to a shortfall in the funds available for the Captiva issuer to pay interest due on its senior notes insured by MBIA. See PX-98.  When the insured notes matured in 2009, Captiva had insufficient assets to satisfy its payment obligations, and MBIA was required to make additional payments of approximately $57.04 million under its insurance policy. PX-445 [Murtagh Tr.] 312:5-17; see Tr. [McKiernan] 704:14-25; PX-444 [Tilton Tr.] 408:25-409:8. Pursuant to the relevant insurance policy, MBIA became subrogated to the rights of the holders of the relevant insured notes to receive future payments from Captiva. PX-207 § 5.5

82

(Captiva Insurance and Reimbursement Agreement "Subrogation" section).

MBIA expected to receive the benefit of the Master Agreement even if it proved necessary to initiate litigation. See, e.g., PX-445 [Murtagh Tr.] 409:2-411:13 (e.g., "She told us several times she was not going to give us the B notes. . . . which didn't eliminate her legal obligation that we believed was always there."), 413:7-20 (*e.g.*, "And her statements were, I'm not giving you the B notes. I thought the documents governed that, not her emotions."), 497:14-20; see also PX-445 [Murtagh Tr.] 92:14-93:9, 202:11-18, 494:18-495:23; Tr. [McKiernan] 707:14-19.  MBIA eventually filed the instant lawsuit in April 2009.


**IV.**   **The Required Rating Of The B Notes Was Not Achievable**


It is undisputed that Patriarch did not attempt to have the B Notes rated.  The parties do, however, dispute whether or not the B Notes *could have* been rated during the relevant period.

83

The parties submitted evidence concerning Natixis'
conclusions on the issue of ratability, as well as expert
testimony as to whether such an effort would have been
successful. While Natixis' analysis indicated that the B Notes
were ratable, Natixis' conclusions were acknowledged to be
merely "guesstimates," Tr. [Wormser] 376, while Patriarch expert
Mark Froeba ("Froeba"), who was the most qualified and credible
of the experts, opined that the B Notes could not have achieved
an investment grade rating during the relevant period.

      1.   The Natixis Evidence Did Not Establish Ratability

In an effort to demonstrate that the B Notes were in
fact ratable, MBIA has relied upon a number of Natixis emails.
The first such email was written in March 2005, by Natixis'
Medvecky, and appears to be an internal discussion of Natixis'
fees and does not mention MBIA or the Master Agreement.  See PX-
44.  It stated that any rating was to be obtained pursuant to §
7.13(b) of the Zohar I Indenture that is, within 30 days of the
collateral balance exceeding $750 million. Id. at 2. No one sent
the email to Patriarch. Tr. [Tilton] 602-05; Tr. [Medvecky] 471-
72.

The Natixis email of September 2005 also relied upon by MBIA, came in the context of discussions between MBIA and Patriarch about potential alternative transactions outside the Master Agreement, and again focused on Natixis' fees. PX-48. Medvecky expressed concern about whether Natixis would receive its deferred fees because "it sounds as though MBIA (and Lynn) are considering NOT getting the BBB Notes and are instead talking about some other arrangement whereby Lynn would buy the BBB Notes for cash from MBIA." Id.

Inglese responded that Tilton had discussions with Neil Budnick of MBIA and that,

> no one wants the Class B Notes going into the old CBOs to net against losses. So she asked me to come up with ideas of what we could do with this note that would be advantageous to her and satisfy MBIA. The tone wasn't to screw us out of fees but the notes are valuable and MBIA can't really use them so what do we do with them.

Id.

The rating analysis was the same as in March 2005, and Medvecky testified that she did not know if any additional models were run. Tr. [Medvecky] 472. There is no evidence that Natixis ran any rating models in September 2005.

The November 9, 2005 email from Medvecky stated that it "looks like $150mm Ba3 rating is achievable," which was below investment grade and would not have satisfied the Rating Condition.  PX-52; Tr. [Medvecky] 474.  In addition, the email was based on hypothetical scenarios about how much could be rated if the collateral balance grew by a certain amount by a certain date, and was sensitive to the timing of any rating application. See PX-44, PX-48, PX-52, PX-58.

Medvecky's November 2005 email states: "[A]s time goes on (and I adjust the start date further out), the [B] notes will look worse unless the deal generates some gains/par . . . . So if I change the start date from 11/20/05 to 2/20/06 and assume everything else stays the same (including the collateral balance) – we start to fail." PX-52.

The Natixis model contained the assumption that assets would be purchased at 74.5% of par. However, the Indenture, as amended by the Third Supplemental Indenture, contained no limit on the weighted average purchase price until the collateral balance reached $650 million. See PX-8 § 2(dd). The Rating Agencies would test the ratability of the B Notes based on the

86

terms of the Indenture as it existed at the time. Tr.[Medvecky] 468.

Medvecky recognized that the ratings model was highly contingent on the assumptions used, including the start date. She noted that if the start date is moved "from 11/20/05 to 2/20/06 and assume everything else stays the same," the ratings analysis for even a below investment grade rating failed. PX-52; see also Tr. [Medvecky] 474.

On October 31, 2006, Medvecky emailed Wormser and Inglese about a B Notes rating and stated that, under certain assumptions, based on the current collateral, she believed about $100 million of the B Notes could be rated investment grade. See id. However, as time passed, the amount of the B Notes that were thought to be ratable shrunk to only approximately $35 million Id. which was below the $50 million threshold necessary for Natixis to earn its fee. Medvecky also stated in her email of October 31, 2006 that she "took a look at the old Zohar I model," which she had not looked at since March 2005. PX-73.

The Natixis decision to request a waiver of its obligation to obtain an investment grade rating on at least $50

million of the B Notes was based on Medvecky's determination that such a rating was not possible. As she put it, "the bottom line is that the portfolio has not appreciated as projected." PX-73.

A week later, on November 8, Natixis circulated the proposed amendment to the Indenture (the Fourth Supplemental Indenture) that allowed Natixis to be paid its deferred fee without $50 million of the B Notes obtaining an investment grade rating.  See DX-175 at MBIA043291-303.  The language of the amendment had also been previously discussed with MBIA.  See DX-175.

MBIA signed off on the proposed language, and did so without making any request that Patriarch or Natixis seek a rating. Tr. [McKiernan] 758; PX-445 [Murtagh Tr.] 88-92.

Patriarch also consented to the fee waiver, though not for several months. See DX-185; PX-10. After Patriarch approved the amendment, the Fourth Supplemental Indenture was executed. See PX-10.

The amendment only authorized the release of fees to Natixis that had already been modeled as being paid in the first place. DX-203; Tr. [Froeba] 1454-55, 1591; Tr. [Chen] 955-56.

Moody's did not run a rating model when it approved the Fourth Supplemental Indenture. Tr. [Froeba] 1455.  At that time, Natixis was no longer able to work its model or send it to the Rating Agencies. DX-202; DX-203.  Medvecky told Moody's that "the 2 people who worked on Zohar I modeling are no longer here," and the model "is very unwieldy and not an easy one to pick up – we no longer use it – I guess you could say it has become 'discontinued.'" DX-202.

The Natixis emails concerning ratability were not considered by Natixis to be empirically accurate and exact, but rather were viewed as mere "guesstimates."  Tr. [Wormser] 376. The author of the emails, Medvecky, did not personally work on the rating models and did not know what assumptions went into them. Tr. [Medvecky] 457-58.  During her testimony at trial, Medvecky was unable to identify a copy of the Natixis model that was put before her. See id. at 449-50.  In addition, the Natixis consideration of the possibilities of rating the B Notes was

never acted upon, and thus its models were not established to have been reliable.

Given the above, the Natixis evidence relating to ratability did not establish the ratability of the B Notes.

2.    Froeba's Testimony Established That the B Notes Were Not Ratable

Mark Froeba was Patriarch's expert witness with respect to ratability.  Froeba's qualifications to address the ratability of the B Notes were well established. From 1997 to December 2007, he worked at Moody's and specialized in CLOs. Tr. [Froeba] 1386, 1543.  He was the ratings analyst for approximately 250 CLO transactions, and authored or contributed to twelve Moody's publications, all relating to CLOs.  Tr. [Froeba] 1437-38.  In 2005, Froeba and his colleague Danielle Nazarian ("Nazarian") were named the two CLO Team Leaders, "responsible for the development of new CLO rating criteria." Tr. [Froeba] 1387-88; see also Id. 1541-43. Froeba was well known in the industry; Natixis' senior banker, Wormser, described Froeba as a "legend." Tr. [Wormser] 373.

Ratings analysts were required to invite the two CLO "Team Leaders" to the meetings of the "ratings committees." It was at those meetings that ratings were assigned. Tr. [Froeba] 1387, 1390-91; see also Tr. [Chen] 917. Although ratings committees could be chaired by a managing director acting without the team leaders, that rarely happened. During their tenure as team leaders, Froeba and Nazarian presided over 90 to 95 percent of CLO ratings committees. Tr. [Froeba] 1437, 1480. As team leaders, Froeba and Nazarian developed the standardized "committee memo template" that ratings analysts were required to use in presenting transactions to a ratings committee. Tr. [Froeba] 1388-89.

Froeba was also familiar with Standard & Poor's ratings methodology. He appeared at conferences with his counterparts at Standard & Poor's and, while working on transactions that were also being rated by Standard & Poor's, observed its practices relating to CLOs. Tr. [Froeba] 1392. He testified that the "core of credit analysis of CLOs is essentially the same between the two agencies." Froeba published an article relating to Standard & Poor's methodologies. Id.

91

Ratings were primarily determined by comparing the outputs of a cash flow model against the Rating Agencies' numerical thresholds for certain ratings. Tr. [Chen] 856; Tr. [Carelus] 1007; Tr. [Froeba] 1395. At the relevant time, the Rating Agencies would typically audit and (where appropriate) modify cash flow models created in the first instance by the investment bankers such as Natixis. Tr. [Froeba] 1390, 1555-56; Tr. [Chen] 858-59; Tr. [Carelus] 1015. Froeba audited two Zohar I cash flow models that Natixis produced in this litigation (one for Moody's and another for Standard & Poor's), and made three changes which would have been required by the Rating Agencies' practices and published guidance:

- That reinvestments would be made at their face value (or "par") instead of at an assumed discount to par;

- That Zohar I would, as the Indenture allowed, invest 20% of its portfolio in assets paying a fixed (instead of floating) rate of interest; and

- That (for Moody's) loans modeled as having defaulted would recover, and be able to reinvest, a portion of that defaulted investment after four years.

Tr. [Froeba] 1395-96. Once these corrections were made, the model showed that no investment grade rating was possible. Tr. [Froeba] 1393.

Froeba similarly audited the models received from MBIA's experts. He restored two of the three assumptions above (reinvestment price and recovery timing) to their models, and further corrected them to assume:

- That Patriarch would make investments with a weighted average interest rate "spread" above the LIBOR benchmark of 6.75%, as required by the Indenture;

- That (for Standard & Poor's) a special "stress" assumption required at the time concerning certain low-performing assets would apply; and

- That (for Moody's) the investments would have the most conservative of certain features allowed under a "matrix" of possible combinations in the Indenture.

Tr. [Froeba] 1461-62, 1476-77. With the corrections, the models confirmed that no portion of the B Notes could be rated investment grade. Tr. [Froeba] 1467-68.

The inputs to the cash flow models must reflect the most conservative limits of what the indenture permits the CLO to do. Tr. [Froeba] 1398-1401; Tr. [Chen] 922, 956. As stated in Moody's published guidance, "[s]ince the Manager can always trade in such a way that [the portfolio attributes] equal their respective test levels, Moody's assumes that each such criterion is indeed equal to, but no better than, its corresponding

93

limit." PX-277 at 16. Standard & Poor's has the same rule:
"[T]he cash flow analysis is based on collateral pool parameters
specified by the transaction documents." DX-3 at 79-80.

After the Indenture was amended in October 2004, it no
longer imposed any restriction on Patriarch's ability to
originate or purchase loans for their full par value, as opposed
to at a discount. PX-8 §2(dd); Tr. [Chen] 885, 928-29; Tr.
[Carelus] 1076-77. Accordingly, Froeba's models assumed that
funds in Zohar I were invested (or reinvested) in loans at par.
Tr. [Froeba] 1397-1401. MBIA's experts assumed that Zohar I
would be able to invest at a substantial discount, even though
the Indenture allowed for purchases at par PX-8 § 2(dd)), and
even though MBIA's experts conceded there is no published
guidance suggesting cash flow models can assume discounted
purchases not required by a CDO's indenture. Tr. [Chen] 928,
932; Tr. [Carelus] 1032, 1050.

Froeba's models assumed Zohar I would make investments
with a weighted average interest rate "spread" above LIBOR of
6.75% because that is the minimum spread required by the
Indenture. Tr. [Froeba] 1462-65; 1477. Moody's guidance stated:
"Moody's uses the Weighted Average Spread ('WAS') and Weighted

94

Average Coupon ('WAC') covenants . . . to model the interest flows from the CLO assets." PX-277 at 11. Standard & Poor's guidance similarly states: "Standard & Poor's criteria include modeling CDO cash flows that assume the minimum weighted average coupon and the minimum spread for the asset pool allowed by the transaction documents." DX-3 at 86.

MBIA's experts assumed a much higher spread, and conceded that in doing so they did not follow the Rating Agencies' guidance. Tr. [Chen] 933-34; Tr. [Carelus] 1056-57. There was no published guidance presented to justify MBIA's experts' assumption that Zohar I would continue making investments that would earn interest above what the Indenture required.  MBIA's assumption on this issue and its assumption about discounted purchases were the two "main drivers" of its ratings analysis. Tr. [Froeba] 1461, 1476.

The Indenture allowed for up to 20 percent of the portfolio to be invested in assets with a fixed rate of interest (as opposed to a "floating" rate that is a spread to an index, such as LIBOR) PX-8 § 2(ww); Tr. [Froeba] 1414-20. creating the risk of a "mismatch" between the cash flowing into the CLO from loans (20% of which could be in fixed rate assets) and the cash

flowing out to noteholders (all of which was at floating rates).
Tr. [Froeba] 1414-15; Tr. [Chen] 934-35; Tr. [Carelus] 1062-63.
"Moody's examines model runs that assume a fully utilized fixed
rate securities bucket . . . ." PX-273 at 11. Similarly,
"Standard & Poor's requires that the transaction be modeled at
both portfolio extremes, assuming the minimum and the maximum of
the fixed rate assets." DX-3 at 84.  However, not only did
MBIA's experts fail to model the fixed rate bucket, they did not
explain their failure to do so. Tr. [Chen] 939; Tr. [Carelus]
1062-65.

The Indenture required that the portfolio maintain a
certain combination of Weighted Average Rating Factor and
Moody's Average Recovery Rate Test. PX-8 § 2(i); PX-5, at 35,
37; Tr. [Froeba] 1478-80. According to Froeba, those limits were
not fixed: Zohar I could have a worse Weighted Average Rating
Factor if its Moody's Average Recovery Rate Test limit were
better, and vice versa. Id. Consistent with the general
principle of modeling to the limits of the indenture, Moody's
would require that each combination be modeled: "[M]any CDOs
contain a matrix in which various combinations of weighted
average rating factor, weighted average life, diversity score,
weighted average recovery rate, weighted average spread and/or

weighted average coupon covenants may apply. Moody's models each such combination to ensure that the ratings remain valid for each such combination." PX-277 at 9 n.23.  Jack Chen, an MBIA expert ("Chen") did not do that, and instead "presented the results from the most favorable" combination. Tr. [Froeba] 1479; see also Tr. [Chen] 945-46.  Chen cited no guidance authorizing a departure from the Moody's rule. Id.

MBIA's experts both testified that the ratings agencies had discretion to depart from the indenture limits, but neither cited any published guidance in support of that contention. Tr. [Chen] 976; Tr. [Carelus] 1088-89.

Froeba incorporated certain additional assumptions either into his initial model and his corrections of the models developed by MBIA's experts, in accordance with rating agency requirements. Froeba's model gave credit only for discounted purchases to the extent they had actually settled Tr. [Froeba] 1405-07) because unsettled commitments do not actually pay interest or principal and because a CLO should not in this context get credit for discounted purchases that have not actually been realized. Tr. [Froeba] 1406-07. Until a commitment has settled, the agencies cannot know whether the commitment

97

will settle and, if so, whether it will settle at exactly the price contemplated. Tr. [Froeba] 1571-72. If Patriarch needed the unsettled commitments to achieve the ratings, Froeba testified that the ratings agencies would say, "Come back to us when you settle, and we will give you all the credit." Tr. [Froeba] 1407.  Approximately 20 percent of Zohar I consisted of unsettled commitments, and only about 20 percent of those commitments actually settled. Id.; see also DX-273; DX-274.

Froeba's Moody's model assumed that defaulted loans would recover a portion of the face value in four years. Tr. [Froeba] 1410-12. Moody's published guidance requires that this "recovery lag" be based on Indenture terms that create incentives for managers swiftly to recover on defaulted loans. Where, as in Zohar I, there are no such terms, the lag is to be assumed to be through the CLO's maturity date. PX-273 at 10 & n.6.  Accordingly, Froeba's assumption of a four-year lag is more generous than the published guidance, which would have required the lag to extend to the CLO's maturity, in this case 2015 or 2018. Tr. [Froeba] 1411-12. Chen did not follow this guidance; he simply assumed a two-year lag. Tr. [Chen] 939-42.

Froeba used the Natixis model for Standard & Poors as a starting point for his analysis, and that model included a special "stress" for poorly performing assets. Standard & Poor's had applied this test when it rated the A Notes. Tr. [Froeba] 1465-67; DX-86.  Jean-Bapstiste Carelus, an MBIA expert ("Carelus"), used the Natixis model for Moody's, and, as a result, did not apply the stress. Id.; Tr. [Carelus] 1047-48.

Froeba identified six other "credit issues" that one or both of the ratings agencies would have considered and that, if modeled, would have made the results even worse.

- Zohar I was permitted to invest in assets with a "weighted average life" (time to maturity) of five years. However, the weighted average life test did not decline over time, which the Rating Agencies recognize has the effect of increasing the risk of default, because the effective time that the investments may be outstanding is longer. Under Moody's guidance, the Natixis model should be adjusted to increase the weighted average life assumption. Tr. [Froeba] 1421-26; PX-277 at 10. Chen ignored this guidance, and modeled the weighted average life at five years. Tr. [Chen] 879.

- Under certain circumstances where the portfolio is underperforming, the Indenture requires Zohar I to suspend reinvestment and pay down the notes. PX-5 at 52-53 (§ 1) (definition of "Reinvestment Period"). The Natixis model erroneously assumed reinvestment could resume after these triggers, and the MBIA experts did not correct it. Tr. [Froeba] 1426.

- The Indenture established a $30 million "Unrestricted Collateral Account" with which Zohar I could purchase

securities that would not otherwise be eligible, including equity securities. PX-5 at 159 (§10.9), 191 (§12.1(b)). Since these funds could be used to buy equity securities, which are not given credit in ratings agency models, the proper approach would be to assume the most conservative portfolio permitted, and exclude these funds. Tr. [Froeba] 1427.

- A typical CLO would have express limits on the amount of lower-rated assets, but Zohar I could buy large concentrations of lower-rated assets so long as it also held sufficient higher rated assets to maintain certain average ratings. Tr. [Froeba] 1428-29. This created the risk of a "barbell" portfolio that behaves more like two portfolios — a higher-rated one and a lower-rated one. Tr. [Froeba] 1430-31. Moody's published guidance required portfolios of this type to be modeled with the stricter "double binomial" approach. PX-277 at 19; PX-256 at 11. The double binomial made the results worse for notes like the B Notes that were junior in the capital structure and are therefore the most vulnerable to the first losses in a CLO. Id.; Tr. [Froeba] 1438-40.

- The Indenture allowed for the portfolio to be highly concentrated in a few borrowers. As few as seven borrowers may constitute as much as 44.5% of the collateral pool. PX-8 § 2(uu). This created the risk that a default by only a small number of borrowers can eliminate any value in the junior securities. Tr. [Froeba] 1440-41. Moody's published guidance required that the double binomial be run "in cases of a concentrated portfolio" because "'eating through' the equity could be a high probability event (since the default of only one issuer in a concentrated portfolio could affect the subordinated notes)." PX-256 at 11.

- Zohar I and its affiliates were the sole lenders for many of the loans in the collateral pool, which meant that Patriarch had more control than usual over when a default was declared. Tr. [Froeba] 1445. The Rating Agencies would have been concerned that this subjective element would not match the objective default patterns in the models. Tr. [Froeba] 1446, 1574)

In addition to these quantitative modeling issues, there were qualitative issues that would have made it more difficult to obtain an investment grade rating. No one paid any money for the B Notes, which would have given the ratings agencies substantial pause. Tr. [Froeba] 1456.  In addition, Patriarch had switched to a new strategy for which it did not have a track record. Tr. [Froeba] 1456-57. Finally, with respect to any rating after September 2007, the economic downturn had placed "extreme stress" on the "middle market borrowers to which [Zohar I] had been lending" and, overall, created "great anxiety and uncertainty" at the ratings agencies. Tr. [Froeba] 1457-58. Few transactions were being rated.  Id.  The lending markets froze in the summer of 2007, and the ratings agencies downgraded thousands of structured finance transactions.  Tr. [McKiernan] 770-72.

3.   Froeba's Testimony Was Not Impeached

MBIA's chief response to Froeba's testimony was to assert that the ratings agencies must have considered and rejected his "credit issues" because, according to further analysis by MBIA's experts, incorporating those credit issues into the models would have resulted in ratings for the A Notes

101

lower than the ratings that the agencies confirmed in 2004. However, MBIA did not present evidence as to the modeling decisions the Rating Agencies actually made in 2004. Tr. [Froeba] 1500, 1557.  In contrast, Froeba assumed the role of CLO Team Leader at Moody's in 2005 — after the A Note confirmation but before any of the dates of contract termination that has put at issue here — and instituted a standardized ratings template that flagged the precise credit issues he identified.  Tr. [Froeba] 1388-89, 1448-50.

MBIA's assertion about what the Rating Agencies did in 2004 was also not persuasive since, as found above, the Rating Agencies were more strict by 2005, when they rated Zohar II. Tr. [Tilton] 1247 ("The criteria got more strict . . . "[T]here was a big change."); Tr. [Wormser] 393 (agreeing that "the ratings agencies were much harder on Zohar II than they had been on Zohar I"); DX-291 [Zucker Tr.] 459-60 (rating criteria became stricter over time). At Moody's, the two analysts who worked on the Zohar I A Notes were replaced with Froeba and Nazarian for Zohar II because the managing director of Moody's derivative's group wanted "a fresh pair of eyes on the deal." Tr. [Froeba] 1402-03. Froeba confirmed that the standards he and Ms. Nazarian imposed were more conservative. Tr. [Froeba] 1459-60,

1522.

In Zohar II, Moody's raised questions about Natixis' attempt to model reinvestments at a discount, DX-127; Tr. [Froeba] 1404-05), about the borrower concentrations DX-127; [Froeba] Tr. 1442, and about the "single lender hazard," DX-133; Tr. [Froeba] 1447-48.  Moody's required that Zohar II be modeled with the harsher double binomial, Tr. [Tilton] 1248; DX-133; Tr. [Froeba] 1444-45, and both agencies refused to include unsettled commitments, even though they had done so in Zohar I. Tr. [Tilton] 579, 1294-95, 1372; Tr. [Wormser] 396.  Chen acknowledged that the Rating Agencies would have applied these then-current standards to any rating on the B Notes, and would not have "grandfathered" in any standards used in the past.  Tr. [Chen] 918-19.

MBIA sought to invalidate the credit issues that Froeba identified because the Rating Agencies did not flag them during the monitoring of Zohar I or at the time the ratings on the A Notes were confirmed in connection with the Fourth Supplemental Indenture in 2007, and also because these issues were not listed in a 2009 press release announcing the downgrade of the Zohar I A Notes.

However, Froeba testified that the monitoring process does not typically require re-modeling, and that there would have been no need to re-model Zohar I during the relevant period.  Tr. [Froeba] 1453.  Moreover, no evidence was presented that Zohar I was remodeled during the monitoring process. The Indenture authorized only the release to Natixis of fees that had already been modeled when the ratings were confirmed in 2004.  DX-203; Tr. [Froeba] 1454-55, 1591; Tr. [Chen] 955-56. As Medvecky explained at the time, "the model was originally run with the arranger fees upon the last rating confirm [sic] this change s[hould] not have impact." DX-203. Froeba was personally involved in Moody's approval of the Fourth Supplemental Indenture and he testified that no model was run at that time. Tr. [Froeba] 1455.

As noted above, Medvecky's email to Moody's stated "the 2 people who worked on Zohar I modeling are no longer here," and the model "is very unwieldy and not an easy one to pick up — we no longer use it — I guess you could say it has become 'discontinued.'" DX-202. Medvecky's emails show that Natixis was no longer able to work its model and did not send it to the Rating Agencies. DX-202; DX-203. As Chen testified,

Moody's used the Natixis model as the basis for its own analysis
See Tr. [Chen] 853, 856, 868, and Natixis did not provide a
model to Moody's at the time of the Fourth Supplemental
Indenture.

As for the downgrade press release, Chen, MBIA's
expert, conceded that a press release would not typically have
been "an exhaustive shopping list" of the credit issues, Tr.
[Chen] 971, and, since the reinvestment period had ended by
2008, the Indenture limits and most of the credit issues Froeba
raises would no longer have been relevant. Tr. [Froeba] 1452-53.

Chen testified that the credit issues raised by Froeba
were not applicable at the relevant time because they are
discussed in two later publications that were issued in March
2009 and August 2009.  See PX-273 & 277.  However, Chen did not
have personal knowledge of the standards that were applied after
he left Moody's in March 2006, and Froeba testified that he
personally applied each of these credit issues while he was at
Moody's in 2005, 2006 and 2007. Tr. [Froeba] 1401, 1412, 1418-
19, 1425, 1427, 1475.  Furthermore, one of the publications
cited was addressing issues that were applicable long before its
2009 publication, as evidenced by the fact that Froeba, who left

Moody's in December 2007, is listed as a contributor.  PX-273 at 1.

In his expert report, Chen cited and relied upon both of these publications. Tr. [Chen] 935, 923-24; Tr. [Froeba] 1475. Chen specifically cited the portion of Moody's August 2009 guidance requiring modeling the fixed rate bucket, even though he did not include in his testimony that the Natixis model he used as a template had failed to address that feature. Tr. [Chen] 977.

With respect to Moody's, Chen did not testify that the B Notes could have received the type of investment grade rating contemplated in the Master Agreement and Indenture, but rather that only portions of the B Notes could have received an "unmonitored" rating on the dates he analyzed. Tr. [Chen] 896-900, 920. Tilton testified that the B Notes could not have been transferred under the terms of the Master Agreement if it had only an unmonitored rating. Tr. [Tilton] 1238.

An unmonitored rating is a rating that is good for only one day. Tr. [Chen] 859-60. Both the original Indenture and the Third Supplemental Indenture specify that Patriarch was

obligated to request an "initial rating" for the B Notes, meaning that the rating would be of the continuing, monitored kind. PX-5 § 7.13(b); PX-9 § 2(a). The phrase "initial rating" was also used in the Indenture to describe the type of rating to be obtained for the A Notes, the ratings for which are monitored. Id.; Tr. [Tilton] 1236; Tr. [Froeba] 1596. The Indenture required an annual fee and review for the rated notes which confirms that a monitored rating was contemplated. PX-5 § 7.13(c); Tr. [Tilton] 1377.

No MBIA witness testified that an unmonitored rating would have satisfied the rating condition, nor was any document identified that mentions an unmonitored rating.

MBIA has asserted that Froeba was "fired" from Moody's MBIA PFOF ¶ 263, but fails to mention he was laid off as part of a general downsizing that corresponded to the collapse of the structured finance markets at the onset of the financial crisis. Tr. [Froeba] 1587-88. Froeba received his best performance review in his final year. Tr. [Froeba] 1485.

MBIA has noted that Froeba criticized Moody's methodologies in testimony before Congress (MBIA PFOF ¶ 263), but fails to mention that his criticism had nothing to do with the CLO team for the United States, which had 100% market share and thus did not face the same competition or market pressures as other teams within Moody's. Tr. [Froeba] 1483.

MBIA has contended that bankers could "go over [Froeba's] head[]" to negotiate issues directly with a Managing Director, MBIA PFOF ¶ 294, but such a process rarely changed the result, and in reality was done to make the bankers "feel better" about having their arguments rejected. Tr. [Froeba] 1583. The managing director in charge of derivatives, Gus Harris, started at Moody's with Froeba, knew Froeba well, and would not have "abandon[ed] an important substantive issue for business reasons." Tr. [Froeba] 1583-84.

With respect to Standard & Poor's, MBIA has asserted that Froeba was not qualified to offer an opinion because he never worked there. MBIA PFOF ¶ 290. However, Froeba testified without contradiction that he had substantial interaction with his counterparts at Standard & Poor's and that the "core of credit analysis of CLOs is essentially the same between the two

agencies." Tr. [Froeba] 1392. While MBIA has suggested that Froeba had no grounds to dispute its Standard & Poor's expert MBIA PFOF ¶ 290, in fact such grounds did exist, as Froeba focused his criticism on instances in which MBIA's Standard & Poor's expert departed from published guidance as described above.

The published guidance required that ratings models utilize the parameters established by the relevant indenture, because that methodology appropriately captures the risk inherent in the note to be rated. In contrast, the methodology used by MBIA's experts assuming that the CLO's performance will remain constant over time does not result in a ratings model that accurately captures the extant risk. As MBIA's own expert told the Wall Street Journal: "Any assumption that the manager is not trading to the worst-permitted portfolio is dangerous." Tr. [Chen] 957; Tr. [Froeba] 1481.

Medvecky confirmed that the methodology adopted by Froeba of conforming the ratings model to the parameters of the Indenture would have been applied to any rating of the B Notes, Tr. [Medvecky] 461 & 468, and the Natixis models of the B Notes reflected this rule. Natixis used the Weighted Average Spread

limit permitted by the Indenture, rather than the actual
Weighted Average Spread. Tr. [Froeba] 1461-62, 1477; Tr.
[Carelus] 1025.  While Natixis models assumed that reinvestments
would be made at 74.5% of par, not 100% of par as the Indenture
allowed PX-73; Tr. [Chen] 929), that appears to have been based
on a misreading of the Indenture.  The Indenture required Zohar
I to maintain a Weighted Average Purchase Price of 74.5% only
for purchases made after the collateral reached $650 million PX-
8 § 2(dd)), and Natixis apparently read that provision to mean
that the 74.5% cap was applicable at all times. A January 2006
email from Inglese refers to the "current purchase price cap in
place," even though the collateral never reached the level to
trigger that cap. PX-58; DX-273.  The email also refers to
"amend[ing] the deal" to allow Zohar I "to buy at a higher
price," but acknowledges that doing so will not help the B Notes
ratings, which "depend[] on having a certain amount of discount
embedded in the portfolio." PX-58.


        Froeba's testimony that Moody's would not have given
credit to discounted purchases that had not yet settled, Tr.
[Froeba] 1571-73, was corroborated by Tilton and by Wormser,
both of whom testified that the ratings agencies had ceased to
give credit for discounted purchases in the period following the

October 2004 confirmation of the rating on the A Notes.  Tr.
[Tilton] 1247-49, 1261, 1280-81, 1295; Tr. [Wormser] 396.  MBIA
suggested that Tilton contradicted herself on this point because
she allegedly claimed to have first learned of the Rating
Agencies' new position in January 2005 (when Zohar II closed)
and, in a separate part of her testimony, in 2006 (when Zohar II
was forced to extend its ramp up).  MBIA PFOF ¶¶ 316-17.
However, Tilton never said that she first learned of the new
policy in 2006, Tr. [Tilton] 1248-49, but rather testified that,
at that time, the "unsettled assets, when we went for
confirmation, were not included in our portfolio balances." Id.
MBIA claims Tilton had a third version of events when she
referred to the ratings agencies allowing unsettled commitments
"in Zohar I in December of 2005," MBIA PFOF ¶ 317.  However,
Zohar I closed in 2003 and its A Note ratings were confirmed in
October 2004.


          MBIA has urged that unsettled commitments would in
fact have been counted in the ratings models because, in Zohar
II and III, unsettled commitments were counted towards various
eligibility tests.  MBIA PFOF 318-22.  However, the question of
what assets were counted for eligibility tests is unrelated to
the issue of how the Rating Agencies calculate collateral

balance for use in their cash flow models. Tr. [Tilton] 580; Tr.
[Froeba] 1572.

MBIA has submitted that Froeba's analysis is erroneous
because using his model to evaluate the A Notes would result in
ratings from Moody's lower than what Moody's confirmed for the A
Notes in 2004. MBIA PFOF ¶¶ 259-61. As set forth above, Froeba
took over as CLO Team Leader in 2005, and implemented a
standardized credit template to ensure that important issues,
including those issues that are in dispute in the instant case,
were addressed in every CLO evaluation. MBIA has not disputed
that Froeba's promotion and credit template would have created a
stricter and more uniform application of Moody's ratings
standards for CLOs seeking ratings after 2004.

Froeba testified that an investment grade rating on
the B Notes would have been particularly difficult because the B
Notes were unfunded; because the B Notes was issued by a CLO
that had to radically change strategies; and because, by
September 2007, the economic downturn meant that few CLOs were
being rated at all. MBIA cited a publication of JP Morgan to
show that issuances of CDOs backed by "high yield loans" were
relatively stable in 2007, and did not decline until January

112

2008.  MBIA PFOF ¶ 264 (citing PX-411 at 7).  However, no
witness testified as to what those figures represent, and
whether the CDOs in that category are similar to Zohar I.
Further, the document does not indicate whether or to what
extent the referenced issuances were rated investment grade or
rated at all.  The JP Morgan report also indicated that the
issuance of CDOs that were unfunded like the B Notes dropped to
zero for the entire fourth quarter of 2007. PX-411 at 10.

MBIA has contended that Patriarch was obligated to
agree to amend the Zohar I Indenture to achieve an investment
grade rating, MBIA PFOF ¶¶ 293-98, for example, by agreeing to
mandated discount purchases, eliminating the "fixed rate
bucket," and increasing the weighted average spread.  However,
Froeba testified, these changes would have resulted in a
"radically different deal" that would have severely restricted
Patriarch's flexibility. Tr. [Froeba] 1533-34.  Under that
scenario, if Zohar I did not maintain the stricter requirements,
the entire transaction could have been downgraded. Id. at 1595.

MBIA's experts modeled the Weighted Average Spread
("WAS") as of September 28, 2007 as either 8% (Moody's) or 8.3%
(Standard and Poor's). Tr. [Chen] 883 (Chen used lesser of

113

actual WAS and 8%); Tr. [Carelus] 1057 (Carelus used actual
WAS); PX-170-33 at MBIA0028921 (showing WAS of 8.268%). By
December 2007, however, the Weighted Average Spread had dropped
to 7.88%. PX-170-36 at MBIA0028292.

Although MBIA has contended that amendment was
required, MBIA PFOF ¶ 298, nothing in the Master Agreement
required Patriarch to alter Zohar I to the detriment of Zohar
I's investors and potentially to MBIA itself. The Master
Agreement's cooperation clause listed examples of steps
Patriarch must take to satisfy the Contribution Conditions,
including "consenting to and otherwise supporting supplemental
indentures, amendments, waivers or other modifications" to the
Indenture. PX-3 § 3.04. This reference was to lifting the
transfer restriction to allow the B Notes to be transferred to
one or more of the Identified CDOs, and to re-characterizing the
B Notes from debt to equity. PX-5 § 8.1(i)(1), (4) (authorizing
Patriarch and MBIA to make these amendments without noteholder
consent). MBIA has proposed that Natixis understood that Zohar I
could be modified to obtain a B Notes rating, MBIA PFOF 297, but
the email cited states only that there could be a particular
change to the Indenture "if we were really going for a rating."
PX-73.  Since Natixis was not a party to the Master Agreement

114

and was not aware of its terms, Tr. [Wormser] 320-31, the email was not relevant to Patriarch's alleged obligations to transform Zohar I for MBIA's benefit.

MBIA has asserted that the heavy negotiation and amendments relating to the confirmation of the A Notes' ratings "overwhelmingly demonstrates" that the parties would have done the same for the B Notes. MBIA PFOF ¶ 293. However, failing to achieve the necessary ratings on the A Notes would have been an Event of Default that could have caused the entire Zohar I transaction to collapse. PX-5 §§ 5.1(o), 5.2(a); Tr. [Mauer-Litos] 164-65; Tr. [Tilton] 1375-76. The assumption of same process with respect to the B Notes is not supported by the evidence submitted.

MBIA has asserted that potential transactions are typically structured and modified as necessary to achieve the desired rating, and that the ratings agencies rarely decline to issue ratings altogether. MBIA PFOF I 232-33. However, the ratings are usually issued on the entire transaction from the outset, and thus can and must be changed to ensure whatever ratings are necessary to sell the notes to investors. Tr. [Froeba] 1457. Rating agencies also issue ratings below what

parties hope to achieve, including ratings below investment grade. Tr. [Froeba] 1593.  Since Zohar I was already ramped up, and since the A Noteholders were relying on the particular strategy and structure in the Indenture, no authority to permit Patriarch to rewrite the transaction a second time has been established.

In sum, Froeba's testimony was credible, substantiated and not effectively impeached. He established that, given the circumstances, the B Notes could not have received an investment-grade rating during the relevant period.

**V.    The Fulfillment Of The Debt For Tax Condition Was Not Achievable**

In addition to the requirement that the B Notes be rated investment grade in order to be transferred to the Identified CDO's, there was a requirement that B Notes "shall constitute debt for United States federal income tax purposes, as evidenced by the opinion of a nationally recognized tax counsel."  PX-3 § 3.04.  While no such opinion was ever sought or obtained, both parties submitted opinions by nationally recognized tax counsel reaching opposing conclusions as to whether this condition could have been fulfilled. As this

condition was a condition precedent to any transfer, it was MBIA's burden to establish that the required opinion would be forthcoming. This burden was not met because the opinion of MBIA's expert was based upon assumptions which the evidence established could not be met.

The experts for both parties, David Miller ("Miller"), of Cadwalader, Wickersham & Taft, LLP, for MBIA and Thomas Humphreys ("Humphreys") of Morrison Foerster, LLP for Patriarch were eminently qualified as demonstrated by their reports which the parties submitted in lien of testimony.

Miller concluded that his firm, as well as any one of a number of nationally recognized tax counsel, would have issued a legal opinion to the effect that the Class B Notes could have been contributed to one or more of the Identified CDOs on December 31, 2005, March 31, 2006, December 29, 2006, September 28, 2007 or December 31, 2007. PX-298; see also PX-299.

In reaching his opinion, Miller considered the factors that courts and the IRS have held to be relevant in determining whether a financial instrument constitutes a debt instrument for federal income tax purposes:

117

> (1)  Whether there is an unconditional
> promise on the part of the issuer to pay a
> sum certain on demand or at a fixed maturity
> date that is in the reasonably foreseeable
> future; (2) whether holders of the
> instruments possess the right to enforce the
> payment of principal and interest; (3)
> whether the rights of the holders of the
> instruments are subordinate to the rights of
> general creditors; (4) whether the
> instruments give the holders the right to
> participate in the management of the issuer;
> (5) whether the issuer is thinly
> capitalized; (6) whether there is identity
> between the holders of the instruments and
> stockholders of the issuer; (7) the label
> placed on the instruments by the parties;
> and (8) whether the instruments are intended
> to be treated as debt or equity for non-tax
> purposes, including regulatory, rating
> agency, or financial accounting purposes.

PX-298 at 18-23 (quoting Notice 94-47, 1994-C.B.).

He based his opinion on the case law and IRS guidance as applied to the Class B Notes, as well as the legal opinion practice of nationally recognized law firms. Id.

Because no attempt was made or requested to procure the ratings on the Class B Notes or to contribute the B Notes to the Identified CDOs, Miller based his opinion on certain assumptions. PX-298 at 14-17, 18-23. Miller's principal assumption was that, as of each relevant date, the amount of B

118

Notes for which a debt-for-tax opinion was sought had the required investment grade rating. PX-298 at 15, 20-21. Miller also assumed certain ratios based on the Zohar I capital structure and the fair market value of the amount of Class B Notes for which a debt-for-tax opinion was sought. PX-298 at 15-16, 19-22. He further assumed that the Indenture would have been amended to modify the tax treatment of, and permit the transfer of, the Class B Notes. PX-298 at 15-16.

In forming his opinion, Miller relied upon the opinions of Prof. Mason, Chen and Carelus, as well as other evidence in the record. PX-298 at 14-17, 18-23; see also, e.g., PX-3 (Master Agreement); PX-5 (Indenture); PX-46 (Patriarch Pitchbook); PX-67 (Patriarch Pitchbook); PX-71 (Patriarch Pitchbook); PX-74 (Patriarch Pitchbook); PX-76 (Patriarch Pitchbook); PX-77 (Patriarch Pitchbook); PX-195 (Octaluna LLC Agreement); Tr. [Chen] 901:6-21 (addressing rating agency confirmation of amendments); Tr. [Carelus] 1015:22-1017:5 (same); Tr. [Tilton 501:8-13] (testifying she is the ultimate tax payer of Zohar I), 520:16-19 (addressing ownership of Class B Notes), 557:6-8 (addressing ownership of Preference Shares); Mason 1132:23-1136:23 (describing calculation of ratios related

to Zohar I capital structure and fair market value of the Class B Notes).

The terms "debt" and "equity" are not defined in federal tax laws or regulations. The ultimate focus in distinguishing debt from equity is "whether the funds were advanced with reasonable expectations of repayment regardless of the success of the venture [i.e., debt] or were placed at the risk of the business [i.e., equity]."  DX-289 (quoting TIFD III-E, Inc. v. United States, 459 F.3d 220, 233 (2d Cir. 2006)).

According to Humphreys, courts also have looked to a series of nonexclusive factors to distinguish debt and equity, such as whether the instrument at issue pays adequate interest and whether the issuer is adequately capitalized Id. ¶¶ 41-42). Humphreys also noted that an instrument's label is not determinative, and, thus, for example, highly speculative "notes" are equity. Id. ¶ 42.

The MBIA and Patriarch experts did not dispute the relevant standards. PX-289 at 1.

120

In applying these standards, a nationally recognized tax counsel can issue debt-for-tax opinions with varying degrees of certainty. DX-289 ¶ 31. The highest degree of certainty is a "will" opinion, which "provides near certainty" because it indicates the taxpayer's position "will" be upheld and that "there is no reasonable basis for an opposite (or different) position." Id.

It was not disputed that the Master Agreement requires a "will" level opinion because it specifies that the B Notes "shall" constitute debt. Id. ¶¶ 33-35; PX-299 (rebuttal report not disputing that a "will" level opinion is required).

On the question of whether there is a reasonable expectation of payment, "the Class B Notes were long-dated subordinated securities issued for no cash, paying no interest and having no creditors' enforcement rights (unless none of the Class A Notes remained outstanding)." DX-289 ¶¶ 49-52. Since "payment on the Class B Notes is (and always has been) highly contingent on the Zohar I strategy succeeding in the future," they are "classically equity, not debt." Id.

Miller came to the opposite conclusion, because he relied upon at least two key assumptions the evidence did not establish.

First, Miller assumed that the B Notes would be rated investment grade, a premise he described as a "critical assumption" for his analysis. PX-298 ¶ 2. PX-299 at 1.  As found above, the B Notes were not rated investment grade, nor could they have been.

Second, Miller assumed that, as of the relevant dates, the value of the assets in Zohar I was at least 110% of the amount of the A Notes plus the fair market value of the B Notes and that therefore there was at least a 10% equity "cushion" beyond what would be necessary to pay both the A Notes and the B Notes.

For the equity cushion assumption, MBIA cited Prof. Mason's testimony that he had calculated "the excess value in the transaction over and above the class A and B notes as of various dates." Tr. [Mason] 1133.  However, Prof. Mason never actually testified as to what that excess value was. Tr. [Mason] 1132-36.  While he testified that the excess value was presented

on PX-282, that document was not introduced into evidence but rather was presented as a demonstrative exhibit. Id. In addition, Miller did not cite PX-282 in his report, and there is nothing in the record to suggest that he ever saw it or even knew of its existence.  Moreover, the quarterly financial statements issued by Zohar I closest in time to MBIA's hypothetical transfer dates show that the B Notes had a fair value of $0, indicating there was no equity cushion. DX-269 at 7; PX-303 at 7; DX-271 at 7; DX-272 at 7.

Lastly, while Humphreys opined that the necessary debt-for-tax option would not have been issued on the basis of an unmonitored rating under any circumstance DX-290 at 14-18, MBIA's expert did not even address (let alone rebut) this point. PX-299 at 3.

Because certain key assumptions upon which Miller's opinion was based were not established by the evidence, and because Miller failed to rebut Humphreys' opinion that an unmonitored rating was unattainable, Miller's report failed to prove that a Debt-for-Tax opinion could have been obtained as required by the Master Agreement.

123

## VI.  **Witness Credibility**

Thirteen witnesses presented evidence.  Those employed by MBIA included: Amy Mauer-Litos, Vice President and a Managing Director in the IPM; Anthony McKiernan, Chief Risk Officer and member of the Executive Credit Committee, the Risk Oversight Committee, and the Loss Reserve Committee and successor to Murtagh as head of IPM; Michael Murtagh, Vice President and Director of IPM; and Mark Zucker, Global Head of Structured Finance.  Those employed by Natixis included: Kenneth Wormser, Managing Partner; and Lorraine Medvecky, Managing Director. Lynn Tilton was the lone current Patriarch employee to testify. In addition, testimony was heard from experts Mark Froeba, Joseph Mason, Jean-Baptiste Carelus, Jack Chen, Thomas Humphreys and David Miller.

The principal fact witness for Patriarch was Tilton, who was the Patriarch decision maker during the events at issue. She was vigorous, authoritative, informed and almost entirely supported by documentary evidence.[5]  Because of Tilton's role and

---

[5]    There was, however, one aspect of Tilton's testimony that approached hyperbole and was unsupported by documentary evidence: her purported desire to preserve the B Notes for distribution to her employees.

responsibility at Patriarch, she had the greatest personal
interest of any of the witnesses in the outcome.
Notwithstanding that fact, however, Tilton's recollection of
events was clear and unshaken.  She was an effective witness and
in the main entirely credible.

Murtagh and Zucker were credible as well, though both
regrettably testified only by deposition, due to unavailability
during the trial proceedings.

As set forth above, Froeba was the most authoritative
and credible of the experts with respect to the issue of the
rating process and the ratability of the B Notes.  The tax
experts were both highly qualified and credible, although as set
forth above, the reasoning of Humphreys was more persuasive.


**CONCLUSIONS OF LAW**


**I.  Elements of the Breach of Contract Claim and Burden of Proof**


MBIA contends that Patriarch breached its
responsibilities under the Master Agreement and the Indenture

(collectively, the "Agreements") by failing to have the B Notes rated.  <u>See</u> Post-Trial Memorandum of Plaintiff MBIA ("MBIA PTB") at 9.

In order to prevail on a breach of contract claim under New York[6] law, a plaintiff must prove "(1) the existence of a contract; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages."  <u>United Resource Recovery Corp. v. Ramko Venture Mgmt.</u>, 584 F. Supp. 2d 645, 652 (S.D.N.Y. 2008).  The burden rests upon MBIA to prove these elements by a preponderance of the evidence.  <u>E.g.</u>, <u>Enercomp, Inc. v. McCorhill Pub., Inc.</u>, 873 F.2d 536, 542 (2d Cir. 1989).  As set forth below, MBIA has not proven that Patriarch breached the Agreements; consequently MBIA's breach of contract claim fails.

**II.  The Agreements Required Patriarch to Use Commercially Reasonable Efforts to Have the B Notes Rated As Soon As Reasonably Practicable**

Patriarch's obligations with respect to seeking a rating for the B Notes are addressed in Section 3.04 of the

---

[6] The Master Agreement is governed by New York law.  PX-3 § 4.11.

126

Master Agreement ("§3.04") and Section 7.13(b) of the Indenture

("§7.13(b)").


Section 3.04 of the Master Agreement provides, in

pertinent part,


> [Patriarch] agrees to cooperate and use
> commercially reasonable efforts to procure
> as soon as reasonably practicable [the
> satisfaction of certain conditions including
> the rating of the B Notes], including
> without limitation consenting to and
> otherwise supporting supplemental
> indentures, amendments, waivers or other
> modifications to [the relevant documents]
> and taking such other action as may be
> necessary to effectuate the intention of
> and/or facilitate the performance of
> [Patriarch]'s obligation to [contribute the
> B Notes to certain troubled CDOs for the
> benefit of MBIA].


PX-3 § 3.04


Section 3.04 further provides that Patriarch's

obligation to contribute the B Notes to the troubled Identified

CDOs for MBIA's benefit (the "Contribution Obligation") is

subject to, *inter alia*, the following condition precedent: "the

rating of such [B] Notes is at least 'Baa3' by Moody's and 'BBB-

' by Standard and Poor's **as contemplated by Section 7.13(b) of**

**the Zohar Indenture**." Id. (the "Rating Condition") (emphasis added).

Section 7.13(b) of the Indenture provides, in pertinent part,

> Within thirty (30) days following the date that the Aggregate Principal Balance of the [Zohar I collateral portfolio] exceeds $750,000,000 (or such earlier date as [Patriarch] may determine), [Patriarch] shall . . . request that each of Moody's and Standard & Poor's provide an initial rating of the Class B Notes of at least "Baa3" by Moody's and at least "BBB-" by Standard & Poor's . . . .

PX-9 § 2.

The respective contents of §3.04 and §7.13(b), when read together[7], present an ambiguity as to the timing of Patriarch's obligation to seek a rating (the "Rating

---

[7] Under New York law, when determining the contractual obligations of parties involved in a transaction involving multiple documents that "are designed to effectuate the same purpose, [the documents] must be read together, even though they were executed on different dates and were not all between the same parties." TVT Records v. Island Def Jam Music Group, 412 F.3d 82, 89 (2d Cir. 2005) (quoting This Is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998)) (quotation marks omitted).

Obligation"). <u>MBIA Ins. Corp. v. Patriarch Partners VIII, LLC</u>, 842 F. Supp. 2d 682, 702-06 (S.D.N.Y. 2012) ("<u>S.J. Op.</u>"). The plain language of these sections can be read to support either MBIA's position that Patriarch had an obligation to seek a rating as soon as reasonably practicable, or Patriarch's position that the obligation to seek a rating would be triggered if, and only if, Zohar I's collateral level reached $750 million. <u>Id.</u>

"Under New York law, the fundamental neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." <u>Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.</u>, 375 F.3d 168, 178 (3d Cir. 2004) (<u>quoting</u> <u>Greenfield v. Philles Records, Inc.</u>, 98 N.Y.2d 562, 569 (2002)) (quotation marks omitted). Where, as here, the parties' intent cannot be discerned from the contractual language itself, a court may seek to determine the intent of the parties by "consider[ing] evidence extrinsic to the contract, including testimony offered by the parties." <u>Diesel Props S.r.l. v. Greystone Bus. Credit II LLC</u>, 631 F.3d 42, 51 (2d Cir. 2011). As set forth below, the extrinsic evidence presented on this issue at trial, namely, the drafting history of the Agreements and the conduct of the entities that

are party to them, establishes that the parties' objective intent was for the clause in §3.04 requiring Patriarch to use commercially reasonable efforts to obtain a rating on the B Notes as soon as reasonably practicable (the "Timely Efforts Clause") to govern the timing of Patriarch's Rating Obligation.

### 1. The Drafting History of the Agreements

The drafting history of the Agreements demonstrates that the parties intended the Timely Efforts Clause to govern the timing of the Rating Obligation.  When the parties first began drafting the Master Agreement and Indenture, they were operating under the expectation that the B Notes would first receive an "initial" rating at Zohar I's closing, to be followed by a subsequent confirmation of that rating at a later date. See supra FOF § II.  Accordingly, the "rating obligation" contemplated at that initial stage simply required Patriarch to obtain confirmation of the initial rating.  The language of the Rating Condition found in the early drafts of §3.04 reflected this perspective, stating that "the *initial* rating of the Class B Notes shall have been *confirmed* by each of Moody's and Standard & Poor's as contemplated by Section 9.8 of the Indenture."  PX-22 § 3.04 (emphasis added).  The contemporaneous

130

drafts of the Indenture gave Patriarch the authority to request the confirmatory rating at any time it so chose.  See DX-238 §§ 1.1, 9.8.

When it subsequently became apparent to the parties that the B Notes would not be eligible to receive initial ratings at Zohar I's closing, see supra FOF § III, the Rating Condition was changed to its current form, which requires that "the rating of the [Class B Notes] is at least 'Baaa3' by Moody's and 'BBB-' by Standard and Poor's as contemplated by Section 7.13(b) of the Zohar Indenture."  PX-3 § 3.04.  The Indenture was modified accordingly, but the new formulation maintained Patriarch's authority to request a rating on the B Notes at the time of its choosing.  See PX-5 §§ 1.1, 7.13(b).

Crucially, the Timely Efforts Clause, which was present in the earliest versions of the Master Agreement[8], remained there, unchanged, during the course of the modifications described above.  This continuity indicates that throughout the drafting process, the parties always understood

---

[8] Although the Timely Efforts Clause did not appear in the very first version of the Master Agreement, see PX-20, it was included two days later in the next iteration of the draft, see PX-22, and remained there throughout the drafting process.

and intended that (i) Patriarch was required under the Master
Agreement to use commercially reasonable efforts to satisfy the
Rating Condition as soon as reasonably practicable; and (ii) the
Indenture granted Patriarch the power to have the B Notes rated
at any time.

Though Patriarch suggests otherwise, the enactment of
the Third Supplemental Indenture in October 2004 does not evince
any intent by the parties to alter the nature of Patriarch's
responsibility vis-à-vis obtaining ratings for the B Notes.  The
amended Indenture language stated that Patriarch will request a
rating on the B Notes "[w]ithin thirty days following the date
that the Aggregate Principal Balance of [Zohar I] exceeds
$750,000,000 (*or such earlier date as [Patriarch] may
determine*)."  PX-9 § 2(a)(1) (the "$750MM Clause") (emphasis
added).  It is significant to note that despite the introduction
of an "amount certain," this version of the Indenture maintained
the status quo set by the previous versions in that it granted
Patriarch the ability to request a rating at any time.

The insertion of the $750MM Clause into §7.13(b) does
not manifest an intention by the parties to alter the role of
the Timely Efforts Clause, which had up until that point served

132

as the contractual provision governing the timing of Patriarch's rating obligation.  Rather, the constancy and consistency of the Timely Efforts Clause throughout the drafting process, coupled with the Indenture's retention (over the course its various iterations) of a provision allowing Patriarch to seek the rating at the time of its choosing, demonstrates a shared intent by the parties for the Timely Efforts Clause to control the timing of Patriarch's obligation to satisfy the Rating Condition.  The inclusion of the $750MM Clause in §7.13(b) merely established a definitive point at which Patriarch would lose its discretionary power over whether to seek a rating, but did not abrogate the Timely Efforts Clause's requirement that Patriarch use commercially reasonable efforts to obtain a rating on the B Notes as soon as reasonably practicable.

2. The Conduct of the Parties

The conduct of the parties following the execution of the Agreements also supports MBIA's position that the Timely Efforts Clause (rather than the $750MM Clause) controlled the timing of Patriarch's rating obligation.  MBIA internal documents that expressly contemplated the contribution of the B Notes to the Identified CDOs made no mention whatsoever of

133

Patriarch's obligation to contribute the B Notes being contingent upon Zohar I reaching $750 million in collateral. See, e.g., DX-130, DX-142, DX-144, DX-151, DX-153, DX-161, DX-168, DX-172, DX-174, DX-177, DX-212, DX-217.  By the same token, there is no in the trial record in which Patriarch states that it is not contractually required to seek a rating on the B Notes until the Zohar I collateral reaches $750 million.

In addition, even after the insertion of the $750MM Clause into the Indenture in October 2004, both MBIA and Patriarch discussed an entirely different number – $650 million – as the amount of collateral that was being sought for Zohar I. See DX-279 ("As of the October [2004] trustee report, the deal is approximately 82% ramped with collateral at $530.6 million"); Tr. [Tilton] 1272:12-15 ("we were setting a path to get to 650 million").  The parties' shared focus upon reaching a collateral amount other than $750 million belies Patriarch's contention that the parties intended the $750MM Clause to represent a significant and material shift in the nature of the parties' duties under the Agreements.

Moreover, internal documents and communications from Natixis, which was a signatory to the Third Supplemental

134

Indenture and had reviewed and approved the content of that
document prior to its execution, see PX-9, PX-37, indicate that
Natixis did not view the $750MM Clause as creating a trigger for
the Rating Obligation.  An internal Natixis memorandum from
early 2005 states "[t]he Zohar I transaction has a $150 million
Class B Note which is currently unrated, *but is expected to be
rated Baa3/BBB- once the transaction reaches an aggregate
principal balance of $615 million . . . .*"  PX-41 (emphasis
added).  A March 2005 email string between Natixis employees
contemplated the "[a]dvantages of getting [a portion of] the
Class B Notes rated *now* [i.e., March 2005]," and also discussed
a plan to speak to Tilton about having the B Notes rated when
the Zohar I collateral reached $614 million.  PX-44 (emphasis
added).  Similarly, in a September 2005 email string, Natixis
employees discussed the possibility of having a portion of the B
Notes rated when Zohar I's collateral reached $590 million, and
also noted that the full amount of the B Notes would be ratable
once the collateral reached $615 million.  PX-48.  The same
email string also contained a recounting of a conversation
between Natixis and Tilton about having the B Notes rated that
makes no mention whatsoever of a $750 million trigger.  See id.
Finally, an internal Natixis memorandum from June 2007 asserted
that the B Notes had not been rated by that time because

135

"Patriarch Partners has decided that they do not want to incur
the expense nor invest the time needed to get these notes
rated," and again made no mention of a $750 million trigger for
Patriarch's rating obligation.  PX-95; see also PX-97.  The
absence of any reference to a $750 million trigger from the
above communications – all of which address the rating of the B
Notes and/or Patriarch's failure to obtain such rating at
various points in time – supports MBIA's contention that Third
Supplemental Indenture was not intended to create such a
trigger.

     3. Patriarch's Position is Not Supported by the Third
Supplemental Indenture

     Patriarch contends that its reading of §3.04 and
§7.13(b) is supported by testimony regarding a "long
conversation" that allegedly took place between Tilton and
Zucker which Patriarch claims was the basis for the insertion of
the $750MM Clause into the Indenture.  Patr. PTB at 19.  While
Zucker's testimony may be read to indicate that he viewed the
$750MM Clause as a trigger for Patriarch's Rating Obligation,
Zucker's own personal understanding is not relevant to the
contract interpretation analysis; rather, what matters is the

intent of MBIA, the corporate entity that was a party to the Third Supplemental Indenture.  <u>See</u> <u>Misano di Navigazione, SpA v. U.S.</u>, 968 F.2d 273, 275 (2d Cir. 1992) ("[T]he ultimate touchstone of the Court's decision is the intent of the *parties to the contract . . . .*") (emphasis added).  While Patriarch presents Zucker's personal understanding of the language of the Third Supplemental Indenture as reflecting that of MBIA, <u>see</u> Patr. PTB at 38, the evidence presented suggests otherwise, as it showed that Zucker (i) was not included in any of the written communications regarding the Third Supplemental Indenture, (ii) did not participate in the negotiations of the Third Supplemental Indenture's terms, (iii) did not recall a single conversation regarding the Third Supplemental Indenture and (iv) was not a member of the committee that approved the Third Supplemental Indenture.  <u>See</u> DX-291 [Zucker Tr.] 12:6-12:16; Tr. [Mauer-Litos] 108:23-25, 109:4-110:13.

Patriarch also has cited MBIA's internal reports on Zohar I, all of which include a verbatim quotation from §7.13(b) stating: "Process for getting the B Note rated – Within thirty (30) days following the date that the Aggregate Principal Balance of [Zohar I] exceeds $750,000,000 (or such earlier date as [Patriarch] may determine), [the Issuer will request the

Ratings on the Class B Notes]." See, e.g., DX-180.  Patriarch

has asserted that the presence of this language in MBIA's own

reports indicated that MBIA believed the timing of Patriarch's

Rating Obligation to be governed by the $750MM Clause.  The

inference appropriately drawn from the inclusion of this

language is that MBIA understood Patriarch to have the ability

to request a rating on the B Notes at any time it so chose,

which is fully in harmony with MBIA's understanding of $750MM

Clause.


        Patriarch has additionally contended that its reading

of the Agreements is buttressed by MBIA's decision not to offer

testimony at trial in support of its position with respect to

the Timely Efforts Clause.  See Patr. PTB at 40.  However,

MBIA's trial strategy must be viewed in the context of the pre-

trial evidentiary ruling which held that that MBIA would be

deemed to have waived attorney-client privilege on certain of

its documents if it chose to present testimony at trial

regarding "its contracting intent and interpretation of the

agreements at issue . . . ." MBIA Ins. Corp. v. Patriarch

Partners VIII, LLC, No. 09 Civ. 3255 (RWS), 2012 WL 3655297

(S.D.N.Y. July 3, 2012), at *4.  As such, the absence of trial

testimony offered by MBIA on the issue of its intent may well

138

result from a desire by MBIA to maintain its right to assert attorney-client privilege over the documents at issue.  No adverse inference may be drawn on that basis.  See In re Currency Conversion Fee Antitrust Litig., --- F.R.D. ---, 2012 WL 401113, at *8 (S.D.N.Y. Feb. 8, 2012) ("[W]hile Plaintiffs attribute this evidentiary deficiency to Defendants' redactions for privilege, this Court does not draw an adverse inference from Defendants' privilege determinations") (citing Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 226 (2d Cir. 1999) (abrogated on other grounds, Moseley v. V Secret Catalogue, Inc., 537 U.S. 418 (2003))).

Patriarch finally contends that its position is supported by the absence of any request by MBIA asking either Patriarch or Natixis to seek a rating on the B Notes.  Patr. PTB at 25-26.  However, as noted above, supra FOF § III(9), the evidence presented at trial showed that throughout 2005 and 2006, MBIA relied on the B Notes and their ratability.

## III. MBIA Did Not Establish that Patriarch Failed to Use Commercially Reasonable Efforts

Although MBIA has successfully established that the Agreements required Patriarch to use commercially reasonable

efforts to obtain a rating on the B Notes as soon as reasonably practicable, MBIA has not established that Patriarch failed to adhere to this standard of conduct.

As noted in the opinion deciding the parties' cross-motions for summary judgment, the "commercially reasonable efforts" clause in §3.04 establishes an objective standard of conduct.  See <u>S.J. Op.</u> at 704-05.  MBIA has not put forth evidence to establish the type of conduct that would constitute "commercially reasonable" conduct for a collateral manager of a CLO such as Zohar I.  Though MBIA did assert that Patriarch should have exercised the same degree of care as "institutional investment managers of national standing," MBIA PFOF ¶ 49, MBIA did not present evidence to define the parameters of that standard.  Such evidence is necessary to support a cause of action premised upon an allegation commercially unreasonable conduct where, as here, the complained-of conduct took place in the context of an industry that is outside the fact-finder's ordinary experience.  See <u>B.D.G.S., Inc. v. Balio</u>, 8 N.Y.3d 106, 113 (2006) (relying on expert testimony regarding bank practices on check endorsement for purposes of commercial reasonableness analysis); <u>Tom-Lin Enters v. Sunoco, Inc.</u>, 349 F.3d 277, 283 (6th Cir. 2003) (finding that "there is no evidence indicating

the existence of a material factual dispute concerning whether
[the defendant's] practices were commercially reasonable"
because "[the] record is utterly devoid of any competent and
relevant evidence of industry . . . standards, let alone [the
defendant's] deviation from those standards").

Moreover, even putting aside the failure of MBIA to
establish parameters for what constitutes commercially
unreasonable conduct, the evidence presented at trial
established that Patriarch's efforts were well within the bounds
of any rational characterization of the "commercially
reasonable" standard.  See supra FOF § III.  Patriarch
consistently kept Zohar I's uninvested (i.e., available) funding
to a minimum, and in virtually all instances throughout the
relevant period invested the available funding at the maximum
amounts and concentrations permitted under Zohar I's eligibility
criteria.  Id.  In addition, despite the significant hurdles to
growing Zohar I's collateral, see id., Patriarch made collateral
commitments and acquisitions each month during the reinvestment
period, and was able to either enhance or at least maintain
Zohar I's collateral balance throughout that period.  By the end
of the reinvestment period, virtually all of Zohar I's available
funding had been invested.  Id.

141

While MBIA has contended that Patriarch abandoned its efforts with respect to Zohar I in March 2006, see MBIA PFOF ¶¶ 130-49, that assertion is belied by the fact that, during the period following March 2006, MBIA's executives did not give any indication that they believed that Patriarch's efforts to fund Zohar I were deficient to any extent.  Indeed, in May 2007, more than a year after MBIA has alleged that Patriarch ceased its efforts on behalf of Zohar I, MBIA reported being "encouraged" by the "value being generated in [the B Notes]" as a result of Patriarch's efforts.  Tr. [McKiernan] 706; DX-205.  In addition, MBIA did not present evidence of having ever accused Patriarch of being in breach of its contractual duties prior to filing the instant suit.

A contractual requirement to act in a commercially reasonable manner does not require a party to act against its own business interests, "which it has a legal privilege to protect."  Citri-Lite Co. v. Cott Beverages, Inc., 721 F. Supp. 2d 912, 924 (E.D. Cal. 2010).  Tilton reasonably believed that a premature rating application for the B Notes would risk a downgrade of the A Notes, since the initial rating given to the A Notes was based upon the presumption that the collateral would

reach $650 million, which it never did.  See supra FOF § III.  A
downgrade of the A Notes would have hurt Patriarch, not to
mention the Zohar I noteholders and MBIA itself.  It was
therefore commercially reasonable for Patriarch to wait until
Zohar I had accumulated additional collateral before seeking a
rating on the B Notes.


    Accordingly, MBIA has produced no evidence to
establish that Patriarch violated the requirement to use
commercially reasonable efforts to satisfy the Contribution
Conditions.


**IV. The Conditions For Contributing the B Notes Were Not
Established**


    The Master Agreement set forth certain conditions
precedent to Patriarch's obligation to contribute the B Notes to
the Identified CDOs.  Accordingly, for MBIA to succeed on its
breach of contract claim that Patriarch failed to fulfill its
contractual obligation to transfer the B Notes, MBIA must prove
that all of the Contribution Conditions had either been
satisfied or otherwise excused, thereby triggering Patriarch's
obligation to contribute the B Notes.

MBIA has contended that the non-occurrence of two of the Contribution Conditions – the Rating Condition and the Debt-for-Tax Condition – was excused pursuant to the "prevention" doctrine, which holds that "[w]here a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused." Restatement (Second) of Contracts § 245 (1981); see also Merrill Lynch Realty/Carll Burr, Inc. v. Skinner, 63 N.Y.2d 590, 596-97 (1984).  According to MBIA, the non-occurrence of the Rating Condition and the Debt-for-Tax Condition was excused because Patriarch materially contributed to the non-occurrence by failing to seek a rating on the B Notes, which was the first step to satisfying these conditions precedent, see Tr. [Tilton] 1237:21-1238:4.  However, since the evidence demonstrated that neither the Rating Condition nor the Debt-for-Tax condition could have been satisfied even if Patriarch had used commercially reasonable efforts, neither of those conditions are entitled to excusal under the prevention doctrine.

With respect to the Rating Condition, MBIA's rating experts testified that the B Notes could have been rated during the relevant period so as to satisfy the Rating Condition. However, as found above, supra FOF § IV, Froeba, Patriarch's

144

expert, demonstrated that the rating models utilized by MBIA's experts deviated materially from the Rating Agencies' published guidance, suffered from numerous methodological deficiencies, and failed to take into account significant environmental factors.  In contrast, Froeba's own testimony, in which he concluded that the Rating Condition could not have been satisfied, was credible, substantiated, and not effectively impeached.  Accordingly, the evidence at trial established that the Rating Condition could not have been satisfied regardless of whether or not Patriarch had used commercially reasonable efforts to obtain a rating for the B Notes.

With respect to the Debt-for-Tax Condition, as found above, supra FOF § V, MBIA's tax expert, David Miller, opined that the condition could have been satisfied, but his conclusion was based upon two core assumptions – that the B Notes would be rated investment grade, and that the value of the assets in Zohar I was at least 110% of the amount of the A Notes plus the fair market value of the B Notes – that were not supported by the evidence.  Moreover, Miller did not rebut the conclusion of Patriarch's tax expert, Thomas Humphreys, that a debt-for-tax opinion would have been issued only if a monitored rating had been awarded, and would not have been issued on the basis of an

145

unmonitored rating.  MBIA's rating expert testified only that the B Notes could have received an unmonitored (rather than monitored) rating.  As a result of these issues, MBIA has failed to prove that the Debt-for-Tax Condition could have been satisfied even if Patriarch had engaged in commercially reasonable efforts to have the B Notes rated.

Since the evidence shows that neither the Rating Condition nor the Debt-for-Tax Condition could have been satisfied regardless of Patriarch's efforts, MBIA's reliance on the prevention doctrine is unavailing, and the non-occurrence of these conditions is not excused.  Cf. Ixe Banco, S.A. v. MBNA Am. Bank, N.A., No. 07 Cv. 0432 (LAP), 2009 WL 3124219, at **5-6 (S.D.N.Y. Sept. 29, 2009) (citing Restatement (Second) of Contracts § 245 (1981)).  In the absence of such excusal, the fact that neither of these conditions has been satisfied means that Patriarch's Contribution Obligation was never triggered, so Patriarch's failure to transfer the B Notes to the Troubled CDOs does not constitute a breach of contract.  See Deutsche Bank AG v. AMBAC Credit Prods., LLC, No. 04 Civ. 5594 (DLC), 2006 WL 1867497, at *16 (S.D.N.Y. July 6, 2006) ("Because [Plaintiff] failed to fulfill that condition precedent, [Defendant] was

under no contractual duty . . . and [Plaintiff]'s claim that [Defendant] breached the [agreement] fails.").

## V.  Anticipatory Breach Has Not Been Established

MBIA has contended that even if Patriarch did not breach the Agreements by virtue of its failure to transfer the B Notes, it nonetheless committed a breach by anticipatorily repudiating its duties under the Master Agreement via the November 2007 Email sent by Tilton to MBIA.  MBIA PTB at 45. However, MBIA has failed to prove that the November 2007 Email constituted a repudiation by Patriarch.

An anticipatory repudiation occurs when a party to a contract declares its intention not to comply with its duties under that contract before the time for performance of those duties has expired.  See, e.g., Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002).  The declaration must be "positive and unequivocal" in order to constitute an anticipatory repudiation.  Tenavision, Inc. v. Neuman, 45 N.Y.2d 145, 150 (1978).

MBIA has failed to meet its burden of proving that the November 2007 Email was a "positive and unequivocal" repudiation by Patriarch of its obligations under the Master Agreement, because the evidence at trial established that MBIA itself did not consider the November 2007 Email to be a repudiation.

MBIA presented no internal emails or other communications suggesting that the company executives who received the November 2007 Email perceived it to be a repudiation by Patriarch. Rather, the evidence showed that the recipients of the email viewed it as indicating that Ms. Tilton was "clearly open to a meeting," DX-208, and possibly willing to accept an invitation for a business lunch with MBIA, DX-209. While MBIA is correct in its contention that mere willingness to meet with Tilton following the November 2007 Email does not necessarily mean that MBIA did not consider the email to be a repudiation, see, e.g., Quiroga v. Fall River Music, Inc., No. 93 Civ. 3914(RPP), 1998 WL 851574, at *32-33 (S.D.N.Y. Dec. 7, 1998), MBIA's apparent readiness to continue its business relationship with Tilton, *coupled with* the complete absence of any documented sentiments expressing the view that a repudiation had occurred, weighs strongly in favor of an inference that MBIA did not view the November 2007 Email as a repudiation.

148

MBIA did not call a single witness at trial to testify that MBIA considered the November 2007 Email to be a repudiation.  This left unchallenged Tilton's credible testimony that the November 2007 Email was not a repudiation of Patriarch's obligations, but rather a rejection of MBIA's repeated efforts to convince Patriarch to contribute the B Notes through alternative arrangements not contemplated by the Master Agreement.  See Tr. [Tilton] 640.  While MBIA does cite to a portion of Murtagh's deposition testimony wherein he states that MBIA concluded that "there had been a breach of the Master Agreement" after receiving "an e-mail from [Tilton] [sent] sometime in '07," PX-445 [Murtagh Tr.] 202:11-18, when Murtagh was asked earlier in his deposition whether it is "MBIA's contention that there was a repudiation of the Master Agreement during the calendar year 2007," he definitively answered "[n]o." Id. 67:13-24.  Given these apparently contradictory responses, Murtagh's testimony on this issue is not sufficient to satisfy MBIA's burden of proving that the November 2007 Email was a "positive and unequivocal" repudiation.

Had MBIA perceived the November 2007 Email to be a repudiation, that belief would have been reported to MBIA's loss

reserve committee and to the company's senior management.  See Tr. [McKiernan] 743-49; DX-291 [Zucker Tr.] 88-90; PX-445 [Murtagh Tr.] 94-96.  In fact, no such report was made, as in each quarter following MBIA's receipt of the November 2007 Email, MBIA's loss reserve reports stated that there had been "no material change" to the remediation strategy for Z-1 and Captiva, and that the full remediation was expected to come from the future value of the B Notes.  See DX-212; DX-217; Tr. [McKiernan] 730-41, 744-45, 748.  Moreover, MBIA presented no contemporaneous communications either to or from MBIA senior management indicating that anyone at MBIA was of the belief that the November 2007 Email constituted a repudiation by Patriarch.

Since MBIA has not carried its burden to prove that the November 2007 Email was a "positive and unequivocal" repudiation by Patriarch, MBIA's claim for anticipatory breach of contract fails.

**CONCLUSION**

Based on the findings and conclusions set forth above, MBIA has failed to satisfy its burden of proof with respect to its breach of contract and anticipatory breach of contract claims against Patriarch.[10]  Accordingly, judgment will be entered in favor of Patriarch with costs and disbursements.

Submit judgment on notice.

**New York, NY**
**June _10_ , 2013**

_____
ROBERT W. SWEET
U.S.D.J.

---

[10] MBIA's complaint asserted one additional claim that survived summary judgment: promissory estoppel.  See S.J. Op. at 711-12. However, MBIA has since abandoned that claim in light of the indisputable existence of a contract between the parties, see MBIA PTB at 1 n. 2, which renders such a quasi-contractual claim inapposite, e.g., Kwon v. Yun, 606 F.Supp.2d 344, 368 (S.D.N.Y. 2009).

151